# VEHICLESTARS

connecting buyers + sellers everyday

• FAQ • Contact Us • About Us • Member Site

HOME    USED VEHICLES    CAR BLOG    SELL MY VEHICLE    MEMBERS    MONEY BACK GUARANTEE    ABOUT US

## Facebook Connect

Facebook connect is provided as a service to you to ease your ability to sign in, not requiring you to remember additional passwords. Our primary aim is to make it easier for people searching for vehicles to register without having to manage new passwords, making it easier to receive contact information from individuals selling their vehicle on Vehicle Stars.

Facebook connect is an optional service provided by Vehicle Stars and is not required for purchasing or selling vehicles on our service.

### Privacy Information

Vehicle Stars does not collect information from Facebook other than your first name, nor do we share your private information except where listed below. You are given the option to remove the Facebook link at any time. We do not store your first name in our database, it is requested from Facebook each time you sign in using Facebook Connect.

If, as an interested party, you send an instant message to a private seller, the first name retrieved from Facebook might be shared (unless you've entered an alternate name). We do not have permission to send you emails nor any other forms of messages through Facebook, and as a result you would have to come back to see if the message has been replied to.

If you have any technical of privacy related questions about this service, email them to management@vehiclestars.com

**SIGN IN**

f Connect with Facebook

## The Latest News

- **Video: Volkswagen pits Jetta GLI against... a speed talker?**
  Thursday, Jun 28th 2PM

- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 2PM

- **Official: Updated McLaren MP4-12C to debut at Goodwood**
  Thursday, Jun 28th 2PM

- **Report: Cadillac ATS-V, Coupe talks resurface, new convertible model in the works?**
  Thursday, Jun 28th 1PM

- **Ford RS200 takes to the streets in a pair**
  Thursday, Jun 28th 1PM

Privacy Policy Terms of Service

BRANNON-QUALE ATTACHMENT 5
TRO Exhibit 13

235

• FAQ   • Contact Us   • About Us   • Member Site

HOME    USED VEHICLES    CAR BLOG    SELL MY VEHICLE    MEMBERS    MONEY BACK GUARANTEE    ABOUT US

## Privacy Policy Summary

Vehicle Stars' motive is to sell vehicles. We do not release member information to any public or private database for any purpose other than to assist the sale of a vehicle, with your knowledge and consent.

If you are selling a vehicle on Vehicle Stars, we may provide your contact information to parties that we have good faith are intent on considering your vehicle for purchase. We will discontinue all exposure of your contact information within 7 days of your advertisement being marked as sold.

If you have registered for an account on Vehicle Stars and are not selling your vehicle, your personal information will not be released, except if you click on an advertisement to indicate that you would like to communicate with the seller of a vehicle.

Vehicle Stars further makes attempts to secure your information from online scripts that are designed to garnish information from websites, and lock out the ability to retrieve a phone number from our website to anybody viewing more than 10 advertisements per day, or if we notice suspicious activity. For Sellers, we reserve the right to restrict your information from being displayed to a potential buyer if we believe the potential buyer may not be a legitimate candidate.

## Privacy Policy

When accessing our Website, Vehicle Stars LLC will learn certain information about you during your visit. How we will handle information we learn about you depends upon what you do when visiting our site.

If you visit our site to read or download information on our pages, we collect and store only the following information about you:

1. The name of the domain from which you access the Internet
2. The date and time you access our site
3. The Internet address of the website you used to link directly to our site.
4. IP address
5. source website
6. Time

If you identify yourself by sending us an e-mail containing personal information, then the information collected will be solely used to respond to your message.

The information collected is for statistical purposes. Vehicle Stars LLC may use software programs to create summary statistics, which are used for such purposes as assessing the number of visitors to the different sections of our site, what information is of most and least interest, identifying system performance or problem areas. This information is not sold nor provided to third parties.

For site security purposes and to ensure that this service remains available to all users, Vehicle Stars LLC uses software programs to monitor network traffic to identify unauthorized attempts to upload or change information, or otherwise cause damage.

Vehicle Stars LLC will not obtain personally-identifying information about you when you visit our site, unless you choose to provide such information to us, nor will such information be sold or otherwise transferred to unaffiliated third parties without the approval of the user at the time of collection.

SIGN IN

f  Connect with Facebook

User name

## The Latest News

- **Video: Volkswagen pits Jetta GLI against... a speed talker?**
  Thursday, Jun 28th 2PM

- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 2PM

- **Official: Updated McLaren MP4-12C to debut at Goodwood**
  Thursday, Jun 28th 2PM

- **Report: Cadillac ATS-V Coupe, also a performance convertible model in the works?**
  Thursday, Jun 28th 2PM

- **Ford RS200 takes to the streets in a pair**
  Thursday, Jun 28th 2PM

Privacy Policy  Terms of Service

# VEHICLESTARS

connecting buyers + sellers everyday

• FAQ • Contact Us • About Us • Member Site

HOME   USED VEHICLES   CAR BLOG   SELL MY VEHICLE   MEMBERS   MONEY BACK GUARANTEE   ABOUT US



## Returning customer?

**SIGN IN**

**REGISTER**

User name

**You must be signed in to access the member's site pages.**

You can use the sign in form above to sign in with your user name and password

## Membership benefits:

- Sell your vehicle fast on the most advanced vehicle sales platform today
- Have full access to your profile details

Call today to register, or fill out our free car evaluation form.

### Request a free car evaluation

## The Latest News

- **Video: Volkswagen pits Jetta GLI against... a speed talker?**
  Thursday, Jun 28th 2PM

- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 2PM

- **Official: Updated McLaren MP4-12C to debut at Goodwood**
  Thursday, Jun 28th 2PM

- **Report: Cadillac ATS-V Coupe talks resurface, new convertible model in the works?**
  Thursday, Jun 28th 1PM

- **Ford RS200 takes to the streets in a pair**
  Thursday, Jun 28th 1PM

Privacy Policy Terms of Service

Latest **Vehicle Stars exclusive** articles:
- Vehicle Stars Facebook Add-ons- Contest! posted on Mar 09 2011, 10:07PM
- Vehicle Stars Draw posted on Feb 08 2011, 12:51PM
- How to become a Featured Advertisement posted on Jan 19 2011, 9:31PM
- VehicleStars.com Makes Landmark Achievements in 2010 Final Quarter posted on Jan 03 2011, 8:17PM
- December: a good time to sell (or buy) your vehicle posted on Dec 20 2010, 7:56PM

BRANNON-QUALE ATTACHMENT 5
TRO Exhibit 13

## HOW LONG WILL IT TAKE FOR MY CAR TO SELL?

People ask us this all the time – it's a tough call, because it depends on so many variables, but the short answer is that we observe most cars selling through this site within three to six weeks.

The long answer is that it really depends on two things: the level of demand for your vehicle and how aggressively it is priced. Ultimately, by setting the price, the seller plays a significant role in determining how long the sale will take. When you use our service we will advise you of how long we expect your sale will take, based on the past year's sales.

However, our commitment to all sellers is simple: we will list the vehicle for 90 days to make sure we have enough time to get you your asking price.

## WHAT IS FAIR MARKET VALUE FOR MY VEHICLE?

Anything is worth as much as someone else is prepared to pay for it. That's where our experience and market research come in. If you choose to sell your vehicle with us, we will help you establish a fair market value. This is done in two ways: you can fill out an online car evaluation form, and we will call you back with our research data, or else you can arrange for one of our agents to visit and examine your vehicle in person.

## WHO WILL BE PURCHASING MY VEHICLE?

The great majority of automobile sales are local – so you can expect a private sale from someone within driving distance of your car. However, if you have a rare car, or if there is a particular demand in another part of the country, the buyer may be further afield. Wherever the buyer may live, you will not be asked to give up your car without being paid first.

## WHAT DOES VEHICLESTARS.COM DO FOR ME?

We're a one-stop shop. The experts at vehiclestars.com help sellers to price and promote their vehicles, and also help buyers to finance their purchases.

**SIGN IN**

Connect with Facebook

User name

## The Latest News

- **Video: Volkswagen pits Jetta GLI against... a speed talker?**
  Thursday, Jun 28th 2PM

- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 2PM

- **Official: Updated McLaren MP4-12C to debut at Goodwood**
  Thursday, Jun 28th 2PM

- **Report: Cadillac ATS-V, Coupe takes resurface, new convertible model in the works?**
  Thursday, Jun 28th 2PM

- **Ford RS200 takes to the streets in a half**
  Thursday, Jun 28th 2PM

Privacy Policy Terms of Service

It breaks down like this:

Sellers:Our agents can help you by making a suggested sale price, along with an estimated sales time based on the past year's sales. We will field phone calls for you to ensure only serious inquiries get through. If your vehicle requires more time on the market, we will continue to list it.

Buyers: We have links to the industry's biggest and best finance agencies to help you get an auto loan. We can assist people with no or bad credit, or who have been declared bankrupt.

Our aim is to support the sale, from both sides, from start to finish.

## HOW CAN VEHICLE STARS SELL MY VEHICLE FROM A DIFFERENT STATE OR PROVINCE?

Simply put, it's by leveraging our vast online network. Like other major sites, being an online business enables us to connect people (buyers and sellers) from anywhere in North America to anywhere in North America. Just like www.facebook.com can connect you in California, to your friend in New York, or Amazon.com can email you an e-book without actually needing to ship it. Our vast network gives us an extensive reach in the online classified community, and this enables us to market and sell your vehicle locally -- wherever 'local' might be for you.

## WHAT ARE THE GUIDELINES I NEED TO FOLLOW, TO RECEIVE MY LISTING FEE BACK?

Our Online Marketing Agreement can be <u>downloaded here,</u> and it is also emailed to you with your receipt.

## ONCE MY VEHICLE SELLS, DO I STILL GET GET A REFUND?

It may sound obvious, but this question does arise from time to time. First, you must contact us immediately by phone, email, or fax to inform us that your vehicle has sold -- then we can cease advertising your vehicle. It should be clear that, once your vehicle has sold, there is no basis for a refund -- as the service has concluded successfully. We do not refund your purchase once the item posted (car, truck, SUV, etc.) has sold.

## WHY SHOULD I GO THROUGH VEHICLESTARS.COM?

We do not ask for commission on sales -- sellers pay only for the initial advertisement, which, if you choose the Premium Option upon registration, is refundable if the vehicle does not sell within 90 days.

Or, to put it another way: we don't get paid until you do! If your vehicle does not sell after 90 days send in a notarized copy of your registration or title of ownership and your advertising will be refunded.

Vehiclestars.com has a clear interest in you selling your car.

And buyers use the service because there are so many car deals at their fingertips. It's a win-win situation.



# VEHICLESTARS

connecting buyers + sellers everyday

FAQ • Contact Us • About Us • Member Site

HOME | USED VEHICLES | CAR BLOG | SELL MY VEHICLE | MEMBERS | MONEY BACK GUARANTEE | ABOUT US

SIGN IN

f Connect with Facebook

| 2008 Lexus | 2006 Audi | 2003 BMW | 2008 Volkswagen | 2005 Toyota | 2003 Jo |
|---|---|---|---|---|---|
| GS 350 | A4 1.8T | 3 Series M3 | GTI | Corolla S | S-TYF |
| Washington | Washington | Washington | Washington | Washington | Washin |

## Free evaluation

- **Estimate out how long** your vehicle will take to sell with Vehicle Stars.
- **Find the price** of other similar vehicles to determine a great price point.
- Get your free evaluation today

### My location:

| USA | | D.C. |
|---|---|---|

### Look for:

All makes        All models

[All makes]

**SEARCH**

**Welcome to the Vehicle Stars Used Car Search**
Find vehicles, read auto news, research models. To search for a vehicle in your area, click the search button above; You can narrow your search on the next page.

## The Latest News

- **Video: Volkswagen pits Jetta GLI against... a speed talker?**
  Thursday, Jun 28th 2PM
- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 2PM
- **Official: Updated McLaren MP4-12C to debut at Goodwood**
  Thursday, Jun 28th 2PM
- **Report: Cadillac ATS Coupe talks resurface, new convertible model in the works?**
  Thursday, Jun 28th 2PM
- **Ford RS200 takes to the streets in a pair**
  Thursday, Jun 28th 2PM

Privacy Policy  Terms of Service

# VEHICLESTARS

• FAQ • Contact Us • About Us • Member Site

HOME | USED VEHICLES | CAR BLOG | SELL MY VEHICLE | MEMBERS | MONEY BACK GUARANTEE | ABOUT US

## Vehicle Stars Facebook Add-ons- Contest!

Posted on Mar 09 2011, 10:07PM by Tyrone B.

Scroll down for contest details To celebrate becoming one of the top 10,000 websites in Canada (according to Alexa, www.alexa.com, a subsidary of Amazon) we here at Vehicle Stars are proud to release the first version of our new Facebook tools. We are also quickly climbing the charts in the United States, but felt this welcome from our Canadian neighbours was a warm welcome, asking us to extend our website's functionality. On all advertisements we now have a Facebook "Recommend" button, for the United States and Canada alike. We have also added Twitter, Gma.. **Click to read more**

**Click here** to read more, and include full pictures

### The Latest News

🚘 **Video: Land Rover-based Bowler EXR-S looks, sounds insane**
Thursday, Jun 28th 5PM

🚘 **Auctions: eBay Motors dropping prices hourly on certain cars until they sell**
Thursday, Jun 28th 4PM

🚘 **Official: Shelby reveals updated 2013 GT350 with new colors and options**
Thursday, Jun 28th 3PM

🚘 **Video: Volkswagen pits Jetta GLI against... a speed talker?**
Thursday, Jun 28th 2PM

🚘 **The Ford Taurus hits 32 mpg: Autoweek TV**
Thursday, Jun 28th 2PM

Privacy Policy, Terms of Service

## Vehicle Stars Draw

Posted on Feb 08 2011, 12:51PM by Mark C.

Vehicle Stars is proud to announce our first give away of 2011! We will be drawing a 1st place prize on April, 4, 2011 of $1000 USD and, a 2nd place prize of an X-Box 360. This draw is for any customer who registers a vehicle for sale through Vehicle Stars, or purchases one of our clients vehicles from our site. Any client that is registered between Febuary, 1, 2011 through March, 31, 2011 will be eligible to win. The winning entrants will be required to write a short paragraph about their experience with the Vehicle Stars website, which may be used for future publicity purposes. Good Luck to everyone, and thank you for making 2011 a great year!

**Click here** to read more, and include full pictures

## How to become a Featured Advertisement

Posted on Jan 19 2011, 9:31PM by Tyrone B.

There are three featured advertisements for each location: one changes weekly, one daily, and one hourly. We've implemented this system in order to promote high quality advertisements. For fairness, we feel it is important to disclose how these advertisements are chosen. They are picked based off of the quality of your advertisement, and rotate automatically based off of the selected time interval (Weekly, daily, hourly). To be eligible, an advertisement must: Have at least five photographs - the first five will be shown on our homepage, the rest on yo.. **Click to read more**

**Click here** to read more, and include full pictures

## VehicleStars.com Makes Landmark Achievements in 2010 Final Quarter

Posted on Jan 03 2011, 8:17PM by Yahoo! News

[read the full article on on Yahoo! News] – Fri Dec 31, 3:00 am ET Used Auto Site
Provides Alternative to Auto Trader, Craigslist Fort Lauderdale, FL (Vocus/PRWEB)
December 30, 2010 VehicleStars.com, the on-line used automobile sales classifieds
with guaranteed service, announces the official launch of its revitalized website, the
result of a $400,000 infrastructure investment. The upgrades include the
development and installation of more powerful advertising software, as well as a
revamped website interface that delivers improved graph.. **Click to read more**

**Click here** to read more, and include full pictures

## December: a good time to sell (or buy) your vehicle

Posted on Dec 20 2010, 7:56PM by Margaret Stanley

Many of our customers right now are thinking it's a difficult time to advertise and
sell their vehicles;  Christmas is around the corner, New Years celebrations can be
costly, and we are thinking about vacations and family.    Why is December a good
time to sell a vehicle?  In December, many people want to buy a vehicle, and we
need you to fill their demand.   People are now buying vehicles for different reasons
than the rest of the year:  Privileged families often buy vehicles in December, it's a
gift for .. **Click to read more**

**Click here** to read more, and include full pictures

# VEHICLESTARS

connecting buyers + sellers everyday

HOME    USED VEHICLES    CAR BLOG    SELL MY VEHICLE    MEMBERS    MONEY BACK GUARANTEE    ABOUT US

User name:    SIGN IN

Connect with Facebook

**The Premium Option:**

**Our money back guarantee.**

At VehicleStars, nothing is more important than our commitment to our clients. So, for clients concerned about whether their vehicle will sell through our service within the time frame provided, we have structured an elective guarantee option that delivers peace of mind for anxious sellers.

Available for a 25% premium on the basic registration fee, our Premium Option ensures that in the unlikely event that your vehicle remains unsold after the 90-day listing period with our service – you are eligible to receive a full refund of the basic registration fee, subject to <u>Terms and Conditions</u>.

We know our service works because we have made tens of thousands of deals happen for people looking to buy or sell a vehicle. By advertising our clients' vehicles across our extensive network of locations on the internet, our clients enjoy a closing rate of over 84% within the 90-day period. So it is a rare event that a vehicle goes unsold when listed on VehicleStars.com.

Nonetheless, client feedback has told us that many would appreciate a refund option if it were made available – especially those with a vehicle model that has historically shown to take more time to sell. For clients like these, a little security goes a long way – as many will know some vehicles are apt to sell quicker than others.

Upon registration, you will be asked by our customer service agent if you wish to opt-in to the Premium Option Guarantee. Feel free to discuss this in more detail with our friendly staff, they will help you to assess the relative merits of the Premium Option with regard to listing your particular vehicle on VehicleStars.com.

Please note that you must elect the Premium Option at time of registration in order to receive this coverage.

Cost of advertisement service: $399.99

## The Latest News

- **Video: Land Rover-based Bowler EXR-S looks, sounds insane**
  Thursday, Jun 28th 5PM

- **Auctions: eBay Motors dropping prices hourly on certain cars until they sell**
  Thursday, Jun 28th 4PM

- **Official: Shelby reveals updated 2013 GT350 with new colors and options**
  Thursday, Jun 28th 3PM

- **Video: Volkswagen pits Jetta GLI against... a speed talking**
  Thursday, Jun 28th 3PM

- **The Ford Taurus hits 32 mpg: Autoweek TV**
  Thursday, Jun 28th 3PM

Privacy Policy Terms of Service

Cost of optional guarantee of services: $99.95

Total cost: $499.94

Refund if your vehicle does not sell: $399.99

GST applies in Canada, HST in Ontario and British Columbia.

No taxes across the United States of America or Europe apply.

**Please feel free to contact our customer support team with any and all inquiries**

| Call: | **1-888-9STAR50**<br>**1-888-978-2770** | Open from **9AM to 5PM PST** Weekdays |
|---|---|---|

**Fax:** **1-954-212-3200**

**Address: 1007 N Federal Hwy #6002**
Fort Lauderdale, FL 33304

| Email address | Department | Delivery time |
|---|---|---|
| sales@vehiclestars.com | Sales team | 4 Hours |
| support@vehiclestars.com | Customer Support | 4 Hours |
| PR@vehiclestars.com | Public Relations & Promotions | 1 Week |
| management@vehiclestars.com | Management team | 3 Days |

Because the management team has many duties to take care of on a daily basis, return calls from Management are honoured within a maximum of 3 business days, and we strive for a 24 hour period.

Privacy Policy Terms of Service

**SIGN IN**

User name

Connect with Facebook
* Makes it easier to sign in and read messages
Read privacy policy

## The Latest News

**Video: Land Rover-based Bowler EXR-S looks, sounds insane**
Thursday, Jun 28th 5PM

**Auctions: eBay Motors dropping prices hourly on certain cars until they sell**
Thursday, Jun 28th 4PM

**Official: Shelby reveals updated 2013 GT350 with new colors and options**
Thursday, Jun 28th 3PM

**Video: Volkswagen pits Jetta GLI against... a speed talker?**
Thursday, Jun 28th 2PM

**The Ford Taurus hits 32 mpg: Autoweek TV**
Thursday, Jun 28th 2PM



**DomainTools**


Enter search term... | Search



## Whois Record For ReadyPay.net

Whois Record | Site Profile | Registration | Server Stats | My Whois | Like | Confirm


You the smart one? Let us show you the job you dream of

Email Search: it@readypay.net is associated with about **2 domains**

help@hover.com is associated with about **211,494 domains**

Registrar History: **2 registrars**

NS History: **2 changes** on 2 unique name servers over **5 years.**

IP History: **5 changes** on 4 unique name servers over **7 years.**

Whois History: **33 records** have been archived **since 2005-04-10** .

Dedicated readypay.net is hosted on a **dedicated server.**
Hosting:

Log In or Create a FREE account to start monitoring this domain name

**DomainTools for Windows®**
Now you can access domain ownership records anytime, anywhere...
**right from your own desktop! Download Now>**




**GRAB YOUR .ES DOMAIN
FOR ONLY 5EUR / $7.50**

```
Registrant:
ReadyPay Services Inc.
404 - 737 Carnarvon St
New Westminster, BC V3M5X1
CA

Domain name: READYPAY.NET

Administrative Contact:
   Loewen, Matthew   it@readypay.net
   404 - 737 Carnarvon St
   New Westminster, BC V3M5X1
   CA
   +1.6046363400
Technical Contact:
   Contact, Technical   help@hover.com
   96 Mowat Avenue
   Toronto, ON M6K 3M1
   CA
   +1.4165385498     Fax: +1.4163520113

Registration Service Provider:
   Hover, help@hover.com
   416.538.5498
   http://help.hover.com

Registrar of Record: TUCOWS, INC.
Record last updated on 18-Aug-2009.
Record expires on 10-Sep-2012.
Record created on 10-Sep-2004.

Registrar Domain Name Help Center:
   http://tucowsdomains.com

Domain servers in listed order:
   NS5.IXWEBHOSTING.COM
   NS6.IXWEBHOSTING.COM

Domain status: clientTransferProhibited
               clientUpdateProhibited
```

© 2011 DomainTools, LLC All rights reserved.


Open a FREE Account | Log in | Help




Enter search term... | Search

HOME | SEARCH | MONITOR | BUY DOMAINS | LEARN | BECOME A MEMBER



## Whois Record For AutoMarketingGroup.com

Whois Record | Site Profile | Registration | Server Stats | My Whois

| | |
|---|---|
| Server Type: | Microsoft-IIS/7.0 |
| IP Address: | **208.118.240.106**  Reverse-IP  \|  Ping  \|  DNS Lookup  \|  Traceroute |
| ASN: | A827382 |
| IP Location: | 🟥 - **Massachusetts - Pembroke - Media 3 Technologies Llc** |
| Response Code: | 200 |
| Domain Status: | **Registered And Active Website** |





GRAB YOUR .IT DOMAIN
FOR ONLY 5EUR | $7.50

Memberships  |  About Us  |  Blog  |  API  |  Desktop Tools  |  Terms of Service  |  Privacy  |  Support  |  Careers  |  Contact Us  |  Site Map

© 2011 DomainTools, LLC All rights reserved.

 

Open a FREE Account | Log in | Help





## IP Information for 208.118.240.52

**IP Location:** 🇺🇸 United States Pembroke Media 3 Technologies, LLC
**ASN:** AS27382
**IP Address:** 208.118.240.52 [W]-[R]-[P]-[D]-[T]
**Reverse IP:** 1 website uses this address. (example: classifiedautoservice.com)

```
NetRange:      208.118.240.0 - 208.118.255.255
CIDR:          208.118.240.0/20
OriginAS:      AS27382
NetName:       MEDIA3
NetHandle:     NET-208-118-240-0-1
Parent:        NET-208-0-0-0-0
NetType:       Direct Allocation
RegDate:       2008-10-09
Updated:       2008-10-09
Ref:           http://whois.arin.net/rest/net/NET-208-118-240-0-1

OrgName:       Media 3 Technologies, LLC
OrgId:         MD3T
Address:       33 Riverside Drive
City:          Pembroke
StateProv:     MA
PostalCode:    02359
Country:       US
RegDate:       1997-09-05
Updated:       2008-10-02
Ref:           http://whois.arin.net/rest/org/MD3T

OrgTechHandle: SRO206-ARIN
OrgTechName:   Rodden, Steven
OrgTechPhone:  +1-800-903-9327
OrgTechEmail:  steve@media3.net

OrgTechRef:    http://whois.arin.net/rest/poc/SRO206-ARIN

RTechHandle:   RH5239-ARIN
RTechName:     Hayes, Rob
RTechPhone:    +1-800-903-9327
RTechEmail:    rh@media3.net

RTechRef:      http://whois.arin.net/rest/poc/RH5239-ARIN

RAbuseHandle:  RH5239-ARIN
RAbuseName:    Hayes, Rob
RAbusePhone:   +1-800-903-9327
RAbuseEmail:   rh@media3.net

RAbuseRef:     http://whois.arin.net/rest/poc/RH5239-ARIN

RNOCHandle:    RH5239-ARIN
RNOCName:      Hayes, Rob
RNOCPhone:     +1-800-903-9327
RNOCEmail:     rh@media3.net

RNOCRef:       http://whois.arin.net/rest/poc/RH5239-ARIN
```

© 2011 DomainTools, LLC All rights reserved.

**United States Postal Service**
**Application for Delivery of Mail Through Agent**
See Privacy Act Statement on Reverse

| 1. Date |
|---|
| *Oct 13, 2010* |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

NOTE: The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public.

The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addresses and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 5 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. (Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include disolator information for either spouse in appropriate box.) | 3a. Address to be Used for Delivery (include PMB or # sign.) 1007 North Federal Highway #0 | | |
|---|---|---|---|
| *Vehicle Stars/Xavier Processing LLC* | 3b. City Fort Lauderdale | 3c. State FL | 3d. Zip + 4 33304-1422 |
| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): No | | |
| a. Name The UPS Store 9630 | | | |
| b. Address (No., street, apt./ste. no.) 1007 North Federal Highway | | | |
| c. City Fort Lauderdale | d. State FL | e. Zip + 4 33304-1422 | |

| 6. Name of Applicant *Xavier Processing Services LLC* | 7a. Applicant Home Address (No., street, apt./ste. | | |
|---|---|---|---|
| 6.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7. *Newport Coast* | 7a. State CA | 7d. Zip + 4 92657 |
| a. # | 7e. Applicant Telephone Number (include area code) | | |
| b. # | 9. Name of Firm or Corporation *Xavier Processing Services LLC* | | |
| ~~Applicable identification requirements, valid driver's license or state photo-identification, armed forces, government, university, or recognized corporate identification cards, passport, alien registration card or certificate of naturalization, current lease, mortgage or Deed of Trust, voter or vehicle registration card, or a home or vehicle insurance policy. A photograph of the applicant will be required...~~ | 10a. Business Address (No., street, apt./ste. no.) 2360 Corporate Circle  Suite 400 | | |
| | 10b. City *Henderson* | 10c. State NV | 10d. Zip + 4 89074- 7722 |
| | 10c. Business Telephone Number (include area code) 866  397 6833 | | |
| | 11. Type of Business *Advertising* | | |

12. If applicant is a firm, name each member whose mail is to be delivered. (All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)

| 13. If a CORPORATION, Give Names and Addresses of its Officers *Matthew J. Loewen 36 Ambroise Newport Coast CA 92657* | 14. If business name (corporation or trade name) has been registered, give name of county and state, and date of registration. *USA , NV   08/2010* |
|---|---|

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant (if firm or corporation, application must be signed by officer. Show title.) *PRES.DENT/CEO* |
|---|---|

PS Form  1583  December 2004    (Page 1 of 2)          (7530-01-000-9365)

BRANNON-QUALE ATTACHMENT 9
TRO Exhibit 13

252

## Mailbox Service Agreement

Center Number: 530

**Customer Information**

Name: Matthew J. Loewen

Company: Xavier Processing Services LLC

Address: 2360 Corporate Circle, Suite 400      ZIP: 89014-8908

City: Henderson      State: NV

Business Telephone: 866 397 6833      Home Telephone: 778 278 1901

Fax: 949 766 5679      Mobile Telephone:

E-mail Address: m loewen @ readypay.net      Taxi Messaging ID:

**Mailbox Information**

Mailbox Number:      Mailbox Size:

**Terms and Conditions**

1. This Mailbox Service Agreement ("Agreement") is made and entered into by the customer identified above ("Customer") for the use of and services related to a mailbox ("Mailbox") at The UPS Store® or Mail Boxes Etc.® Center identified above ("Center") under the terms set forth herein.

2. Customer agrees that Customer will not use the Center premises or any Center services for any unlawful, illegitimate, or fraudulent purpose, or for any purpose prohibited by U.S. postal regulations. Customer further agrees that any use of the Mailbox shall be in conformity with all applicable federal, state, and local laws. Each individual or entity must complete a separate United States Postal Service Form 1583 ("Form 1583") to be authorized to receive mail or packages at the Mailbox.

3. This Agreement and Form 1583 shall remain confidential, except that this Agreement and Form 1583, including Customer's name, address, and e-mail address, may be disclosed to the Center's franchisor, Mail Boxes Etc., Inc. ("MBE") or its successor, solely for purposes of communication between MBE and Customer related to Customer's use of the Mailbox, and upon written request of any law enforcement or other governmental agency, or which legally mandated. Upon request, Customer agrees to complete all necessary documents, including Form 1583 and any required acknowledgments from relating to service of process. Customer further agrees to sign a revised version of this Agreement and Form 1583 whenever any information required on this Agreement or Form 1583 changes.

4. Possession of the Mailbox key shall be considered valid evidence that the possessor is duly authorized to remove any contents from the Mailbox. In the event of death or incapacity of Customer, the Center will require the appropriate documents from the Probate Court, the executor of the estate, the trustee or other similar person or entity before releasing mail or packages to a requesting party.

5. Customer agrees to pay an initial set-up fee of $0.00 (which includes a mailbox key fee and other fees associated with 24-hour access) as well as applicable and/or a door key fee of _____ (which includes an exterior door key fee and other fees associated with 24-hour access) as well as applicable monthly service fees and any applicable sales, use, or other taxes. Mailbox service fees are all due and payable in advance and Customer agrees that the Center may withhold mail and packages from Customer pending payment. There will be no pro-ratios or refunds for cancellation of any service. Customer agrees to pay a late fee of _____ if any payment is not received within five (5) days of when due. In the event the Mailbox lock is changed at the request or fault of Customer, Customer agrees to pay a fee of _____. Mailbox service fees and other related fees stated herein are subject to change.

   In the event that Customer receives an unreasonable volume of mail or packages at the Mailbox according to the Center's reasonable judgment, the Center may require Customer to upgrade to a larger size Mailbox and pay any additional charge. The Center reserves the right to increase the Mailbox service fees in the event that Customer adds additional individuals or entities to the names of those individuals or entities authorized to receive mail and packages at the Mailbox pursuant to Form 1583.

6. Customer agrees that upon expiration, cancellation, or termination of this Agreement, Customer will not file a change of address order with the post office. Customer and the Center further agree that upon expiration, cancellation, or termination of the Agreement, Customer authorizes the Center to accept and destroy any "unsolicited Mail" (i.e., mail addressed to "occupant," "current resident," or similar designation of occupant), advertising, or other promotional material) and any mail addressed to Customer that is delivered to the Center by the United States Postal Service for six (6) months; and may refuse any package addressed to Customer delivered by any party other than the United States Postal Service. Such on a commercial carrier service. However, at Customer's election, the Center will:

   a. Re-mail (i.e., forward) Customer's mail (except for Unsolicited Mail) for six (6) months upon Customer's payment in advance for postage, packaging material, and forwarding fees. Customer must pay a monthly forwarding fee of _____ for month 1, and _____ for months 2 through 6 in advance for the time period that mail is to be re-mailed. It is Customer's responsibility to make arrangements with the Center to identify any mail forwarding needs prior to the expiration, cancellation, or termination of this Agreement; or

   b. Store the mail or Unless United States Postal Service packages (except for Unsolicited Mail) for up to six (6) months upon Customer's submission of a storage fee of _____ per month for the time period in which the Center holds the mail or packages, plus a service fee of _____ for each time Customer visits the Center to pick up such items. It is Customer's responsibility to make arrangements with the Center to identify any mail storage needs prior to the expiration, cancellation, or termination of this Agreement.

7. Six (6) months after the expiration, cancellation, or termination of this Agreement, the Center may:

   a. Refuse any mail or package addressed to Customer and delivered to the Center.
   b. Destroy any of Customer's mail or packages remaining at the Center at such time.

8. Customer authorizes the Center to complete and file a Shipper's Export Declaration as "agent" on behalf of Customer as "principal party in interest" when necessary and to act on behalf of Customer as Customer's true and lawful agent for purposes of any and all re-mailing, including

The UPS Store® Centers are independently owned and operated by licensed Franchisees of Mail Boxes Etc., Inc., an indirect subsidiary of United Parcel Service, Inc., a Delaware corporation. Services, prices, and hours of operation are subject to change and may vary by location. Copyright © 2009 Mail Boxes Etc., Inc. All rights reserved. - Last updated 02/18/00

Page 1

## Mailbox Service Agreement

any re-mailing that requires the filing of a Shipper's Export Declaration by the Center (i.e., any export transaction), in accordance with the laws and regulations of the United States. Customer further agrees to provide the Center with true, accurate, and complete information regarding the contents of any mail or packages to be re-mailed by the Center, whether during the term of the Agreement or after termination or cancellation.

9. The term of this Agreement shall be the initial period paid for by Customer and any renewal period paid for by Customer from time to time. Renewal of the Agreement for additional terms shall be at the Center's sole discretion.

10. Customer agrees that the Center may terminate or cancel this Agreement for good cause at any time by providing Customer with written notice. Good cause shall include but is not limited to: 1) Customer abandons the Mailbox; 2) Customer uses the Mailbox for unlawful, illegitimate, or fraudulent purposes; 3) Customer fails to pay monies owed the Center when due; 4) Customer receives an unreasonable volume of mail or packages; 5) Customer engages in offensive, abusive, or disruptive behavior toward other customers of the Center or the Center's employees; and 6) Customer violates any provision of this Agreement. Customer acknowledges that, for the purpose of determining good cause for termination of this Agreement as provided herein, the actions of any person authorized by Customer to use the Mailbox will be attributed to Customer.

11. Any written notice to Customer required or permitted under this Agreement shall be deemed delivered twenty-four (24) hours after placement of such notice in Customer's Mailbox or at the time personally delivered to Customer. In the event of a termination notice based upon abandonment of the Mailbox, notice shall be deemed delivered (a) on the next day after placing in the hands of a commercial carrier service or the United States Postal Service for next day delivery, or (b) five (5) days after placement in the United States Mail by Certified Mail, Return Receipt Requested, postage prepaid, and addressed to Customer at Customer's address as set forth in Form 1583, one the date of actual receipt, whichever is earlier.

12. [illegible paragraph]

13. [illegible paragraph]

14. Customer acknowledges and agrees that the Center is an independently owned and operated franchise of MBE and that MBE is not responsible for any acts or omissions of its franchisees.

15. CUSTOMER HEREIN AGREES THAT THE TOTAL AMOUNT OF LIABILITY OF THE CENTER AND MBE, IF ANY, FOR ANY AND ALL CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT OR PERFORMANCE HEREUNDER SHALL NOT EXCEED $100.00 REGARDLESS OF THE NATURE OF THE CLAIM. (INITIAL: _____ )

16. Customer must use the exact mailing address for the Mailbox without modification as set forth in Section three (3) of Form 1583. The United States Postal Service will return mail without a proper address to the sender endorsed "Undeliverable as Addressed."

17. Delivery by commercial carrier services must be made to the Center street address only (and not to a P.O. Box). "P.O. Box" may be used only if it is part of Customer's "Caller Service" (arrangement for delivery of mail through Centers using a United States Postal Service address) address format.

18. Upon signing this Agreement, Customer shall provide two (2) forms of valid identification, one of which shall include a photograph. This Agreement may not be amended or modified, except in a writing signed by both parties.

| Customer Signature: | | Date: 13/OCT/2010 |
|---|---|---|

| For Center Use Only | |
|---|---|
| Authorized Center Representative Signature: | Date: |
| How did the customer hear about us? | |
| Comments: | |

The UPS Store® Centers are independently owned and operated by licensed Franchisees of Mail Boxes Etc., Inc., an indirect subsidiary of United Parcel Service, Inc., a Delaware corporation. Services, prices, and hours of operation are subject to change and may vary by location. Copyright © 2009 Mail Boxes Etc., Inc. All rights reserved. - Last updated 02/19/09

Page 2

01/16/2008   01:35    18659029601            READY SERVICES INC            PAGE   01/01

# ATTN:  Chris



ᴅ
(Signature of bearer - Signature du titulaire)



P<CANLOEWEN<<MATTHEW<JAMES<<<<<<<<<<<<<<<<<<
                                    :<<<<<<<<<<04

 **global**payments

_10_

June 14, 2012

VIA UPS NEXT DAY AIR

Jennifer Larabee
Federal Trade Commission
Northwest Regional Office
915 Second Avenue, Suite 2896
Seattle, WA 98174

      Re:    Civil Investigative Demand
               File No. 0123145

Dear Ms. Larabee:

In response to the CID issued to Global Payments Inc. in the above-referenced matter, enclosed please find copies of merchant statements and underwriting files for the following merchant accounts for the time periods indicated:

| Merchant No. | Merchant Name | Time Period |
|---|---|---|
| | | 11/30/2011 – 05/31/2012 |
|     2316 | ReadyPay Service – Matt Loewen d/b/a Auto Seller Network | 01/29/2010 – 12/30/2011 |
|     6957 | Vehicle Stars – Erica Seigred | 12/31/2010 – 05/31/2012 |

Also enclosed are underwriting files for merchant no.    5550 (Auto Marketing Group) and merchant no.    5704 (www.globalautoregistry.com); however, we were unable to locate merchant statements for either merchant for the time period you requested.

Finally, we were unable to locate merchant statements or underwriting files for merchant no.    0482 (Allied Auto Group), which was only open for 12 days, and merchant no.    5705 (Quicksportsnutrition.com), which was closed in 2006.

Since the enclosed documents may contain personal information, it is our position that this information should not be disclosed in response to an open records act request or other request for information. If you anticipate any further disclosure of this information, please let me know immediately.

10 Glenlake Parkway NE, North Tower | Atlanta, Georgia 30328-3473 | T 770-829-8251 | F 770-829-8265 | www.globalpaymentsinc.com

I can be reached at              if you have any questions regarding the foregoing or
require additional information.

Sincerely,

Leslie De Lara Luck
Division General Counsel

Enclosure

# Merchant Application - Global

**ORION** PAYMENT SYSTEMS

2316

Type of Account (Check one):
- ☐ Direct Account
- ☐ Agent Bank Acct.
- ☐ Bank Referral and Relationship

MID# _____

Name of Bank _____ Branch# _____

**Principal** 620  **Associate** 002  **Chain** 070  DDA# _____  MCC Code 7311

| Sales Rep # | Sales Reps Name | | Sales Reps Phone # |
|---|---|---|---|
| 4788/ | Herb Denmark | | |

## Business Information

**Merchant's DBA Name:** Boy Great Auto

**Merchant's Legal Name:** Ready Pay Service

**Physical Street Address (No P.O. Box):** 3155 East Patrick Ln. Sta1

**Legal Address:** Same 3155 E. Patrick LN Sta1

| City | State | Zip | City | State | Zip |
|---|---|---|---|---|---|
| Las Vegas | NV | 89120 | Las Vegas | NV | 89120 |

**DBA Telephone #** 866-397-6833  **DBA Fax #** 866-902-9601  **Telephone #** 866-397-6833  **Fax #** 866-902-9601

**Contact Name at this Address:** MAT Loewen  **E-mail Address:** MIDEWEN@ReadyPay.net  **Contact Name at this Address:** **E-mail Address:** MIDEWEN@Readypay.net

## Business Profile and Assumptions

**Federal Tax ID#:** _____  **Annual Visa/MC Sales ($):** 500,000.00  **Average Ticket ($):** 300.00  **Total Visa/MC Sales (Multiple Locations only) ($):** _____

**Type of Ownership:** ☑ Sole Proprietor ☐ Partnership ☐ Government ☐ LLC ☐ Corporation ☐ Other ☐ Tax Exempt (501-C) ☐ Professional Association

**Sales Profile (must equal 100%):** % Card Swiped + % Manually keyed with Imprint + 100 % MOTO/Internet = 100%

**Type of Goods/Services Sold:** Advertising

**Does merchant accept transactions before the customer receives product or service?** ☑ Yes ☐ No

**Years in business under current ownership** Yr 1 Mo ___

**Percentage of sales in this category (%):** All

**Visa and MC Currently Accepted** ☐ Yes ☑ No

**Percentage of cost that is pre-payment (%):** 0

**How long does customer wait before product is received?** NEXT DAY

**Business Website:** _____

**Does merchant offer warranties, dues, subscriptions, memberships or other extended services?** ☐ Yes ☑ No

**Duration of extended service or benefits (in weeks):** _____

**Have you or your business ever declared bankruptcy?** ☐ Yes ☑ No

**Additional Location - 1st:** _____

**LOC/OLD MID #:** _____

**Bank Reference 1:** First Republic  **Routing #:** _____  **DDA/Checking Account #:** _____ ☐ Deposit ☐ Discount ☐ Chargebacks ☐ Equipment ☐ Supplies ☐ Misc  **Telephone #:** _____

**Bank Reference 2:** _____  **Routing #:** _____  **DDA/Checking Account #:** _____ ☐ Deposit ☐ Discount ☐ Chargebacks ☐ Equipment ☐ Supplies ☐ Misc  **Telephone #:** _____

**Trade Reference:** _____  **Account #:** _____  **Contact:** _____  **Telephone #:** _____

**AMEX ID #:** _____  **Discover ID #:** _____  **Other ID #:** _____

## Owner/Officer Information

| Name | Title | Date of Birth | Social Security # | Home Telephone # |
|---|---|---|---|---|
| Matthew J. Loewen | Pres. | | | |

| Home Address | City | State | Zip Code | Years There | |
|---|---|---|---|---|---|
| 355 Princeton Dr | Costa Mesa | CA | 92626 | | ☑ Own ☐ Rent |

| Former Address (if less than 1 year at current address) | City | State | Zip Code | Years There | |
|---|---|---|---|---|---|
| | | | | | ☐ Own ☐ Rent |

| Name | Title | Date of Birth | Social Security # | Home Telephone # |
|---|---|---|---|---|
| | | | | |

| Home Address | City | State | Zip Code | Years There | |
|---|---|---|---|---|---|
| | | | | | ☐ Own ☐ Rent |

| Former Address (if less than 1 year at current address) | City | State | Zip Code | Years There | |
|---|---|---|---|---|---|
| | | | | | ☐ Own ☐ Rent |

## Member/Account Information

**HSBC Bank USA, National Association**
Merchant Support Group
P.O. Box 3253
Buffalo, New York 14240
716-841-6360

**Important Member Bank Responsibilities:**
1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant.
2. A Visa Member must be a principal (signer) to the Merchant Agreement.
3. The Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply.
4. The Visa Member is responsible for and must provide settlement funds to the Merchant.
5. The Visa Member is responsible for all funds held in reserve that are derived from settlement.

## Direct Sponsor Contact

**Concord EFS National Bank**
2525 Horizon Lake Drive
Ste. 120
Memphis, TN 38133
901-371-8000

**Important Merchant Responsibilities:**
1. Ensure compliance with cardholder data security and storage requirements.
2. Maintain fraud and chargebacks below thresholds.
3. Review and understand the terms of the Merchant Agreement.
4. Comply with Visa Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands these specific responsibilities.

## Cardholder Data Storage Compliance

- **Is Cardholder Data Stored?** ☐ Yes ☑ No — if yes, where?: ☐ Merchant ☐ CAP Only ☐ Both Merchant & CAP ☐ CAA Export Only
- **Name of Primary CAP/VAR:** _____  **Name of Secondary CAP/VAR:** _____

OPS 12 05

Page 1 of 2  Merchant Initials ___

## Merchant Application - Global

**Your pricing is based on the following rates structure:**

☐ Retail/Restaurant  ☐ Purchasing Card
☐ Lodging  ☒ Mail/Telephone Order
☐ Other _____

☐ Accept PIN Based Debit  ☐ Yes  ☐ No
☐ EBT: Merchant FNS#: _____
Cash Benefits:  ☐ Yes  ☐ No
Daily Discount:  ☐ Yes  ☐ No

| | Accept | Discount Rate | Per Item | Add'l Auth Fee |
|---|---|---|---|---|
| Visa Check Card Qualified Transactions | ☒ | 2.95 % | $ .25 | $ |
| Debit MasterCard Qualified Transactions | ☒ | 2.95 % | $ .25 | $ |
| Visa Credit Card Qualified Transactions | ☒ | 2.95 % | $ .25 | $ |
| MasterCard Credit Card Qualified Transactions | ☒ | 2.95 % | $ .25 | $ |
| Mid Qualified Transactions | ☒ | 2.95 % | $ .25 | $ |
| Non Qualified Transactions | ☒ | 4.20 % | $ .25 | $ |
| American Express | ☐ | % | $ | $ |
| Discover | ☐ | % | $ | $ |
| Other | ☐ | % | $ | $ |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Application Fee | $ | One Time | ☒ Statement Fee (5003) | $ 9.00 per Month | ☐ Other _____ | $ per |
| ☐ Monthly Minimum Fee | $ | per Month | ☐ Debit Per Item Fee | $ per Each | ☐ Other _____ | $ per |
| ☐ Star Club (Warranty Fee) (8010) | $ | per Month | ☐ Discover Transaction Fee | $ per Each | ☐ Other _____ | $ per |
| ☐ Voice Address Verification (MO/TO) | $ | per Each | ☒ Chargeback Fee | $15.00 per Each | ☐ Other _____ | $ per |
| ☐ Batch Fee | $ | per Each | ☒ Voice Authorization Fee | $ 1.00 per Each | ☐ Other _____ | $ per |
| ☐ AmEx/Diners Transaction Fee | $ | per Each | ☒ Non Sufficient Funds | $15.00 per Each | ☐ Other _____ | $ per |
| ☒ Retrieval | $ 5.00 | per Each | ☐ Other _____ | $ per | ☐ Other _____ | $ per |

By signing below, I/We represent that the information I/We have provided on the Application is complete and accurate and I/we authorize American Express Travel Related Services Company, Inc. ("American Express") to verify the information on this Application and to receive and exchange information about me, including requesting reports from consumer reporting agencies. If I/We ask American Express whether or not a consumer report was requested, American Express will tell you, and if American Express received a report, American Express will give me the name and address of the agency that furnished it. I/We understand that upon American Express' approval of the business entity indicated above to accept the American Express Card, the Terms & Conditions for American Express ("Card Acceptance") ("Terms & Conditions") will be sent to such business' entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services, I/We agree to be bound by the Terms & Conditions.

Merchant's Signature: X _____  Name (printed): MATTHEW J. LOEWEN  Title: PRESIDENT  Date: 7/8/07

**Personal Guarantee**

We hereby guarantee to Global Direct, Member, and to Debit Sponsor, their successors and assigns, the full, prompt, and complete performance of Merchant and each of Merchant's obligations under the Card Services Agreement, including but not limited to all monetary obligations arising out of Merchant's performance or non-performance under the Card Services Agreement whether arising before or after termination of the Card Services Agreement. This guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of the Card Services Agreement made by or agreed to by Global Direct, Member, Debit Sponsor, and/or Merchant. I/We hereby waive any notice of acceptance of this guaranty, notice of nonpayment or nonperformance of any provision of the Card Services Agreement by Merchant, and all other notices or demands regarding the Card Services Agreement. I/We agree to promptly provide to Global Direct, Member, and/or Debit Sponsor any information requested by any of them from time to time concerning my/our financial condition(s), business(es), business relations, and employment information. I/we have read, understand, and agree to be bound by the Card Services Terms & Conditions provided to Merchant and the terms and conditions contained in this Merchant Application.

Signature of Guarantor: X _____  an Individual, Name (printed): MATTHEW J. LOEWEN

Merchant's Signature: X _____  an Individual, Name (printed): MATTHEW J. LOEWEN

**Acceptance of Merchant Application and Terms & Conditions; Merchant Authorization**

Your Card Services Agreement is between Global Payments Direct, Inc. ("Global Direct"), the Merchant named above, the Member named below ("Member"), and, if applicable, the Debit Sponsor named below. Member is a member of Visa, USA, Inc. ("Visa") and MasterCard International ("MasterCard"). Global Direct is a registered independent sales organization of Visa and a member service provider of MasterCard. A copy of the Card Services Terms & Conditions, relation number _____ has been provided to you. Please sign below to signify that you have received a copy of the Card Services Terms & Conditions and that you agree to all terms and conditions contained therein. If this Merchant Application is accepted for card services, Merchant agrees to comply with the Merchant Application and the Card Services Terms & Conditions as may be modified or amended in the future. If you disagree with any Card Services Terms & Conditions, do not accept service.
IF MERCHANT SUBMITS A TRANSACTION TO GLOBAL DIRECT HEREUNDER, MERCHANT WILL BE DEEMED TO HAVE ACCEPTED THE CARD SERVICES TERMS & CONDITIONS.
By your signature below on behalf of Merchant, you certify that all information provided in the Merchant Application is true and accurate and you authorize Global Direct, and Global Direct to Merchant's behalf, to initiate debit entries to Merchant's checking account(s) in accordance with the Card Services Terms & Conditions. In addition, by your signature below on behalf of Merchant, you authorize Global Direct and/or DRON Payment Systems, LLC to order a consumer credit report on Merchant and you.

| | | | |
|---|---|---|---|
| Merchant's Signature: X _____ | Name (printed): MATTHEW J. LOEWEN | Title: PRESIDENT | Date: 7/8/2007 |
| Signing for Global Payments Direct, Inc.: X _____ | Name (printed): _____ | Title: _____ | Date: _____ |
| Signing for Member: X _____ | Name (printed): _____ | Name of Member (printed): HSBC Bank USA, NA | Date: _____ |
| Signing for Debit Sponsor: X _____ | Name (printed): _____ | Name of Debit Sponsor: Concord EFS National Bank | Date: _____ |

**Merchant Site Survey (Required to be completed by Sales Representative)**

- Merchant Location:  ☐ Retail (Location with Store Front)  ☐ Office Building  ☐ Residence  ☐ _____
- Surrounding Area:  ☐ Commercial  ☐ Industrial  ☐ Residential
- The Merchant:  ☐ Owns  ☐ Leases the business premises
- Does the amount of inventory and merchandise on shelves and floor appear consistent with the type of business?  ☐ Yes  ☐ No  If so, explain: _____
- Does the Merchant use a Fulfillment House?  ☐ Yes  ☐ No  If yes, was the Fulfillment House inspected?  ☐ Yes  ☐ No
- Further comments by Inspector (must complete): _____

I hereby verify that this application has been fully completed by Merchant applicant and that I have physically inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.

Verify and Inspected by Representative (signature): X _____  Representative (printed): _____  Date: _____

| Sales Representative Name | Sales Rep. Code | Sales Rep Telephone # | Sales Rep E-mail Address |
|---|---|---|---|
| Herb Denmark | 4788 | | |

For questions regarding Card Services, contact:  Global Payments  Merchant Customer Service  10705 Red Run Blvd., Owings Mills, MD 21117  1-800-367-2538  Citon Payment Systems Customer Service  14340 Torrey Chase Blvd, Houston, Texas 77014  877-841-6800  877-657-4551 fax

OPS 12.03    Note: Billing disputes must be forwarded, in writing, to Customer Service within 60 days of the date of the statement and/or notice    Page 2 of 2    Merchant Initial

BRANNON-QUALE ATTACHMENT 11
TRO Exhibit 13

259

TO $2.0425.

CREDIT CARD MERCHANT STATEMENT

DATE:   03/31/2010    PAGE:  1

CODES: N   FORM: 9

MERCHANT: ████ 2316

DBA: CLASSIFIED AUTO SERVICE

████ -000

HSBC BANK USA, N.A.

READYPAY SERVICE

MATT LOEWEN

375 N. STEPHANIE STREET

SUITE 1411

HENDERSON, NV 89014

*- INFORMATION ADVICE -

*---------------------------- CHARGEBACKS/REJECTS ----------------------------*

| DAY | REF NO. | ITEMS | $--- AMOUNT ---$ | $ CREDITS$ | $- DISC -$ | $--- AMOUNT ---- |
|-----|---------|-------|------------------|-----------|-----------|-------------------|
| 01 | 01003610597 | 1 | 99.95 | .00 | .00 | 99.95 |
| 01 | 01003610896 | 1 | 399.99 | .00 | .00 | 399.99 |
| 01 | 01003612204 | 1 | 99.95 | .00 | .00 | 99.95 |
| 01 | 01003612569 | 1 | 299.99 | .00 | .00 | 299.99 |
| 04 | 02004010630 | 1 | 399.99 | .00 | .00 | 399.99 |
| 04 | 02004010631 | 1 | 99.95 | .00 | .00 | 99.95 |
| 04 | 02934310139 | 1 | 49.95 | .00 | .00 | 49.95 |
| 05 | 01006410540 | 1 | 299.99 | .00 | .00 | 299.99 |
| 05 | 01006411091 | 1 | 75.00 | .00 | .00 | 75.00 |

Page 19

■■■■2316 stmts.txt

CREDIT CARD MERCHANT STATEMENT
DATE: 03/31/2011    PAGE: 1
CODES: N    FORM: 9
MERCHANT: ■■■■■■■2316
DBA: AUTO MARKETING GROUP

■■■■■■■■-000

HSBC BANK USA, N.A.

READYPAY SERVICE
MATT LOEWEN
375 N. STEPHANIE STREET
SUITE 1411
HENDERSON, NV 89014

*- INFORMATION ADVICE -

*-------------------------- CHARGEBACKS/REJECTS --------------------------*

| DAY | REF NO. | ITEMS | $--- AMOUNT ---$ | $ CREDITS$ | $- DISC -$ | $--- AMOUNT ---- |
|-----|---------|-------|------------------|------------|------------|------------------|
| 01 | 01105410246 | 1 | 399.99 | .00 | .00 | 399.99 |
| 02 | 01105610284 | 1 | 199.99 | .00 | .00 | 199.99 |
| 02 | 01105611372 | 1 | 50.00 | .00 | .00 | 50.00 |
| 03 | 01102612599 | 1 | 481.10 | .00 | .00 | 481.10 |
| 04 | 02106010872 | 1 | 399.99 | .00 | .00 | 399.99 |
| 04 | 02106010873 | 1 | 99.95 | .00 | .00 | 99.95 |
| 07 | 01103210225 | 1 | 99.95 | .00 | .00 | 99.95 |
| 07 | 01106210237 | 1 | 399.99 | .00 | .00 | 399.99 |

Page 176

**0093**

11-0166/1219
62

Date_____

Pay to the
Order of _____ | $

_____ Dollars

First Republic Bank

For _____

0093

BRANNON-QUALE ATTACHMENT 11
TRO Exhibit 13

261



## FIRST REPUBLIC BANK
It's a privilege to serve you®

ReadyPay Services Inc. has a bank account with First Republic Bank. ABA number is
▮▮▮▮▮ and Account number is

Please contact me should you have any questions.

Sincerely,

Reza Mahdavi
First Republic Bank

*San Francisco   Los Angeles   Santa Barbara   Newport Beach   San Diego   Las Vegas   New York*

3993 MACARTHUR BOULEVARD, SUITE 500, NEWPORT BEACH, CALIFORNIA 93660. TEL (949) 255-2734  OR (888) 339-3088. FAX (949) 756-3848
INTERNET INTERNET BANKING AT www.firstrepublic.com - NEW YORK STOCK EXCHANGE SYMBOL FRB  MEMBER FDIC

** TOTAL PAGE.01 **



# *MATCH*



**George Norvell**

**General Operations** ▶
**Maintenance** ▶
**Administration** ▶
**File Operations** ▶
**Tools** ▶
**Help** ▶

## *Inquiry Results(Detail)*

If you would like to print the inquiry results, please use the 'Print' button on the browser toolbar

**Bold text denotes an exact match**
*Italic text denotes a phonetic match*

█*Back to Summary*█     █*<<Prev Match*█     █*Next Match>>*█

|  | *Inquiry* | *Possible Inquiry Match 1 of 2* |
|---|---|---|
| Reference Number: | 21352007080700627 | |
| Date: | 08/07/2007 | 06/02/2007 |
| | | |
| **Merchant Data:** | | |
| Merchant Name | READYPAY SERVICES | |
| Doing Business As | READY PAY SERVICES | |
| Merchant Id | | |
| Merchant Category Code | | |
| Business Address | **3155 EAST PATRICK LANE** | **3155 EAST PATRICK LANE** |
| City | **LAS VEGAS** | **LAS VEGAS** |
| State | **NV** | **NV** |
| Country | **USA** | **USA** |
| Postal Code | 89120 | 89120 |
| Phone Number | 8663976833 | 7028667500 |
| National Tax Id | | |
| State Tax Id | | |
| | | |
| **Principal Data:** | | |
| Principal1: | | |
| Last Name | **LOEWEN** | |
| First Name | **MATTHEW** | |
| Middle Initial | | |
| Address | 355 PRINCE | |
| City | COSTA MESA | |
| State | CA | rↄ |
| Country | USA | USA |
| Postal Code | 92626 | 0085282000 |
| Phone Number | 9499332037 | 4802250105 |
| National ID(SSN) | | |
| Driver's License Number | | |
| Driver's License State | | |
| Driver's License Country | | |

Privacy Policy   Copyright © 2002-2004 MasterCard International Incorporated

BRANNON-QUALE ATTACHMENT 11
TRO Exhibit 13

263



# *MATCH*



**George Norvell**

**General Operations** ▸
**Maintenance** ▸
**Administration** ▸
**File Operations** ▸
**Tools** ▸
**Help** ▸

## *Inquiry Results(Detail)*

If you would like to print the inquiry results, please use the 'Print' button on the browser toolbar

**Bold text** denotes an exact match
*Italic text* denotes a phonetic match

◖Back to Summary ◗        ◖<<Prev Match ◗        ◖Next Match>> ◗

|  | *Inquiry* | *Possible Inquiry Match 2 of 2* |
|---|---|---|
| Reference Number: | 21352007080700827 | |
| Date: | 08/07/2007 | 07/09/2007 |
| | | |
| **Merchant Data:** | | |
| Merchant Name | READYPAY SERVICES | |
| Doing Business As | READY PAY SERVICES | |
| Merchant Id | | |
| Merchant Category Code | | |
| Business Address | *3155 EAST PATRICK LANE* | *3155 EAST PATRICK LANE* |
| City | *LAS VEGAS* | *LAS VEGAS* |
| State | *NV* | *NV* |
| Country | *USA* | *USA* |
| Postal Code | 89120 | 89120 3481 |
| Phone Number | 8663976833 | 8582054216 |
| National Tax Id | ▮▮▮▮▮▮ | ▮▮▮▮▮▮ |
| State Tax Id | | |
| | | |
| **Principal Data:** | | |
| **Principal1:** | | |
| Last Name | LOEWEN | |
| First Name | MATTHEW | |
| Middle Initial | | |
| Address | 355 PRINCE | *3155 EAST PATRICK LANE* |
| City | COSTA MESA | *LAS VEGAS* |
| State | CA | *NV* |
| Country | USA | *USA* |
| Postal Code | 92626 | 89120 3481 |
| Phone Number | 9499332037 | |
| National ID(SSN) | ▮▮▮▮▮▮ | |
| Driver's License Number | | |
| Driver's License State | | |
| Driver's License Country | | |

Privacy Policy   Copyright © 2002-2004 MasterCard International Incorporated

BRANNON-QUALE ATTACHMENT 11
TRO Exhibit 13                                                          264

Pages 265 - 268

Omitted Intentionally

TRO EXHIBIT 13

/2



MasterCard Worldwide
Law Department

Purchase, NY 10577-2509
tel
www.mastercard.com

**MasterCard**
Worldwide

May 31, 2012

## *VIA ELECTRONIC MAIL & OVERNIGHT DELIVERY*

Jennifer Larabee, Esq.
Commission Counsel
Federal Trade Commission
915 2nd Ave., Suite 2895
Seattle, WA 98174

     *Re: ReadyPay Services, Inc. et al, Civil Investigative Demand No.: 0123145*

Dear Ms. Larabee:

MasterCard International Incorporated ("MasterCard") is in receipt of the Civil Investigative Demand ("CID") served in connection with the above referenced matter.

As part of a rolling production, enclosed please find responsive documents relating to some of the merchants and all websites listed in the CID.

MasterCard does not directly contract with merchants for MasterCard acceptance. Merchant accounts are maintained by acquiring banks and those financial institutions are solely responsible for payment to and collection from merchants. Such entities directly contract with merchants to accept payment cards with the MasterCard name and mark under license from MasterCard, but the actual relationship with a merchant is solely that of the acquiring financial institution.

Should you have any questions or require any additional information, I can be reached at ¯ ¯ ¯

Very truly yours,

Leonora Lillie
*Specialist, Paralegal*

Enclosure

242063.1

Close Window

Print Audit

# Audit #31275– Auto Marketing Group

**Audit Info**

| Status: | Closed |
| Auditor: | Andreana Azo |

**Violation Info:**

| # Months Open | # Violation Months | # CMM Months | # BCM Months |
|---|---|---|---|
| 19 | 7 | 1 | 4 |

**Financial Info:**

| | Violation | Late Reporting | Variance | Total Revenue | Issuer Recovery | Grand Total |
|---|---|---|---|---|---|---|
| Charges | $184,803.82 | $1,657.54 | $95,661.36 | $90,800.00 | $7,763.25 | $98,563.25 |
| Billed | $184,803.82 | $1,657.54 | $95,661.36 | $90,800.00 | $7,763.25 | $98,563.25 |
| Difference | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**Merchant Data:**

| | |
|---|---|
| Merchant ID: | ████2316 |
| Merchant Name: | Auto Marketing Group |
| Doing Business As: | |
| Credit Card Billing Descriptor: | Auto Marketing Group |
| Web Site: | |
| Business Address: | 7260 West Agura, |
| | Las Vegas, |
| Phone: | 8885492001 |
| Postal Code: | 89130 |
| National Tax Id: | |
| State Tax Id: | |
| MCC: | ADVERTISING SERVICES |
| CAT: | No |
| Contract Open Date: | 08/10/2007 |
| Contract Terminated Date: | 01/07/2011 |
| Principal Name: | |

**Acquirer Info**

| | |
|---|---|
| Acquirer ID: | 2135 |
| Acquirer Bank: | HSBC BANK USA, NATIONAL ASSOCIATION |
| Region: | United States |
| Security Contact: | |
| Address: | Owings Mills, ████████7 UNITED STATES |
| Phone Number: | |
| Fax Number: | |
| Email Address: | OwingsMillsRiskMgrs@globalpay.com |
| Reporting Contact: | |
| Address: | MARYLAND |
| Phone Number: | |
| Fax Number: | |
| Email Address: | @globalpay.com |

**Regional Contacts**

| Type | Contact | Phone | Fax | Email |
|---|---|---|---|---|
| Member Rep | Doug Whitehead - United States | | | k@mastercard.com |
| Member Rep | Anthony Gracia - United States | | | @mastercard.com |

**Monthly Summary Data**

| Month | # of Sales | Sales Amount ($) | # Chargebacks | Chargeback Amount($) | # Credits | Amount of Credits ($) | Chargeback File | Scale Points | Type |
|---|---|---|---|---|---|---|---|---|---|
| 02/01/2011 | 0 | $0.00 | 31 | $8,023.49 | 0 | $0.00 | N/A | 0 | TERM |
| 01/01/2011 | 0 | $0.00 | 42 | $10,681.73 | 0 | $0.00 | N/A | 0 | TERM |
| 12/01/2010 | 146 | $36,115.23 | 83 | $22,302.16 | 2 | $551.94 | | 2500 | BCM |

BRANNON-QUALE ATTACHMENT 12
TRO Exhibit 13

270

| | | | | | | | ✓ | | |
|---|---|---|---|---|---|---|---|---|---|
| 11/01/2010 | 332 | $82,766.74 | 91 | $23,998.39 | 24 | $8,333.60 | ✓ | 3137 | ECN |
| 10/01/2010 | 290 | $72,577.28 | 72 | $19,393.55 | 15 | $3,836.09 | ✓ | 1666 | ECN |
| 09/01/2010 | 432 | $108,778.49 | 79 | $30,860.17 | 3 | $616.44 | ✓ | 2010 | ECN |
| 08/01/2010 | 393 | $99,717.79 | 63 | $15,207.30 | 7 | $941.20 | N/A | 1603 | CHM |
| 07/01/2010 | 393 | $98,389.71 | 27 | $6,923.79 | 4 | $1,464.91 | N/A | | |

**Billing Data**

| Billing ID | Billing Type | Reporting Period | Assessment | Variance Amount | Total Billing Amount | Billing Letter Date | Confirmation Date |
|---|---|---|---|---|---|---|---|
| 168363 | Issuer Recovery | 12/01/2010 | Total # Chargebacks = 83<br># Not Liable: 332 * 0.01 = 3.32<br># Liable: 83 - 3.32 = 79.68<br>Total Assessment 79.68 * $ 25 = $1992 | $0.00 | $1,992.00 | 02/07/2011 | 02/18/2011 |
| 168368 | Violation | 12/01/2010 | IssuerRecoveryAssessment * BasisPoints: $ 1992 * 2500 = $4980000<br>Total Assessment $ 4980000 / 100 = $49800 | $29,500.00 | $20,300.00 | 02/07/2011 | 02/18/2011 |
| 168381 | ECN Reporting | 12/01/2010 | ECN = $300 | $0.00 | $300.00 | | |
| 165572 | Issuer Recovery | 11/01/2010 | Total # Chargebacks = 91<br># Not Liable: 290 * 0.01 = 2.9<br># Liable: 91 - 2.9 = 88.1<br>Total Assessment 88.1 * $ 25 = $2202.5 | $0.00 | $2,202.50 | 01/10/2011 | 01/21/2011 |
| 165577 | Violation | 11/01/2010 | IssuerRecoveryAssessment * BasisPoints: $ 2202.5 * 3137 = $6909242.5<br>Total Assessment $ 6909242.5 / 100 = $69092.43 | $47,292.43 | $21,800.00 | 01/10/2011 | 01/21/2011 |
| 165580 | ECN Reporting | 11/01/2010 | ECN = $300 | $0.00 | $300.00 | | |
| 163382 | Issuer Recovery | 10/01/2010 | Total # Chargebacks = 72<br># Not Liable: 432 * 0.01 = 4.32<br># Liable: 72 - 4.32 = 67.68<br>Total Assessment 67.68 * $ 25 = $1692 | $0.00 | $1,692.00 | 12/07/2010 | 12/16/2010 |
| 163387 | Violation | 10/01/2010 | IssuerRecoveryAssessment * BasisPoints: $ 1692 * 1666 = $2818872<br>Total Assessment $ 2818872 / 100 = $28188.72 | $9,488.72 | $18,700.00 | 12/07/2010 | 12/16/2010 |
| 163380 | ECN Reporting | 10/01/2010 | ECN = $300 | $0.00 | $300.00 | | |
| 161127 | Issuer Recovery | 09/01/2010 | Total # Chargebacks = 79<br># Not Liable: 393 * 0.01 = 3.93<br># Liable: 79 - 3.93 = 75.07<br>Total Assessment 75.07 * $ 25 = $1876.75 | $0.00 | $1,876.75 | 11/10/2010 | 11/22/2010 |
| 161137 | Violation | 09/01/2010 | IssuerRecoveryAssessment * BasisPoints: $ 1876.75 * 2010 = $3772267.5<br>Total Assessment $ 3772267.5 / 100 = $37722.67 | $8,722.67 | $29,000.00 | 11/10/2010 | 11/22/2010 |
| 161134 | ECN Late Reporting | 09/01/2010 | Late # Days (1-2): 2 * $ 500 = $1000<br>Total $ 1000 + $ 0 = $1000 | $0.00 | $1,000.00 | 11/10/2010 | 11/22/2010 |
| 161132 | ECN Reporting | 09/01/2010 | ECN = $300 | $0.00 | $300.00 | | |
| 160298 | CHM Late Reporting | 08/01/2010 | Late # Days (4) 4 * $ 164.38 = $657.54<br>Total = $657.54 | $657.54 | $0.00 | 10/28/2010 | 11/03/2010 |
| 160301 | CHM Reporting | 08/01/2010 | CHM = $50 | $0.00 | $50.00 | | |
| | | Total | | $195,474.61 | $98,661.36 | $99,813.25 | |

Activity Log

BRANNON-QUALE ATTACHMENT 12
TRO Exhibit 13

271

BRANNON-QUALE ATTACHMENT 12
TRO Exhibit 13

272

**MasterCard Worldwide**
Fraud Detection and Review

Purchase, NY 10577-2509, USA

Phone:
Fax:
E-mail: @mastercard.com
Internet Home Page: http://www.mastercard.com

October 27, 2010

Terri Harwood
HSBC BANK USA, NATIONAL ASSOCIATION
10705 Red Run Boulevard
Owings Mills, MD 21117 USA

**Re: EXCESSIVE CHARGEBACK PROGRAM**

Dear Ms. Harwood:

Please be advised that MasterCard has calculated the assessments and issuer recovery pertaining to case number 31275, regarding HSBC BANK USA, NATIONAL ASSOCIATION and the violation of the MasterCard Excessive Chargeback Program (ECP) rules with respect to its acquiring for the merchant Auto Marketing Group. These rules are set forth in Section 8.3 of the MasterCard *Security Rules and Procedures Manual*.

The assessments are listed below and segregated by the reporting period. Please be aware that if you have received a variance, future variances may not apply if the chargeback levels continue to exceed the current ECM thresholds. *Furthermore, merchants that exceed the ECM thresholds for four consecutive months will not be considered for a variance.* The billing events listed below have been waived and your MCBS account ICA 2135 will not be debited.

- 08/2010 - CMM Violation, Reported by       on October 19, 2010

| Assessment Type | Amount | Variance | Total |
|---|---|---|---|
| CMM Late Reporting | $657.54 | -$657.54 | $0.00 |

If you have any questions regarding this matter or would like help in preventing future violations of this program, please contact                              or send an email t          @mastercard.com.

Sincerely,                                              cc:    MasterCard Worldwide

Nicole Katzman
Program Leader,
Fraud Detection and Review

**MasterCard Worldwide**
Fraud Strategy and Investigations

Purchase, NY 10577-2509, USA

Phone:
Fax: 9
E-mail:        @mastercard.com
Internet Home Page: http://www.mastercard.com

November 15, 2010                        **Via Courier & Fax: 4433941842**

Ms. Terri Harwood
HSBC BANK USA, NATIONAL ASSOCIATION
10705 Red Run Boulevard
Owings Mills, MD 21117 USA

**Re: EXCESSIVE CHARGEBACK PROGRAM**

Dear Ms. Harwood:

Please be advised that MasterCard has calculated the assessments and issuer recovery pertaining to case number 31275, regarding HSBC BANK USA, NATIONAL ASSOCIATION and the violation of the MasterCard Excessive Chargeback Program (ECP) rules with respect to its acquiring for the merchant Auto Marketing Group. These rules are set forth in Section 8.3 of the MasterCard *Security Rules and Procedures* Manual.

The assessments are listed below and segregated by the reporting period. Please be aware that if you have received a variance, future variances may not apply if the chargeback levels continue to exceed the current ECM thresholds. *Furthermore, merchants that exceed the ECM thresholds for four consecutive months will not be considered for a variance.* The billing events listed below will be reflected on your MCBS account ICA 2135 on November 28, 2010.

* 09/2010 - ECM Violation, Reported by        on November 1, 2010

| Assessment Type | Amount | Variance | Total |
|---|---|---|---|
| Issuer Recovery | $1,876.75 | $0.00 | $1,876.75 |
| Violation | $37,722.67 | -$8,722.67 | $29,000.00 |
| ECM Late Reporting | $1,000.00 | $0.00 | $1,000.00 |

If you have any questions regarding this matter or would like help in preventing future violations of this program, please contact          a          or send an email t          @mastercard.com

Sincerely,

cc:        MasterCard Worldwide

Nicole Katzman
Program Leader,
Fraud Detection and Review

**MasterCard Worldwide**
Fraud Strategy and Investigations

Purchase, NY 10577-2509, USA

Phone:
Fax:  9
E-mail          @mastercard.com
Internet Home Page:  http://www.mastercard.com

December 7, 2010                    **Via Courier & Fax:  4433941042**

Ms. Terri Harwood
HSBC BANK USA, NATIONAL ASSOCIATION
10705 Red Run Boulevard
Owings Mills, MD 21117 USA

Re: **EXCESSIVE CHARGEBACK PROGRAM**

Dear Ms. Harwood:

Please be advised that MasterCard has calculated the assessments and issuer recovery pertaining to case number 31275, regarding HSBC BANK USA, NATIONAL ASSOCIATION and the violation of the MasterCard Excessive Chargeback Program (ECP) rules with respect to its acquiring for the merchant Auto Marketing Group. These rules are set forth in Section 8.3 of the MasterCard *Security Rules and Procedures Manual.*

The assessments are listed below and segregated by the reporting period. Please be aware that if you have received a variance, future variances may not apply if the chargeback levels continue to exceed the current ECM thresholds. *Furthermore, merchants that exceed the ECM thresholds for four consecutive months will not be considered for a variance.* The billing events listed below will be reflected on your MCBS account ICA 2135 on December 19, 2010.

* 10/2010 – ECM Violation, Reported by          on November 30, 2010

| Assessment Type | Amount | Variance | Total |
|---|---|---|---|
| Issuer Recovery | $1,692.00 | $0.00 | $1,692.00 |
| Violation | $28,188.72 | -$9,488.72 | $18,700.00 |

If you have any questions regarding this matter or would like help in preventing future violations of this program, please contact                    or send an email t          @mastercard.com.

Sincerely,

cc:          MasterCard Worldwide

Nicole Katzman
Program Leader
Fraud Detection & Review

**MasterCard Worldwide**
Fraud Strategy and Investigations

Purchase, NY 10577-2509, USA

Phon
Fax:
E-mail:       · ·  @mastercard.com
Internet Home Page: http://www.mastercard.com

**MasterCard**
**Worldwide**

January 13, 2011          **Fax: 4433941042**

Ms. Terri Harwood
HSBC BANK USA, NATIONAL ASSOCIATION
10705 Red Run Boulevard
Owings Mills, MD 21117 USA

**Re: EXCESSIVE CHARGEBACK PROGRAM**

Dear Ms. Harwood:

Please be advised that MasterCard has calculated the assessments and issuer recovery pertaining to case number 31275, regarding HSBC BANK USA, NATIONAL ASSOCIATION and the violation of the MasterCard Excessive Chargeback Program (ECP) rules with respect to its acquiring for the merchant Auto Marketing Group. These rules are set forth in Section 8.3 of the MasterCard *Security Rules and Procedures* Manual.

The assessments are listed below and segregated by the reporting period. Please be aware that if you have received a variance, future variances may not apply if the chargeback levels continue to exceed the current ECM thresholds. *Furthermore, merchants that exceed the ECM thresholds for four consecutive months will not be considered for a variance.* The billing events listed below will be reflected on your MCBS account ICA 2135 on January 23, 2011.

- 11/2010 - ECM Violation, Reported by          on December 30, 2010

| Assessment Type | Amount | Variance | Total |
|---|---|---|---|
| Issuer Recovery | $2,202.50 | $0.00 | $2,202.50 |
| Violation | $69,092.43 | -$47,292.43 | $21,800.00 |

If you have any questions regarding this matter or would like help in preventing future violations of this program, please contact the Customer Compliance team at          @mastercard.com.

Sincerely,

MasterCard Franchise Compliance

**MasterCard Worldwide**
Fraud Strategy and Investigations

Purchase, NY 10577-2509, USA

Phone
Fax:
E-mail:            @mastercard.com
Internet Home Page: http://www.mastercard.com

February 8, 2011          **Fax: 4433941042**

Ms. Terri Harwood
HSBC BANK USA, NATIONAL ASSOCIATION
10705 Red Run Boulevard
Owings Mills, MD 21117 USA

### Re: EXCESSIVE CHARGEBACK PROGRAM

Dear Ms. Harwood:

Please be advised that MasterCard has calculated the assessments and issuer recovery pertaining to case number 31275, regarding HSBC BANK USA, NATIONAL ASSOCIATION and the violation of the MasterCard Excessive Chargeback Program (ECP) rules with respect to its acquiring for the merchant Auto Marketing Group. These rules are set forth in Section 8.3 of the MasterCard *Security Rules and Procedures* Manual.

The assessments are listed below and segregated by the reporting period. Please be aware that if you have received a variance, future variances may not apply if the chargeback levels continue to exceed the current ECM thresholds. *Furthermore, merchants that exceed the ECM thresholds for four consecutive months will not be considered for a variance.* The billing events listed below will be reflected on your MCBS account ICA 2135 on February 20, 2011.

- 12/2010 - ECM Violation, Reported by          on January 28, 2011

| Assessment Type | Amount | Variance | Total |
|---|---|---|---|
| Issuer Recovery | $1,992.00 | $0.00 | $1,992.00 |
| Violation | $49,800.00 | -$29,500.00 | $20,300.00 |

If you have any questions regarding this matter or would like help in preventing future violations of this program, please contact the Customer Compliance team at          @mastercard.com.

Sincerely,

MasterCard Franchise Compliance

MasterCard RSM Report

| | |
|---|---|
| Month Report | January, 2011 |
| Tracking | 312775 |
| Acquirer # | 2135 |
| Merchant Name | AUTO MARKETING GROUP |
| Merchant Number | 15616 |
| Merchant Location | 2300 CORPORATE CIRCLE HENDERSON, NV |
| MCC | 7311 |
| Merchant CTR | 0 |
| Gross Count of Sales Transactions | 28.77% |
| Gross Dollar Volume of Sales Transactions | $0.00 |
| Gross Count of Chargebacks | 42 |
| Gross Dollar Volume of Chargebacks | $10,981.73 |
| Gross Count of Credits | 0 |
| Gross Dollar Amount of Credits | $0.00 |
| Preceding Month Gross Count of Sales Transactions | 146 |
| Preceding Month Gross Dollar Volume of Sales Transactions | $36,116.23 |

*After discussing this matter with the merchant and evaluating its activities, we believe the RSM status is the direct result of: *****REASON***

*Please refer to the Action Plan for additional information

**As an Acquirer, Global Payments monitors merchant activities by using a dedicated Risk System, daily chargeback reporting, automated chargeback resolution, automated Chargeback Monitored Merchant and Excessive Chargeback Merchant identification and a team of investigators. Global Payments believes that these resources will assist in reducing chargebacks on the MasterCard payment system.

**MasterCard ECM Report**

February, 2011

| | |
|---|---|
| Month Report | 31275 |
| Tracking | 2135 |
| Acquirer # | AUTO MARKETING GROUP |
| Merchant Name | 2316 |
| Merchant Number | 2380 CORPORATE CIRCLI HENDERSON, NV |
| Merchant Location | 7311 |
| MCC | 0.00% |
| Merchant CTR | 0 |
| Gross Count of Sales Transactions | $0.00 |
| Gross Dollar Volume of Sales Transactions | 31 |
| Gross Count of Chargebacks | $8,023.49 |
| Gross Dollar Volume of Chargebacks | 0 |
| Gross Count of Credits | $0.00 |
| Gross Dollar Amount of Credits | 0 |
| Preceding Month Gross Count of Sales Transactions | $0.00 |
| Preceding Month Gross Dollar Volume of Sales Transactions | |

*After discussing this matter with the merchant and evaluating its activities, we believe the ECM status is the direct result of: *****REASON***

*Please refer to the Action Plan for additional information

*As an Acquirer, Global Payments monitors merchant activities by using a dedicated Risk System, daily chargeback reporting, automated chargeback resolutions, automated Chargeback Monitored Merchant and Excessive Chargeback Merchant identification and a team of Investigators. Global Payments believes that these resources will assist in reducing chargebacks on the MasterCard payment system.

BRANNON-QUALE ATTACHMENT 12
TRO Exhibit 13

 **global**payments

January 7, 2011

MasterCard Worldwide

Fraud Strategy and Investigations
2000 Purchase Street
Purchase, NY 10577-2509

**RE: Auto Marketing Group (Excessive Chargeback Program)**

Dear Mr. Paulucci:

Please be advised that on behalf of HSBC Bank USA N.A., Global Payments has elected to
terminate the merchant agreement for Auto Marketing Group, effective January 7, 2011.

Global Payments continues to support the initiatives of the Excessive Chargeback Program.
Please accept this notice to serve in place of the requested Month 2 ECM requirements. Should
you have any additional questions or concerns please feel free to contact me directly &

Regards,

Brian Hongtong
Global Payments, Inc.

10705 Red Run Blvd | Owings Mills, Maryland 21117 | T 443-394-1000 | www.globalpaymentsinc.com

**MasterCard ECM Report**

Month Report
Tracking
Acquirer #
Merchant Name
Merchant Number
Merchant Location
MCC
Merchant CTR
Gross Count of Sales Transactions
Gross Dollar Volume of Sales Transactions
Gross Count of Chargebacks
Gross Dollar Volume of Chargebacks
Gross Count of Credits
Gross Dollar Amount of Credits
Preceding Month Gross Count of Sales Transactions
Preceding Month Gross Dollar Volume of Sales Transactions

December, 2010          31275
                         2135
AUTO MARKETING GROUP
                         2316
2380 CORPORATE CIRCLI HENDERSON, NV
                         7311
                          26.00%
                          146
                      $36,115.23
                           83
                      $22,302.16
                            2
                         $651.84
                          332
                      $82,766.74

*After discussing this matter with the merchant and evaluating its activities,
we believe the ECM status is the direct result of: *****REASON!***

*Please refer to the Action Plan for additional Information

*As an Acquirer, Global Payments monitors merchant activities by using a dedicated Risk System,
daily chargeback reporting, automated chargeback resolutions, automated Chargeback Monitored
Merchant and Excessive Chargeback Merchant Identification and a team of Investigators. Global
Payments believes that these resources will assist in reducing chargebacks on the MasterCard payment system.

BRANNON-QUALE ATTACHMENT 12
TRO Exhibit 13

281



Jonathan Trivelas

**General Operations** ▶
**Maintenance** ▶
**Administration** ▶
**File Operations** ▶
**Tools** ▶
**Help** ▶

## *Inquiry Results(Detail)*

If you would like to print the inquiry results, please use the 'Print' button on the browser toolbar

Bold text denotes an exact match
Italic text denotes a phonetic match

**Back to Summary**    **<<Prev Match**    **Next Match>>**

*Inquiry*           *Possible Merchant Match 5 of 26*

| | Inquiry | Possible Merchant Match 5 of 26 |
|---|---|---|
| Reference Number: | 19982012020700001 | Added by 8925 on 06/23/2010 |
| **Merchant Data:** | | |
| Merchant Name | AUTO MARKETING GROUP | 0632237 BC LTD. |
| Doing Business As | *AUTO MARKETING GROUP* | *AUTOMARKETINGGROUP COM* |
| Merchant Id | | 8016045794 |
| Merchant Category Code | | 7311 |
| Business Address | 1007 N FEDERAL HWY | BOX #36060 HILLCREST VILLAGE PO |
| Business Address | | |
| City | FORT LAUDERDALE | SURREY |
| State | FL | |
| Country | USA | CAN |
| Postal Code | 33304 | V3S 7Y5 |
| Phone Number | 8889782770 | 5142822200 |
| National Tax Id | | ********* |
| State Tax Id | | |
| CAT | | N |
| Date Opened | | 09/29/2009 |
| Date Closed | | 06/23/2010 |
| Reason Code | | 10 - VIOLATION OF MASTERCARD STANDARDS |
| **Principal Data:** | | |
| Principal 1: | | |
| Last Name | LOEWEN | JANTZ |
| First Name | MATTHEW | JASON |
| Middle Initial | | |
| Address | 135-19705 FRASER HIGHWAY | 1766 MANCHESTER COURT |
| Address | | |
| City | LANGLEY | PORT COQUITLAM |
| State | | |
| Country | CAN | CAN |
| Postal Code | V3A8H2 | V3B 5R7 |
| Phone Number | | 7782854006 |
| National ID(SSN) | | ********* |
| Driver's License Number | | |
| Driver's License State | | |
| Driver's License Country | | |

**Comments:**

Privacy Policy | Copyright © 2003-2008 MasterCard. All rights reserved.

2/7/2012

  

Jonathan Trivelas

**General Operations** ▶
**Maintenance** ▶
**Administration** ▶
**File Operations** ▶
**Tools** ▶
**Help** ▶

## Inquiry Results(Detail)

If you would like to print the inquiry results, please use the 'Print' button on the browser toolbar

Bold text denotes an exact match
*Italic text denotes a phonetic match*



| **Back to Summary** | **<<Prev Match** | **Next Match>>** |

| | *Inquiry* | *Possible Merchant Match 6 of 26* |
|---|---|---|
| Reference Number: | 19982012020700001 | Added by 8928 on 08/09/2010 |
| **Merchant Data:** | | |
| Merchant Name | AUTO MARKETING GROUP | CLASSIFIED AUTO SERVICE |
| Doing Business As | AUTO MARKETING GROUP | CLASSIFIED AUTO SERVICE |
| Merchant Id | | 8012908672 |
| Merchant Category Code | | 7311 |
| Business Address | 1007 N FEDERAL HWY | 2201 SPEERS RD |
| Business Address | | 2201 SPEERS RD |
| City | FORT LAUDERDALE | OAKVILLE |
| State | FL | |
| Country | USA | CAN |
| Postal Code | 33304 | L6L 2X9 |
| Phone Number | 8889782770 | 9054695522 |
| National Tax Id | | ********** |
| State Tax Id | | ********** |
| CAT | | N |
| Date Opened | | 11/23/2007 |
| Date Closed | | 08/09/2010 |
| Reason Code | | 04 - EXCESSIVE CHARGEBACKS |
| **Principal Data:** | | |
| **Principal 1:** | | |
| Last Name | LOEWEN | LOEWEN |
| First Name | MATTHEW | MATTHEW |
| Middle Initial | | |
| Address | 135-19705 FRASER HIGHWAY | 601 9380 UNIVERSITY CRESCENT |
| Address | | 601 9380 UNIVERSITY CRESCENT |
| City | LANGLEY | BURNABY |
| State | | |
| Country | CAN | CAN |
| Postal Code | V3A8H2 | V5A 4X9 |
| Phone Number | | 7783297490 |
| National ID(SSN) | | ********** |
| Driver's License Number | | |
| Driver's License State | | |
| Driver's License Country | | |

Comments:

Privacy Policy | Copyright © 2002-2008 MasterCard. All rights reserved.

2/7/2012

If you would like to print this details, please use the Print button on the browser toolbar.

**Work History   Additional Info.   Correspondence      Update      Special Merchant Audit**

**Merchant Information**

| | | | |
|---|---|---|---|
| Acquirer ID: | 2135 - HSBC BANK USA, NATIONAL ASSOCIATION | Compressed Merchant Name: | AUTOMARKGRP8885 |
| Merchant Name: | AUTOMARKGRP88885492001 | | |
| City: | LAS VEGAS | State: | NV |
| Country: | USA - UNITED STATES | Region: | 1 - US |
| Merchant Category Code: | 7311 - ADVERTISING SERVICES | | |

**Status**

| | |
|---|---|
| Group: | 1 - INFORMATION |
| Code: | 02 - SUGGESTED TRAINING FRAUD ALERT |
| Prior Status Code: | |
| Exclude from Future Violations: | N |
| Extracted as Special Merchant: | N |

**Reporting Information**

| | | | |
|---|---|---|---|
| Reported Date: | 11/02/2010 | Start Date: | 05/01/2010 |
| Rule Violation: | FOUR (4) OR MORE FRAUD TRANS., TOTAL >= USD4000, FRAUD/SALES >= 5% AND <= 7.99%, IN ONE MONTH | | |

**Charge Back**

| | | |
|---|---|---|
| Start Date: | End Date: | |

**Security Bulletin**

| | | |
|---|---|---|
| Number: | Date: | |

**Correspondence**

| | | |
|---|---|---|
| Final Response Due By: | | |
| Late Letter Sent On: | Late Response Due By: | |
| Final Letter Sent On: | Final Response Due By: | |
| Suppress Late Letter: | N | Suppress Final Letter: | N |

**Merchant Additional Information**

**Merchant Principal Information**

**Merchant Violations**

Refer to Fraud Reporter reports for complete transaction details.

| Fraud Month | Fraud Amount | Fraud Count | Sales Amount | Sales Count | Loss Percent | Violation Occurred? | Critical Fraud Percent |
|---|---|---|---|---|---|---|---|
| 08/2010 | $1129.88 | 4 | $8748.96 | 34 | | | |
| 09/2010 | $6979.26 | 26 | $103128.96 | 409 | 6.76% | YES | 5% |
| 10/2010 | $3691.62 | 14 | $82201.26 | 327 | 4.49% | | |

2/7/2012

If you would like to print this details, please use the *Print* button on the browser toolbar.

**Work History    Additional Info.    Correspondence     Update     Special Merchant Audit**

**Merchant Information**

| | | | |
|---|---|---|---|
| Acquirer ID: | 2135 - HSBC BANK USA, NATIONAL ASSOCIATION | Compressed Merchant Name: | CLASSIFIEDAUTOS |
| Merchant Name: | CLASSIFIED AUTO SERVIC | | |
| City: | HENDERSON | State: | NV |
| Country: | USA - UNITED STATES | Region: | 1 - US |
| Merchant Category Code: | 7311 - ADVERTISING SERVICES | | |

**Status**

| | |
|---|---|
| Group: | 1 - INFORMATION |
| Code: | 30 - INFORMATION FRAUD ALERT    Prior Status Code: |
| Exclude from Future Violations: | N |
| Extracted as Special Merchant: | N |

**Reporting Information**

| | | | |
|---|---|---|---|
| Reported Date: | 09/02/2010 | Start Date: | 03/01/2010 |
| Rule Violation: | THREE (3) OR MORE FRAUD TRANS., TOTAL >= USD3000, FRAUD/SALES >= 3% AND <= 4.99%, IN ONE MONTH | | |

**Charge Back**

| | |
|---|---|
| Start Date: | End Date: |

**Security Bulletin**

| | |
|---|---|
| Number: | Date: |

**Correspondence**

| | | | |
|---|---|---|---|
| First Response Due By: | | | |
| Late Letter Sent On: | | Late Response Due By: | |
| Final Letter Sent On: | | Final Response Due By: | |
| Suppress Late Letter: | N | Suppress Final Letter: | N |

**Merchant Additional Information**

**Merchant Principal Information**

**Merchant Violations**

Refer to Fraud Reporter reports for complete transaction details.

| Fraud Month | Fraud Amount | Fraud Count | Sales Amount | Sales Count | Loss Percent | Violation Occurred? | Critical Fraud Percent |
|---|---|---|---|---|---|---|---|
| 04/2010 | $999.88 | 4 | $15048.18 | 62 | | | |
| 05/2010 | $399.99 | 1 | $27397.15 | 112 | | | |
| 06/2010 | $3466.39 | 14 | $103918.01 | 431 | 3.33% | YES | 3% |
| 07/2010 | $2618.68 | 12 | $105927.03 | 422 | | | |
| 08/2010 | $3502.75 | 13 | $91491.98 | 363 | 3.82% | | |

5... 2/7/2012

If you would like to print this details, please use the *Print* button on the browser toolbar.

**Work History    Additional Info.    Correspondence     Update     Special Merchant Audit**

**Merchant Information**

| | | | |
|---|---|---|---|
| Acquirer ID: | 2135 - HSBC BANK USA, NATIONAL ASSOCIATION | Compressed Merchant Name: | VEHICLESTARS |
| Merchant Name: | VEHICLE STARS | | |
| City: | COSTA MESA | State: | CA |
| Country: | USA - UNITED STATES | Region: | 1 - US |
| Merchant Category Code: | 7311 - ADVERTISING SERVICES | | |

**Status**

| | | | |
|---|---|---|---|
| Group: | I - INFORMATION | | |
| Code: | 30 - INFORMATION FRAUD ALERT | Prior Status Code: | |
| Exclude from Future Violations: | Y | | |
| Extracted as Special Merchant: | N | | |

**Reporting Information**

| | | | |
|---|---|---|---|
| Reported Date: | 10/02/2011 | Start Date: | 04/01/2011 |
| Rule Violation: | THREE (3) OR MORE FRAUD TRANS., TOTAL >= USD3000, FRAUD/SALES >= 3% AND <= 4.99%, IN ONE MONTH | | |

**Charge Back**

| | |
|---|---|
| Start Date: | End Date: |

**Security Bulletin**

| | |
|---|---|
| Number: | Date: |

**Correspondence**

| | | | |
|---|---|---|---|
| First Response Due By: | | | |
| Late Letter Sent On: | | Late Response Due By: | |
| Final Letter Sent On: | | Final Response Due By: | |
| Suppress Late Letter: | N | Suppress Final Letter: | N |

**Merchant Additional Information**

**Merchant Principal Information**

**Merchant Violations**

Refer to Fraud Reporter reports for complete transaction details.

| Fraud Month | Fraud Amount | Fraud Count | Sales Amount | Sales Count | Loss Percent | Violation Occurred? | Critical Fraud Percent |
|---|---|---|---|---|---|---|---|
| 04/2011 | $584.93 | 2 | $70341.43 | 288 | | | |
| 05/2011 | $1999.76 | 8 | $89648.73 | 366 | | | |
| 06/2011 | $2168.45 | 10 | $76263.71 | 314 | | | |
| 07/2011 | $3293.33 | 14 | $73007.80 | 291 | 4.51% | YES | 3% |
| 08/2011 | $3885.71 | 16 | $64105.75 | 255 | 6.06% | | |
| 09/2011 | $2024.85 | 7 | $73229.08 | 292 | | | |

. 2/7/2012



**media3**™
*solid hosting for serious business*

May 6, 2011

Jennifer Larabee
FTC, Northwest Region
915 Second Ave., Suite 2896
Seattle, WA 98174

Jennifer,

Please find attached our response pursuant to your recent CID received May 2, 2011.

If you have any questions, I can be reached at ___ ___media3.net or ___ (cell).

Thank You,

R. Haye

Bob Hayes
Media3 Technologies, LLC

33 Riverside Drive * Pembroke, MA 02359 * USA * 1-800-903-9327

BRANNON-QUALE ATTACHMENT 13
TRO Exhibit 13

287



**media3™**
*solid hosting for serious business*

.IV SPECIFICATIONS

    A. Name(s)
    Matt Lowen
    ReadyPay Services

    B. Address(es)
    22944 Old Yale Rd.
    Langley, BC  85028

    C. Our phone system does not have logs that we can associate by
       customer.

    D. Startdate:01/30/2009   Windows 2008 VPS Webhosting

    E. IP's assigned
    208.118.240.43
    208.118.240.52
    208.118.240.32
    208.118.240.106

    F. Source of Payment
      VISA  4500(

BRANNON-QUALE ATTACHMENT 13
TRO Exhibit 13

288

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.  I, _Robert Hayes_, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by Media3 Technologies, LLC and attached hereto.

3.  The documents produced and attached hereto by Media3 Technologies, LLC are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of Media3 Technologies, LLC; and

    c)  Were made by the regularly conducted activity as a regular practice of Media3 Technologies, LLC.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on _May 6_, 2011.

_R. Hayes_
Signature

# Form of Certificate of Compliance*

I/We do certify that all of the documents and information required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to such interrogatory or uncompleted portion and the reasons for the objections have been stated.

Signature _____R. Hays_____

Title ___CEO___

Sworn to before me this day

_May 13_ _2011_

_Elizabeth Coletta_

Notary Public

_My commission expires:_

_10|8|2012_



*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible. In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

FTC Form 144-Back (rev. 2/08)

BRANNON-QUALE ATTACHMENT 13
TRO Exhibit 13

*14*

## CIVIL INVESTIGATIVE DEMAND
**(888) 760-3426 AND (888) 980-1223**

| Account Number: | 42186 |
|---|---|
| Account Name: | Matthew Loewen |
| Address: | No Address Provided |
| Country: | Canada |
| Email: | warren.kean@gmail.com |
| Website: | www.integritymarketingllc.com |
| Call Information: | See attached CDR (Call Detail Records) information |

**CREDIT CARDS USED:**

| | | | Name | | Address |
|---|---|---|---|---|---|
| 5192 | | | Jason | Jantz | 1766 Manchester Court |
| 5191 | | | Jason | Jantz | 1766 Manchester Court |
| 519 | | | Jason | Jantz | 1766 Manchester Court |
| 450 | | | Jason | Jantz | 1766 Manchester Court |
| 45 | | | Jason | Jantz | 1766 Manchester Court |
| 450 | | | Jason | Jantz | 1766 Manchester Court |
| 45 | | | Jason | Jantz | 1766 Manchester Court |
| 51 | | | Jason | Jantz | 1766 Manchester Court |
| 450C | | | Matthew | Loewen | 22944 Old Yale Road |
| 519 | | | Jason | Jantz | 1766 Manchester Court |
| 51 | | | Jason | Jantz | 1766 Manchester Court |

| | | | |
|---|---|---|---|
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Langley | BC | V2Z 2V3 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |
| Port Coquitlam | BC | V3B5R7 | CA |

# PayPal™

## Global Asset Protection

**Law Enforcement Officer:** Jennifer Larabee
**Law Enforcement Agency:** Federal Trade Commission
**Requested On:** Wed, 04 May 2011 23:38
**Evidence Gathered On:** Tue, 07 Jun 2011 22:27
**Law Enforcement Reference:**

All times indicated in this document refer to time zone GMT/BST

| Registration Information | |
|---|---|
| First Name | Jay |
| Middle Name | |
| Last Name | J |
| DOB | 24-Sep-79 |
| CC Statement Name | AUTO SELLER |
| Email | jjantz@alliedautogroup.com, sales@alliedautogroup.com |
| Business Name | Auto Marketing Group |
| URL | http://www.alliedautogroup.com |
| Customer Service Phone | 888-390-6051  - Trusted |
| Account Status | Open |
| Account # | |
| Account Type | Business - Canadian Verified - Cat10A (Canada) - Merchant Manager |
| Time Created | Tue, 02 Dec 2008 21:01:44 |
| SSN | |
| TIN | |

15

| | | | |
|---|---|---|---|
| sales@automarketinggroup.com | FALSE | TRUE | FALSE |
| sales@autosellernetwork.com | FALSE | TRUE | FALSE |
| jjantz@alliedautogroup.com | FALSE | TRUE | TRUE |
| sales@alliedautogroup.com | TRUE | TRUE | TRUE |
| info@autosellernetwork.com | FALSE | TRUE | FALSE |

| | | | |
|---|---|---|---|
| 888-980-1223 | Unconfirmed - No Attempt | (Home) | Home - Deleted |
| 604-723-5833 | Unconfirmed - No Attempt | | Work |
| 888-980-1223 | Unconfirmed - No Attempt | | Work - Deleted |
| 888-390-6051 | Unconfirmed - No Attempt | | Customer Service |
| 888-980-1223 | Unconfirmed - No Attempt | | Customer Service - Deleted |

| | |
|---|---|
| Auto Marketing Group<br>1766 Manchester Court<br>Port Coquitlam<br>British Columbia V3B5R7<br>Canada | 11/24/10 |
| Auto Marketing Group<br>200-604 Columbia St<br>New Westminster<br>British Columbia V3M 1A5<br>Canada | 12/02/08 |

| | |
|---|---|
| | $0.13 CAD (Primary) |
| | $5.12 USD |
| Account Balance | $4.99 CAD * |
| Total Amount Sent | $3,279.70 USD |
| Total Amount Received | $78,039.79 USD |
| Amount Received Current Month | $0.00 USD |
| Amount Received Month 1 | $499.94 USD |
| Amount Received Month 2 | $499.95 USD |
| Amount Received Month 3 | $3,863.79 USD |
| Pending Balance to be Released | |
| Minimum Reserve Balance | $0.00 CAD* (0 % - $0.00 CAD) |
| Rolling Reserve Balance | $0.00 CAD* (0 % - 0 days) |
| Billing Address | |
| Secure Card Numbers | N/A |
| Backup Funding Source | N/A |
| Daily Spending Limit | $500 |
| PP Credit Account Number | |
| Expiration Date | |
| Account Status | Disabled |
| Funding Source Availability | Not Available |
| Authorized Users | |

| Status | | | | |
|---|---|---|---|---|
| Active - Primary | Auto Seller Network | Confirmed(rand dep) | 27260 (Bank Transit Number) 001 (Institution Number) | |
| Checking | Bank of Montreal | | | CA |

| | | | |
|---|---|---|---|
| Thu, 04 Mar 2010 1:11:27 | Fri, 06 May 2011 20:25:05 | 70.68.3.155 | 63 |
| Thu, 28 Apr 2011 22:43:04 | Thu, 28 Apr 2011 22:43:04 | 209.17.153.17 | 1 |
| Thu, 23 Dec 2010 6:25:01 | Thu, 23 Dec 2010 6:25:01 | 207.216.225.92 | 1 |
| Fri, 19 Nov 2010 20:51:50 | Fri, 19 Nov 2010 20:51:50 | 70.68.39.155 | 1 |
| Sat, 23 Oct 2010 10:04:54 | Sat, 23 Oct 2010 10:04:54 | 68.171.234.12 | 1 |
| Sat, 23 Oct 2010 10:01:49 | Sat, 23 Oct 2010 10:01:49 | 68.171.231.16 | 1 |
| Wed, 05 May 2010 0:15:55 | Tue, 17 Aug 2010 18:11:24 | 174.1.180.97 | 18 |
| Wed, 14 Apr 2010 19:25:07 | Mon, 26 Jul 2010 22:24:54 | 66.183.20.119 | 101 |
| Thu, 11 Feb 2010 18:56:03 | Fri, 18 Jun 2010 19:59:50 | 75.157.144.25 | 17 |
| Thu, 17 Jun 2010 18:05:12 | Thu, 17 Jun 2010 18:05:12 | 24.85.162.100 | 1 |
| Tue, 01 Jun 2010 1:21:46 | Tue, 01 Jun 2010 4:28:42 | 70.71.109.232 | 2 |
| Fri, 19 Mar 2010 20:48:03 | Thu, 22 Apr 2010 17:07:06 | 66.183.20.121 | 17 |
| Tue, 16 Mar 2010 23:44:03 | Tue, 16 Mar 2010 23:44:03 | 70.28.245.4 | 1 |
| Mon, 07 Dec 2009 18:47:26 | Fri, 12 Mar 2010 0:03:09 | 64.114.42.178 | 128 |
| Wed, 22 Jul 2009 20:59:44 | Tue, 09 Mar 2010 23:00:00 | 64.114.42.177 | 156 |
| Mon, 29 Dec 2008 19:08:39 | Fri, 12 Feb 2010 21:30:32 | 70.68.6.51 | 66 |
| Thu, 14 Jan 2010 20:00:18 | Thu, 14 Jan 2010 20:00:18 | 70.68.19.198 | 1 |

| Wed, 28 Oct 2009 19:18:29 | Mon, 07 Dec 2009 18:48:44 | 75.157.150.198 | 10 |
|---|---|---|---|
| Sat, 14 Nov 2009 18:46:13 | Sat, 14 Nov 2009 18:46:13 | 24.85.91.96 | 1 |
| Mon, 09 Nov 2009 1:54:36 | Mon, 09 Nov 2009 1:54:36 | 174.1.201.164 | 1 |
| Wed, 04 Nov 2009 0:24:32 | Wed, 04 Nov 2009 0:30:50 | 70.70.139.123 | 2 |
| Thu, 07 May 2009 21:12:30 | Fri, 16 Oct 2009 17:58:41 | 75.157.185.240 | 61 |
| Thu, 13 Aug 2009 3:42:30 | Thu, 10 Sep 2009 0:46:13 | 70.68.191.168 | 3 |
| Tue, 28 Jul 2009 20:55:44 | Wed, 09 Sep 2009 22:18:21 | 74.198.148.45 | 7 |
| Thu, 27 Aug 2009 5:58:58 | Thu, 03 Sep 2009 7:09:38 | 74.198.148.46 | 4 |
| Wed, 26 Aug 2009 15:32:58 | Wed, 26 Aug 2009 15:32:58 | 75.155.124.156 | 1 |
| Tue, 09 Dec 2008 2:47:54 | Fri, 17 Jul 2009 20:18:59 | 70.71.21.230 | 120 |
| Tue, 02 Dec 2008 21:01:45 | Mon, 06 Jul 2009 21:02:12 | 70.71.29.85 (Signup) | 70 |
| Sat, 13 Dec 2008 9:43:54 | Sat, 13 Dec 2008 9:43:54 | 70.68.34.154 | 1 |

This document is sent electronically and does not require any signature.

The information in this document has been processed based on the request from the Law Enforcement Officer named above.

CONFIDENTIALITY NOTICE:

This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.



**From:** Paul Karkas   >
**Sent:** Thursday, December 15, 2011 10:54 AM
**To:** Larabee, Jennifer
**Cc:** McKewen, Richard
**Subject:** RE: Request for Information Vehiclestars.com and readypay.net CID

Hello;

By way of background let me first describe the Tucows business model so as to elucidate what Tucows can and cannot provide within the request of the CID.

Tucows is a domain name registrar that uses a wholesale model, as such Tucows does not accept payment directly from domain name registrants and will not access to payment gateways for domain name purchases.
However, Tucows can direct you to our Reseller - the party that accepted payment for the domain name.

The domain Vehiclestars.com is registered with Tucows and the internal whois displays as:

Organization Information
First Name:   Matthew
Last Name:   Loewen
Organization Name:   Matthew Loewen
Street Address: 22944 Old Yale Road


City:   Langley
State:   BC
2 Letter ISO Country Code:   CA
Postal Code:   V2Z 2V3
Phone: +1.7789950941
Fax:
Email: warren.kean@gmail.com
Admin Information
First Name:   Matthew
Last Name:   Loewen
Organization Name:   Matthew Loewen
Street Address: 22944 Old Yale Road


City:   Langley
State:   BC
2 Letter ISO Country Code:   CA
Postal Code:   V2Z 2V3
Phone: +1.7789950941
Fax:
Email: warren.kean@gmail.com
Billing Information

1

First Name:     Matthew
Last Name:      Loewen
Organization Name:     Matthew Loewen
Street Address: 22944 Old Yale Road


City:   Langley
State:  BC
2 Letter ISO Country Code:     CA
Postal Code:    V2Z 2V3
Phone: +1.7789950941
Fax:
Email:  warren.kean@gmail.com
Technical Contact Information
First Name:     Verio
Last Name:      Hostmaster
Organization Name:     Verio
Street Address: 5050 Blue Lake Dr.


City:   Boca Raton
State:  FL
2 Letter ISO Country Code:     US
Postal Code:    33431
Phone: +1.8886636648
Fax:    +1.8886636655
Email:  hostmaster@VERIO-HOSTING.COM
DNS Information
FQDN   IP
ns19b.nameservers.net
ns19a.nameservers.net

This name was originally registered with Tucows on 2010-08-31 and (as best as I can tell) has always held the same information in the whois.


The Tucows reseller for vehiclestars.com is Verio, Inc., hostmaster@verio-hosting.com
    +1.888-663-6648    http://www.verio.com - Verio may be contacted for
any payment information.

With respect to readypay.net;

The whois is currently shown at tucowsdomains.com as thus;

Registrant:
ReadyPay Services Inc.
404 - 737 Carnarvon St
New Westminster, BC V3M5X1
CA

Domain name: READYPAY.NET

2

Administrative Contact:
Loewen, Matthew it@readypay.net
404 - 737 Camarvon St
New Westminster, BC V3M5X1
CA
+1.6046363400
Technical Contact:
Contact, Technical help@hover.com
96 Mowat Avenue
Toronto, ON M6K 3M1
CA
+1.4165385498 Fax: +1.4163520113

Registration Service Provider:
Hover, help@hover.com
416.538.5498
http://help.hover.com

Registrar of Record: TUCOWS, INC.
Record last updated on 18-Aug-2009.
Record expires on 10-Sep-2012.
Record created on 10-Sep-2004.

Registrar Domain Name Help Center:
http://tucowsdomains.com

Domain servers in listed order:
ns5.ixwebhosting.com
ns6.ixwebhosting.com

Domain status: clientTransferProhibited
clientUpdateProhibited

I can see historical whois information that shows the whois (at time of transfer to the Tucows database) to be;

Owner Contact Information
First Name      Matthew
Last Name       Loewen
Organization Name       SunQuest Marketing Inc.
Street Address   29 - 533 SW Marine Drive
(eg: Suite #245)
Address 3
City     Vancouver
State    BC
2 Letter Country Code    CA
Postal Code     V6P5X9
Phone Number    +1.9499332037
Fax Number
Email    mloewen@readypay.net
Admin Contact Information
First Name       Matthew
Last Name        Loewen

3

Organization Name      SunQuest Marketing Inc.
Street Address   29 - 533 SW Marine Drive
(eg: Suite #245)
Address 3
City      Vancouver
State     BC
2 Letter Country Code   CA
Postal Code      V6P5X9
Phone Number   +1.9499332037
Fax Number
Email   mloewen@readypay.net
Billing Contact Information
First Name      Matthew
Last Name      Loewen
Organization Name      SunQuest Marketing Inc.
Street Address   29 - 533 SW Marine Drive
(eg: Suite #245)
Address 3
City      Vancouver
State     BC
2 Letter Country Code   CA
Postal Code      V6P5X9
Phone Number   +1.9499332037
Fax Number
Email   mloewen@readypay.net
Technical Contact Information
First Name      Domain
Last Name      Direct
Organization Name      Domain Direct
Street Address   96 Mowat Avenue
(eg: Suite #245)
Address 3
City      Toronto
State     ON
2 Letter Country Code   CA
Postal Code      M6K 3M1
Phone Number   +1.4165312084
Fax Number      +1.4165315584
Email   dnstech@domaindirect.com

Here's the data that Hover was able to dig on readypay.net - please keep in mind, the last 'action' on this account appears to have been in 2007 which was for a renewal;

" The name on the user account is:  Matthew Loewen
Contact email address on file:  admin@readypay.net

There's no credit card info on the account and the location is listed as "unknown".

The "source" on the account is Domain Direct, though, so that means the domain was imported out of the old database into Hover.

There are no mailboxes set up on this domain in the account through us.

4

According to the log file on the account, this user has never logged into this user account to make any changes or updates, not even once since we imported the domain from the old database.

Sorry there isn't more info.... this is all there is in the account, not even any IPs since they've never logged in and we can no longer get into the old Domain Direct database to get anything further.
"

Please let me know if you have any questions.


Paul Karkas
Compliance Officer OpenSRS
Tucows Inc.


1-800-371-6992
Fax 1-416-531-2516


Vehiclestars.com and readypay.net

From: Larabee, Jennifer [mailtc
Sent: Thursday, December 15, 2011 12:59 PM
To:
Cc: McKewen, Richard
Subject: Request for Information
Importance: High

Paul
Karkas
          Via email tc                        Tucows, Inc.
96 Mowat Avenue
Toronto, Ontario M6K 3M1 Canada


Dear Mr. Karkas:


        Consistent with our telephone discussion with you, we are forwarding to you our request for information from Tucows, Inc., Contact Privacy, Inc. and Hover, Inc. If you have any questions, please do not hesitate to contact me at 206-22C        We thank you for your assistance with our investigation.

5

Very truly yours,

/s/ Jennifer Larabee

Federal Trade Commission

Attachment

Jennifer Larabee
Federal Trade Commission
915 Second Ave., Suite 2896
Seattle, Washington 98174
Front Desk: 206-220-6350
Fax: 206-220-6366

6

| Record # 4 of 20 / Consumer Sentinel Network Complaints | | | |
|---|---|---|---|
| **Reference Number:** | 37565121 | **Originator Reference Number:** | 06330090146444 |
| **Language:** | English | **Contact Type:** | Complaint |
| **Source:** | Organization | **DNC?** | N |
| **Comments:** | I posted an ad on Craigslist to sell a 2009 Ford ranger. The salesman made it sound like they had really good success, and because my truck was so new and in good condition I could probably get 15,000 for it. That sounded a little high to me but I thought why not give it a try. I never got one inquiry about the truck. When the required 90 day period ended, I followed the instructions to the letter about how to get you refund back. On September 23, 2011 I had a Notary sign the required documents, and mailed them in. Since then I have had made multiple attempts to contact them and when I actually get someone on the phone they say your check is refunded and has been sent, but it never comes. I am concerned about my personal information being stolen and would like to help warn other people about doing business with them. Jeff LaterThank you for talking with me about your FORD RANGER 2D XL.As I mentioned earlier my position at vehicle stars is to scout for vehicles that my manager will be able to sell quickly. I was given a list of vehicles that are in high demand in your area and gather some information. I believe yours is a good match and I have sent the details we discussed to my supervisor for review. If my manager agrees it will be a good match, we will be able to guarantee the sale of your FORD RANGER 2D XL. My manager may contact you directly, or I will contact you if further information is needed.Here is some information on our company as well how we are able to guarantee the sale.We guarantee our results, and a deposit of $499.99 will be required. We will guarantee the sale of your FORD RANGER 2D XL within 90 days.84% of vehicles we list sell within 90 days, if by chance you are still in possession of your vehicle at the end of the 90 days $399.99 will be refunded. . http://www.vehiclestars.com/refund_terms Vehicle Stars boasts over 20 Million unique viewers every month through our advertising affiliates. We constantly purchase custom software to ensure we have the most accurate and up to date information CONFIRMATION LETTERDear Jeff LaterThank you for choosing VehicleStars for the sale of your vehicle. You have already completed the first step by creating a profile with your agent - the next is to activate your account.To activate your account, sign in with the details below, and register the VIN number that activates your Premium Option guarantee. Please note that you must complete this process within seven days of your contract date to be eligible for the money back guarantee, in order to give us a proper time-frame to complete our duties. We reserve the right to perform a Carfax analysis on all the vehicles registered to verify they are in the stated condition.Please update your profile with pictures, and check the options that are on your vehicle. Your user name and password is below. Transaction confirmation/Verification Code: 173095541Contract Date: 2011-06-21 12:29:50 General Package: $399.99 Approval code:3697317772Premium Option Price: $99.95 Approval code:Empty approval codes could indicate a decline on the card, please contact us for assistance if this is the case. If your premium option fee has declined we will continue to retry it for two weeks. The premium option money back guarantee is valid for anybody who has successfully paid the price listed above, as long as the number is non-zero. If you have not accepted the premium option, then it will list $0 for that portion above, will not be billed, and will not be available. You can choose to sign up for the premium option within the first two weeks of your advertisement, if you haven't already chosen to do so.All prices quoted in US dollars. Canadian customers are charged GST or HST when applicable. Membership InformationListing ID: 9064User-name                            com Password: grk2ise Advertisement Locality: Hawaii — Additional Comments: I want Vehicle Stars to honor th |
| **Data Reference:** | | | |
| **Entered By:** | BBBWEFL-USER | **Entry Date:** | 4/11/2012 |
| **Updated By:** | | **Updated Date:** | |
| **Complaint Source:** | BBB FL West Palm Beach | **Product Service Code:** | Internet Information & Adult Services |
| **Amount Requested:** | | **Amount Paid:** | |
| **Payment Method:** | | **Agency Contact:** | External Agency |
| **Complaint Date:** | 4/11/2012 | **Transaction Date:** | |
| **Initial Contact:** | | **Initial Response:** | |
| **Statute/Rule:** | | **Law Violation:** | |
| **Topic:** | | **Dispute with Credit Bureau?:** | |
| **Dispute with Credit Bureau - Responded?:** | | **Dispute with Credit Bureau - Resolved to Satisfaction?:** | |
| **Member of** | | | |

BRANNON-QUALE ATTACHMENT 17
TRO Exhibit 13

304

Record Details

| armed forces or dependent?: | | | |
|---|---|---|---|
| | **Consumer Information** | | |
| **Consumer** | | | |
| Complaining Company/Org: | | | |
| First Name: | Jeffrey | Last Name: | Later |
| Address 1: | | Address 2: | |
| City: | | State: | Hawaii |
| Zip: | | Country: | UNITED STATES |
| Home Number: | | Work Number: | |
| Fax Number: | | Ext: | |
| Email: | | Age Range: | |
| Military Service Branch: | | Soldier Status: | |
| Soldier Station: | | | |
| | **Subject** | | |
| Subject: View Similar Complaints | Vehicle Stars | | |
| Address: | 1007 N. Federal Hwy., # 6002 | | |
| City: | Fort Lauderdale | State/Prov: | Florida |
| ZIP: | | Country: | United States |
| Email: | support@vehiclestars.com | URL: | www.vehiclestars.com |
| Area Code: | | Phone Number: | |
| Ext: | | | |
| Representative Name: | | Title: | |

BRANNON-QUALE ATTACHMENT 17
TRO Exhibit 13

305

**From:** Jeff later <        .com>
**Sent:** Monday, June 18, 2012 11:18 PM
**To:** Brannon-Quale, Amy
**Subject:** FW: FORD RANGER 2D XL (From Emily Williams)

---

Date: Mon, 20 Jun 2011 21:19:15 -0700
From: requested-information@vehiclestars.com
To:    @   .com
Subject: re: FORD RANGER 2D XL (From Emily Williams)

# VEHICLESTARS

## 1-888-9STARS0  Connecting buyers + sellers everyday.

**Jeff**

Thank you for talking with me about your FORD RANGER 2D XL,

As I mentioned earlier my position at vehicle stars is to scout for vehicles that my manager will be able to sell quickly. I was given a list of vehicles that are in high demand in your area and gather some information. I believe yours is a good match and I have sent the details we discussed to my supervisor for review. If my manager agrees it will be a good match, we will be able to guarantee the sale of your FORD RANGER 2D XL. My manager may contact you directly, or I will contact you if further information is needed.

Here is some information on our company as well how we are able to guarantee the sale.

We guarantee our results, and a deposit of $499.99 will be required. We will guarantee the sale of your FORD RANGER 2D XL within 90 days.

84% of vehicles we list sell within 90 days, if by chance you are still in possession of your vehicle at the end of the 90 days $399.99 will be refunded. . http://www.vehiclestars.com/refund_terms

- 
  - Vehicle Stars boasts over 20 Million unique viewers every month through our advertising affiliates.
  - We constantly purchase custom software to ensure we have the most accurate and up to date information on any vehicle.
  - We have the latest car reviews, blue book values, and specific demand for any vehicle in North America.
  - Our software automatically alerts us when a vehicle is in demand and under-stocked. This allows us to never flood the market with un-wanted merchandise.
  - We also work with some of the biggest financial institutions to give any consumer the assistance to purchase a vehicle they wouldn't otherwise be able to afford.
  - We do NOT take a commission of the sale of your vehicle, meaning the sale remains private between you and any potential buyer. We will facilitate the sale every step of the way, but ultimately you are in full control.
  - The majority of our vehicles will sell anywhere between 2-6 weeks. The quicker the sale, the better it is for everyone involved.

1

- Check out our website www.vehiclestars.com

**Regards,**

Emily Williams
Vehicle Stars Prospector
#6002-1007 N Federal Hwy
Fort Lauderdale, FL 33304
1-888-9STARS0 ext. 214
1-888-978-2770 ext. 214

**304432: This is an automatic email as a response to you asking one of our junior agents for more information.** If you do not want to receive further communication from our company, please **let your agent know** when you speak to them. If you would like to communicate with our management team with any suggestions or complaints, please forward this email and your comments to management@vehiclestars.com. We maintain a strict do not call list and will not send unsolicited emails nor follow-up calls other than when you've agreed to them. All information provided to us is kept confidential, except in implied circumstances if you choose to register on our website to advertise your vehicle. This email is confidential and not for redistribution.

2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

COMMERCE PLANET, INC., a
corporation, and MICHAEL HILL,
CHARLES GUGLIUZZA, and AARON
GRAVITZ, individually and as officers
of COMMERCE PLANET, INC.,

Defendants.

Case No.: 8:09-cv-01324-CJC(RNBx)

MEMORANDUM OF DECISION

I. INTRODUCTION

The Federal Trade Commission ("FTC") brought this action for injunctive and
monetary equitable relief against Commerce Planet, Inc. ("Commerce Planet") and
several of its directors and officers, including Michael Hill, Aaron Gravitz, and Charles
Gugliuzza (collectively, "Defendants"), for deceptive and unfair business practices
arising from Defendants' website marketing of a web creation and hosting service called

-1-

1  OnlineSupplier. OnlineSupplier was marketed as a free "Online Auction Starter Kit" that
2  purported to help consumers sell products on eBay. Consumers were permitted a free
3  trial period to use OnlineSupplier with payment of a small shipping and handling fee. If
4  consumers did not cancel the service within the trial period, they were automatically
5  charged a recurring monthly fee ranging from $29.95 to $59.95. The FTC alleges that
6  during the relevant time period (July 2005 to March 2008), Defendants deceptively
7  marketed OnlineSupplier as a free auction kit on its website without adequately
8  disclosing the program's negative option plan, which required consumers to affirmatively
9  cancel their membership or otherwise incur a monthly charge to their credit card. The
10 FTC alleges that consumers unwittingly signed up for OnlineSupplier, believing they had
11 ordered a free kit, only to discover later that they had been enrolled in OnlineSupplier's
12 continuity program when they saw monthly charges on their credit card bill. The FTC
13 alleges that between July 2005 and March 2008, Commerce Planet obtained over $45
14 million from over 500,000 consumers.
15
16 The FTC settled with all Defendants except for Mr. Gugliuzza, Commerce Planet's
17 former president and consultant from July 2005 to November 2007. In the operative First
18 Amended Complaint ("FAC"), the FTC asserts two counts against Mr. Gugliuzza for (i)
19 deceptive practices and (ii) unfair practices in violation of section 5(a) of the Federal
20 Trade Commission Act (the "FTC Act" or "Act"), 15 U.S.C. § 45(a). The FTC requests
21 injunctive and monetary equitable relief against Mr. Gugliuzza under section 13(b) of the
22 FTC Act, 15 U.S.C. § 53(b). Between January 31, 2012 and February 28, 2012, the
23 Court conducted a sixteen-day bench trial that involved over 300 exhibits and 22
24 witnesses. The parties thereafter submitted extended closing briefs. The Court, by this
25 Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to
26 Federal Rule of Civil Procedure 52(a). After carefully reviewing all the evidence,
27 testimony, and arguments presented by the parties' counsel, the Court concludes that the
28 FTC has proven by a preponderance of the evidence that Mr. Gugliuzza is individually

-2-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

19

liable for the deceptive and unfair marketing of OnlineSupplier in violation of section 5(a) of the FTC Act. The Court finds that a permanent injunction against Mr. Gugliuzza is appropriate because there is a cognizable danger that he will repeat the deceptive and unfair marketing tactics he authorized and implemented with OnlineSupplier. The Court also finds that monetary equitable relief against Mr. Gugliuzza is proper in the amount of $18.2 million as restitution for his wrongful and knowing participation in the deceptive marketing of OnlineSupplier.

## II. BACKGROUND

Commerce Planet marketed and sold OnlineSupplier, a webhosting service that purported to provide consumers an inexpensive platform to sell products online. Commerce Planet hired Mr. Gugliuzza to provide an assessment of the company and recommend ways to improve its profitability. From July 2005 to November 2007, Mr. Gugliuzza served in various capacities as the company's consultant, president, de facto executive and in-house counsel, and director. Mr. Gugliuzza helped transition the company from telemarketing to internet marketing of OnlineSupplier, whereby consumers could sign up for the program from its website. Internet sign-ups of OnlineSupplier dramatically improved the company's revenue. At the same time, numerous consumers complained to the Better Business Bureau ("BBB"), the Attorney General, and to Commerce Planet regarding confusion as to the nature and cost of OnlineSupplier and demanded refunds. OnlineSupplier was also subject to excessive credit card chargebacks. In March 2008, the FTC served a civil investigative demand ("CID") on Commerce Planet, after which Commerce Planet changed its webpages for OnlineSupplier under the guidance of outside counsel knowledgeable in FTC Act compliance. Sales of OnlineSupplier thereafter plummeted. In November 2009, the FTC filed suit against Commerce Planet and three of its key officers and employees, Messrs.

Hill, Gravitz, and Gugliuzza, for their alleged involvement in the deceptive and unfair marketing of OnlineSupplier during the relevant time period.

### A. The Parties

The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices affecting commerce. The FTC is authorized to bring suit in federal court to enjoin violations of the Act and to secure an array of suitable equitable relief, including consumer redress. 15 U.S.C. § 53(b).

Commerce Planet is a Utah corporation with its headquarters in Goleta, California. (Exhs. 1175, 2043–2051.) Commerce Planet began operations as NetWave, Inc. ("NetWave"),[1] which was founded by Messrs. Gravitz and Hill at the end of 2003 and taken public in January 2004. (Gravitz, 2/1/12, 140:1–3; Hill, 2/7/12, 111:1–18; Hill 2/17/12, 72:23–25.)[2] Through NetWave's subsidiary at the time, Online Supplier, Inc., the company began marketing and selling an online web creation and hosting service called OnlineSupplier. (Exh. 31.) Effective June 2006, NetWave changed its name to Commerce Planet, Inc. (Exhs. 31, 2043–2051.) Commerce Planet began operations as a holding company and conducted its business through three wholly-owned subsidiaries: Consumer Loyalty Group, Inc. ("CLG"), Legacy Media, LLC ("Legacy Media"), and Ivenia, LLC ("Ivenia"). (Id.) Mr. Hill served as the company's Chief Executive Officer from 2004 to September 2007, after which he remained as the company's Chief Strategic Officer until December 2008 when he left the company. (Hill, 2/7/12, 111:19–121:1,

[1] Unless stated otherwise, Commerce Planet, Inc. and NetWave, Inc. are collectively referred to as "Commerce Planet" or the "company."

[2] Testimony from trial is cited using the last name of the witness, the date, and page number of the trial transcript.

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

112:17–18.) Mr. Gravitz, who served as the head of media at NeWave, was president of Legacy Media from 2006 until December 2008 when he left the company. (Gravitz, 2/1, 6:14–19; 2/22, 12:25–13:2.) Mr. Gugliuzza served as the company's titular consultant from July 1, 2005 to September 2006. (Gugliuzza, 2/21/12, 110:25–111:5; Exh. 1035.) From September 11, 2006 to November 5, 2007, Gugliuzza served as president of Commerce Planet. (Gugliuzza, 2/21/12, 110:21–24, 116:3–13; Exhs. 228, 259–60.) Commerce Planet was only licensed to do business in California but received customer orders nationwide and from international locations. (Exh. 31.)

During the relevant time period, Legacy Media functioned as the marketing and advertising arm of Commerce Planet and shared the same office as the parent company. (Gravitz, 2/1/12, 82:19–83:1, 163:3–6, Exh. 31.) CLG handled the customer service component of the company and also shared the same office as Commerce Planet. (Exh. 31.) Christopher Seidel, who joined NeWave in 2004 and served as the company's vice president of operations, was the president of CLG from 2006 until his departure in 2009. (Seidel, 2/14/12, 52:7–11, 67:9–16; Exhs. 318, 1292a–24.) José Guardiola served as CLG's customer service manager from August 2006 to August 2007. (Guardiola, 2/21/12, 4:19–15, 7:3–4, 35:23–24.) Paul Daniel was Commerce Planet's Chief Financial Officer from July 2005 to May 2006. (Daniel, 2/14/12, 15:23–16:2.) David Foucar replaced Mr. Daniel as CFO from June 2006 to October 2007. (Foucar, 2/16/12, 130:19–22, 161:15–18.) Jaime Rovelo served as the company's final CFO from the end of 2007 to February 2009. (Rovelo, 2/10/12, 4:20–22, 5:20–25, 33:1–2.) The company's in-house counsel was Jeffrey Conrad from mid-2004 to the end of 2006. (Conrad, 2/8/12, 40:20–25, 86:19–24.) Paul Huff replaced Mr. Conrad as Commerce Planet's in-house counsel from 2007 until August 2008. (Huff, 2/15/12, 115:9–11; Exh. 117.) In January 2009, Commerce Planet's assets were acquired by Superfly and later purchased by Lenco Mobile, Inc. (Crittenden, 2/28/12, 29:17–30:9, 33:13–21; Exh. 132.) Commerce Planet is currently no longer in business. (Crittenden, 2/28/12, 24:16–17.)

## B. OnlineSupplier

Commerce Planet primarily marketed and sold OnlineSupplier. (Exh. 31.) The bulk of company's revenue was generated from OnlineSupplier and associated upsell products. (Gravitz, 2/1/12, 7:16–20, 133:16–134:9; Hill 2/7/12, 199:10–18.) Messrs. Gravitz and Hill developed the concept for OnlineSupplier. (Hill, 2/7/12, 112:25–113:5.) OnlineSupplier was a website hosting service designed to enable consumers to create and manage a website to sell products on that site and on other internet sites. (Gravitz, 2/1/12, 6:20–7:3.) The service included a hosted website created by the customer; access to an inventory of products; access to the customer service department; and an information kit consisting of a 23-page manual on how to use the service and program. (Gravitz, 2/1/12, 140:12–146:11; Exhs. 31, 2003.) Consumers signed up for OnlineSupplier initially by telephone and then later online on its webpages by entering their shipping address and credit card information. (Exh. 31.) Consumers paid for the initial handling and shipping fee of $1.95 (or $7.95 for expedited delivery) for the membership kit. (Exhs. 1270-2, 1271-2.) Consumers were permitted a free trial period ranging from 7 to 14 days to use the product and services. (Exhs. 1270-1, 1271-1.) If consumers did not cancel within the free trial period, they were automatically enrolled in the continuity program and charged a monthly membership fee ranging from $29.95 to $59.95 on their credit card. (Gravitz, 2/1, 66:25–67:5, 111:13–20; Gravitz, 2/2/12, 15:3–9, Hill, 2/7/12, 123:16–22.) Commerce Planet initially maintained its own warehouse from which goods were sold to customers. (Exh. 31.) The warehouse was discontinued in 2006, and products were subsequently offered to customers through Ingram Micro. (Seidel, 2/14/12, 100:8–101:12; Hill, 2/17/12, 115:23–117:20.) To cancel the service, customers could either call or email customer service at CLG. (Seidel, 2/14/12, 108:17–24.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

310

## 1. Marketing

When Commerce Planet began operations in 2003, it initially marketed OnlineSupplier through classified advertising, newspapers, and emails, and the program was primarily sold through inbound telemarketing whereby consumers would call a toll-free number to sign up for the service. (Gravitz, 2/1/12, 7:4-6, 8:1-7; Hill, 2/7/12, 11:16-24.) At first, Commerce Planet charged consumers a flat fee of $58 or $98.90 for OnlineSupplier, depending on the particular package consumers purchased, and there was no free trial period or a negative option plan. (Gravitz, 2/1/12, 10:12-18.) However, the sale of OnlineSupplier was poor, and the company lost money. (Id. at 155:12-17; Hill, 2/7/12, 131:17-24.) The company later transitioned from telemarketing to online marketing between June and July 2005. (Gravitz, 2/1/12, 11:5-10; Seidel, 2/14/12, 56:6-16.)

## 2. Sign-Up Pages

Between July 2005 and March 2008, there were two versions of OnlineSupplier's sign-up pages. (Exhs. 1270, 1271.) The first working version was complete around July 2005. (Gravitz, 2/1/12, 17:15-24.) After several revisions, the final sign-up pages of the first version ("Version I") went live in October 2005. (Gravitz, 2/1/12, 21:11-19, 27:1-4; Gravitz, 2/2/12, 107:21-108:5; Hill, 2/17/12, 117:21-118:4; Exh. 1270.) Mr. Gravitz developed Version I in 2005 and 2006 with the legal advice of Jeff Conrad and Mr. Gugliuzza. (Gravitz, 2/1/12, 27:11-22; Gravitz, 2/2/12, 114:2-5.) Another version of the sign-up pages ("Version II") was used after some modifications were made to Version I in February 2007. (Gravitz, 2/1/12, 109:22-111:24; Exhs. 1271, 1198.) A third version of the sign-up pages ("Version III") was used after the FTC's CID on Commerce Planet in March 2008. (Exh. 1272.) Version III incorporated changes under the recommendations of outside counsel, Linda Goldstein, who had expertise in FTC Act

compliance. (Gravitz, 2/1/12, 127:9-132:10; Huff, 2/15/12, 93:13-95:22; Roth, 2/8/12, 17:19-18:13; Exhs. 232, 1204, 1271.) Version III did not mention a free auction starter kit and significantly clarified the terms of membership on the landing and billing pages. (Exh. 1272.) After implementing the changes in Version III, the company experienced a severe downward spike in sales of OnlineSupplier. (Roth, 2/8/12, 21:1-14.)

The internet sign-up process of OnlineSupplier involved four steps. First, through affiliate marketing, such as emails and ads, consumers were directed to OnlineSupplier's website. (Gravitz, 2/1/12, 11:5-10, 12:11-13:20, 35:9-36:3; Exhs. 1274, 1277.) The landing page of the website represented OnlineSupplier as a free "Online Auction Starter Kit" that provided information to consumers on how to sell products on eBay. (Exhs. 1270-1, 1271-1.) Consumers could obtain a free kit if they filled out their shipping address and clicked the "Ship My Kit" button. (Id.) Second, upon clicking the "Ship My Kit" button, consumers were directed to the billing page where they could select their shipping method and submit their credit card information. (Exhs. 1270-2, 1271-2.) On the bottom of the landing and billing pages, below the "Ship My Kit" button, there was a hyperlink to the "terms and conditions," which popped up on a separate page. (Exhs. 1270, 1271.) The terms and conditions page included information about OnlineSupplier's services, fees, and legal conditions, including the automatic charge of the monthly membership fee if consumers did not cancel within the trial period. (Id.) At the bottom of the billing pages, in fine print, there was also a disclosure about the negative option plan and membership fee. (Exhs. 1270-2, 1271-2.) The first draft of this disclosure was prepared by Mr. Gravitz using a competitor's site and circulated for management, including Mr. Gugliuzza, for review. (Gravitz, 2/1/12, 71:3-10.) Clicking on the "Ship My Kit" button on the billing page completed the order for OnlineSupplier. (Exhs. 1270-2, 1271-2.) Third, after submitting their credit card information and clicking the "Ship My Kit" button, consumers were directed to the upsell page, where they could choose additional products and services for a monthly or annual fee. (Exhs. 1270-3, 1271-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

3.) The products and services were pre-clicked to "Yes," but the consumer could change
it to "No." (*Id.*) Fourth, upon clicking the "Submit" button on the upsell page,
consumers were directed to the final confirmation page with the order information.
(Exhs. 1270-4, 1271-4.) Commerce Planet experimented with sending post-transaction
confirmation emails to consumers before charges to credit cards were posted, but these
were inconsistently used and discontinued after a brief period of time. (Guardiola,
2/21/12, 11:20-25, 16:14-23; King, 2/3/12, 157:10-19.)

### 3. Consumer Complaints and Chargebacks

More than 500,000 consumers completed OnlineSupplier's sign-up process during
the relevant time period. (Exh. 2061.) The transition to online sign-ups was followed by
dramatic increases in company profits. From 2005 to 2006, when the company
transitioned to online sign-ups, the company swung from over a 6.3 million-dollar net
loss to over an 8.7 million-dollar net profit. (Faucet 2/16/12, 152:18-153:14; Exh. 2044.)
At the same time, the company started to receive high volumes of telephone and written
complaints from consumers who were confused over the nature of the service and terms
of membership and demanded refunds. (Guardiola, 2/21/12, 31:20-32:13; Exhs. 163,
193, 1180, 1177-79, 1292a, 1293, 1295.) In numerous instances, consumers first became
aware that they had been enrolled in a negative option plan when they received a credit
card bill with a charge for membership to OnlineSupplier. (Gravitz, 2/1/12, 165:17-24.)
OnlineSupplier also was subject to excessive credit card chargebacks in 2006 and 2007,
leading to fines of more than one million dollars during this time. (Chen, 2/3/12, 59-23;
Exhs. 1312, 1058-62, 1317-19, 1321-22.)

///
///
///

-4-

### C. Role of Charles Gugliuzza

Mr. Gugliuzza was employed with Commerce Planet as a consultant and president
from July 2005 to November 2007 and retained a seat on the company's Board as an
outside director until May 2008. (Gugliuzza, 2/21/12, 118:10-17, 122:18-20; Exh. 235.)
Before joining Commerce Planet, Mr. Gugliuzza graduated from Loyola Law School and
cofounded a company called eBatts with a law school friend. (Gugliuzza, 2/21/12,
102:1-20.) EBatts operated a consumer direct website that sold batteries, adapters, and
chargers for laptops, cell phones, and digital cameras manufactured by Battery-Biz, the
family business of his law school classmate. (*Id.*) Mr. Gugliuzza held the position of
Chief Operating Officer at eBatts. (*Id.* at 103:16-17.) EBatts was financially successful
and became the exclusive supplier for Durcell's camcorder and digital camera batteries.
(*Id.* at 103:19-104:9.) Mr. Gugliuzza left eBatts to start his own business, American
Power Supplies, a webstore that locally purchased products similar to those at eBatts and
sold them directly to consumers via the Internet. (*Id.* at 104:17-105:17.) Again, Mr.
Gugliuzza had financial success with American Power Supplies. (*Id.* at 105:18-20.) Mr.
Gugliuzza sold his interest in American Power Supplies to his business partner after
selling back his interest in Battery-Biz and signing a noncompete clause with Battery-
Biz. (*Id.* at 105:21-106:7.)

#### 1. Consultant (July 2005 to September 2006)

After he sold his interest in American Power Supplies, Mr. Gugliuzza sent a letter
to NeWave's Board of Directors in April 2005, seeking the position of CEO. (Exh. 3.)[3]
In May 2005, NeWave's Board of Directors retained Mr. Gugliuzza as a consultant to

[3] Mr. Gugliuzza had been initially introduced to Commerce Planet through an investor of the company
when he left eBatts. Mr. Gugliuzza met with Mr. Hill but decided not to work for NeWave and instead
founded American Power Supplies. (Gugliuzza, 2/21/12, at 106:8-21.)

-6-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1 conduct an assessment of the company and identify ways to increase profits and decrease

2 costs. (Gugliuzza, 2/21/12, 108:7-21; Hill, 2/7/12, 115:24-116:24, 117:5-11). Mr.

3 Gugliuzza performed consulting work through his business called Olive Tree Holdings.

4 (Id. at 108:7-21; Exh. 6.) Mr. Gugliuzza conducted a one-month assessment of NetWave's

5 and submitted a 78-page report of his evaluation and recommendations to the company's

6 Board in June 2005. (Gugliuzza, 2/21/12, 108:7-21; Exh. 6.) The report provided a

7 detailed, comprehensive assessment of Commerce Planet and its subsidiaries, including

8 the company's management, infrastructure, operations, finances, products and services,

9 and marketing and advertising. Some of the core deficiencies Mr. Gugliuzza identified in

10 the report included the discrepancy between perceived value and actual value;

11 management's lack of experience and skill to effectively operate the company and

12 implement change; lack of well-established channels of communication and coordination

13 between managers; and "[a] lack of value added products and services that produce high

14 profit margins and customer retention," among others. (Exh. 6.) Mr. Gugliuzza

15 recommendations included a "complete overhaul" with respect to the company's existing

16 decision making process; improvements in the channel of communication between

17 management to clarify expectations and responsibilities for projects; and enhancements to

18 coordination efforts between departments. (Id.) Specifically, with respect to marketing,

19 Mr. Gugliuzza noted the lack of coordination between marketing and sales. (Id.) Mr.

20 Gugliuzza also emphasized that because "existing management lack[ed] experience,"

21 Mr. Gugliuzza also emphasized that the company was in "dire need of a leader" who possessed basic management skills. (Id.)

22 Mr. Gugliuzza also observed that customer retention was extremely low with an average

23 of less than 35% after the first 45 days of billing activity. (Id.) He identified marketing

24 expenditures as comprising the largest portion of NetWave's expense budget with the

25 company's media budget to be the largest contributor to its negative net profits, aside

26 from payroll. (Id.) Mr. Gugliuzza provided more specific recommendations with respect

27 to the company's human resources, infrastructure, operations, products and services, and

28 budgets. For example, Mr. Gugliuzza recommended that Messrs. Hill and Gravitz be

1 replaced as the CEO and head of Media, respectively, so they could focus their attention

2 on developing revenue generating opportunities. (Id.) Mr. Gugliuzza recommended that

3 Mr. Hill remain as president and Mr. Gravitz be in charge of business development. (Id.)

4

5 From July 1, 2005 to September 2006, Mr. Gugliuzza held the titular position of

6 consultant to Commerce Planet. (Gugliuzza, 2/21/12, 110:25-111:5; Exh. 1035.) Mr.

7 Gugliuzza was also a director of the company beginning in August 2006. (Exhs. 31,

8 1247.) After Mr. Gugliuzza conducted an assessment of the company, the Board of

9 Directors hired him to implement the recommendations in his report. (Hill 2/7/12,

10 125:20-126:21; Gugliuzza, 2/21/12, 109:10-18; Exh. 1246.) Mr. Gugliuzza executed a

11 "Corporate Consulting Agreement" with NetWave, dated June 28, 2005. (Exh. 1035.)

12 The consulting agreement provided that, as a consultant, Mr. Gugliuzza, "shall assist in

13 implementing operating strategies and procedures as prescribed by the Company's Board

14 of Directors, and pursuant to the Consultant's Company Performance Assessment Report

15 dated June 14, 2005" and "shall also use [] best efforts to introduce the Company to

16 potential vendors, customers or business partners which would be beneficial to the

17 Company's business." (Id.) Under the consulting agreement, Mr. Gugliuzza was paid

18 $5000 in cash per week, with a signing and performance bonus. (Id.) Although the

19 consulting agreement lasted three months, it had a renewable option under the same

20 terms, and Mr. Gugliuzza renewed his contract until he became president in 2007. (Hill,

21 2/7/12, 131:5-20.)

22

23 The Board of Directors tasked Mr. Gugliuzza with the goal of reducing cost and

24 increasing revenue. (Hill, 2/17/12, 120:6-121:7.) Although Mr. Gugliuzza held the title

25 of consultant, the Board conferred broad, management authority upon Mr. Gugliuzza

26 over the company's departments and daily operations, including over Mr. Gravitz,

27 marketing, and customer service. (Hill, 2/7/12, 128:3-130:9, 137:20-138:7; Daniel,

28 2/14/12, 28:1-14; Gravitz, 2/2/12, 122:3-11.) Messrs. Gugliuzza and Hill comprised the

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

company's executive staff, and by around March 2006, they were being compensated under the same terms. (Hill, 2/7/12, 142:4–7, 156:10–20; Hill 2/17/12, 130:4–9; Exhs. 16, 1331.) Mr. Gugliuzza regularly met with and communicated with all the department heads, who were required to submit weekly reports to him. (Gugliuzza, 2/23/12 Vol. 1, 57:8–11; Seidel, 2/14/12, 58:6–59:22, 61:19–24; Exhs. 1124, 1129, 1130, 1132, 1354, 1356, 1368–71, 1292a, 1293, 1295.) Mr. Gugliuzza, along with Hill, oversaw the company's migration of OnlineSupplier from telemarketing to internet sales in 2003. (Hill, 2/17/12, 122:1–4; Daniel, 2/14/12, 28:15–23.) Mr. Gugliuzza also acted as *de facto* legal counsel of NeWave and took over Mr. Conrad's role as the primary legal reviewer for the company. (Craviz, 2/2/12, 120:6–12; Gugliuzza, 2/22/12, 119:5–14.) After Mr. Gugliuzza implemented many of the recommendations in his assessment report, the company became profitable. (Hill, 2/7/12, 143:10–24.)

**2. President (September 2006 to November 2007)**

Pursuant to an executive agreement, Mr. Gugliuzza became the president of the company, effective September 11, 2006. (Hill, 2/7/12, 152:21–153:10; Exhs. 259.) He signed another executive employment agreement on April 10, 2007. (Exh. 261.) Gugliuzza served as president until he stepped down on November 5, 2007. (Gugliuzza, 2/21/12, 10:21–24, 116:3–13; Exhs. 228, 259–61.) Mr. Hill remained the CEO, and David Foucar became the CFO. (Hill, 27/12, 151:19–152:1.) Although Mr. Gugliuzza assumed the title of president, as a practical matter, his duties and responsibilities did not materially change. (*Id.* at 153:18–25.) Mr. Gugliuzza continued to assert operational control over the company and its subsidiaries and had oversight authority over the department heads. (Foucar, 2/15/12, 137:19–138:6.) Mr. Gravitz reported to Mr. Gugliuzza, and Mr. Gugliuzza directed the marketing of OnlineSupplier, such as by reviewing and improving marketing agreements, approving landing and billing pages of OnlineSupplier, and reviewing weekly performance reports. (Hill, 2/7/12, 155:11–20.)

-13-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

314

---

1 Mr. Seidel also continued to report to Mr. Gugliuzza. (Seidel, 2/14/12, 67:9–16, 68:15–
2 18.) After Mr. Huff was hired in 2007, Mr. Gugliuzza delegated some of his legal
3 responsibilities to Mr. Huff, but remained the final authority on legal matters. (Graviz,
4 2/1/12, 35:1–8; Gravitz, 2/2/12, 120:14–19; Hill, 2/7/12, 141:16–142:13.)
5
6 On November 5, 2007, Mr. Gugliuzza stepped down as president, and Anthony
7 Roth took over as the company's CEO and president. (Roth, 2/8/12, 9:1–9; Exhs. 228,
8 234.) Mr. Gugliuzza continued working for the company as a consultant until December
9 31, 2007. (Gugliuzza, 2/21/12, 116:14–17, 117:4–19; Exh. 235.) At the end of 2007,
10 Commerce Planet repurchased from Mr. Gugliuzza his 1.8 million shares of company
11 stock in exchange for $185,000 cash down, $90,400 in additional payment terms, and a
12 $427,000 promissory note, pursuant to a Share Repurchase Agreement on December 26,
13 2007. (Roth, 2/8/12, 10:10–12:1; Exhs. 264, 265.) Mr. Gugliuzza did not receive
14 payment on the promissory note and received a total of $275,400 for the purchase of his
15 company stock. (Rovelo, 2/10/12, 9:24–11:2; Exhs. 138, 264.) Mr. Gugliuzza remained
16 on the company's Board as an outside director until May 2008. (Gugliuzza, 2/21/12,
17 118:10–17, 122:18–20; Exh. 1175.) From 2006 to 2007, Mr. Gugliuzza received over $3
18 million in compensation, bonuses, stock awards, and option awards for his services at
19 Commerce Planet. (Rovelo, 2/10/12, 6:8–15:10, 36:18–36:7; Exhs. 138, 264, 1042.)
20
21 After leaving Commerce Planet, Mr. Gugliuzza founded a company called Grow
22 Commerce with one partner, Jaime Stafford, the original founder of Iventa. (Gugliuzza,
23 2/21/12, 124:20–125:17.) Grow Commerce was founded on the assets of Iventa. Grow
24 Commerce built, operated, and managed websites for other companies to sell products;
25 managed fulfillment; and provided warehouse and customer service. (*Id.* at 125:18–
26 126:5.) Grow Commerce did not engage in direct consumer sales but serviced other
27 companies and did not include a monthly membership or negative option plan. (*Id.* at
28 127:25–127:13.) Mr. Gugliuzza was a principal of Grow Commerce and owned 49% of

-14-

that company. (*Id.* at 126:6–10.) Crow Commerce was financially successful, and the company was sold within several months. (*Id.* at 127:14–19.) Mr. Gugliuzza then obtained an MBA degree from the University of Southern California, after which he worked for Oakley, a sunglass company, as an e-Commerce strategy manager. (*Id.* at 124:7–11, 128:20–129:3.) Mr. Gugliuzza supported Oakley's large e-commerce account that consisted of business-to-business sales of such companies as Amazon and Zappos. (*Id.* at 129:4–20.) Oakley does not utilize a monthly membership or negative option plan. (*Id.*) Mr. Gugliuzza left Oakley three days before trial. (*Id.* at 129:21–130:1.)

**D. Procedural History**

In March 2008, the FTC served a CID on Commerce Planet. (Gravitz, 2/1/12, 48:3–6; Roth, 2/8/12, 17:19–18:13.) The FTC filed suit against Defendants on November 10, 2009. (Dkt. No. 1.) Shortly thereafter, the FTC settled with Commerce Planet, Mr. Hill, and Mr. Gravitz, and final judgments for permanent injunction and equitable monetary relief in the amount of $19,730,000 were entered against them on November 18, 2009. (Dkt. Nos. 3–5, 7–9.) The parties agreed to suspend the judgment for monetary relief under certain conditions, including the payment of $100,000 by Commerce Planet, $330,000 in cash plus interest on a $100,000 loan by Mr. Hill, and $192,000 by Mr. Gravitz. (Dkt. Nos. 7–9; Hill, 2/7/12, 183:7–11; Hill, 2/17/12, 114:14–16.)

The FTC engaged in settlement discussions with Mr. Gugliuzza, but the parties were unable to reach a resolution. (Dkt. No. 142.) After the FTC and Mr. Gugliuzza engaged in substantial discovery, the FTC filed a motion for leave to amend the Complaint, which the Court granted. (Ct. Order, Dkt. No. 145, June 27, 2011.) The FTC filed the operative FAC on June 29, 2011. (Dkt. No. 147.) On July 18, 2011, Mr.

-15-

Gugliuzza answered the FAC, asserting several affirmative defenses, including advice of counsel, reliance on professionals, good faith, and mootness. (Dkt. No. 149.) On July 27, 2011, Mr. Gugliuzza filed two motions for partial summary judgment, which the Court denied. (Ct. Order, Dkt. No. 164, Sept. 8, 2011.) The Court thereafter conducted its bench trial, and the parties submitted closing briefs. (Dkt. Nos. 242–3, 248–49.)

**III. INDIVIDUAL LIABILITY**

The FTC alleges that Defendants engaged in deceptive and unfair website marketing of OnlineSupplier as a free "Online Auction Starter Kit" from July 2005 to March 2008 without adequately disclosing the program's negative option plan. (FAC ¶¶ 17–24, 48–53.) The FTC also alleges that Mr. Gugliuzza participated in, controlled, or had authority to control as well as knew about or should have known about Commerce Planet's deceptive and unfair practices related to the marketing of OnlineSupplier via his various roles as the company's consultant, president, *de facto* executive, and in-house counsel from July 2005 to November 2007. (*Id.* ¶¶ 38–43.) Based on these allegations, the FTC asserts two counts against Mr. Gugliuzza for deceptive and unfair practices under section 5(a) of the FTC Act.

**A. Deceptive Acts (Count I)**

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce" and empowers the FTC to prevent such acts or practices. 15 U.S.C. § 45(a)(1), (2). An act or practice is deceptive if (1) there is a representation, omission, or practice, (2) that is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995). District courts consider the overall, common sense "net impression" of the representation

-16-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1 or act as a whole to determine whether it is misleading. *See FTC v. Gill*, 265 F.3d 944,
2 956 (9th Cir. 2001) (holding that defendant failed to counter the FTC's substantial
3 showing that he made statements and created an overall "net impression" of a misleading
4 representation regarding the ability to remove negative information from consumers'
5 credit report, "even if the information was accurate, complete, and not obsolete"); *FTC v.*
6 *Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) ("Deception may be found based on the
7 'net impression' created by a representation."). A misleading impression is material if it
8 "involves information that is important to consumers and, hence, likely to affect their
9 choice of, or conduct regarding, a product," *FTC. v. Cyberspace.com, LLC*, 453 F.3d
10 1196, 1201 (9th Cir. 2006) (citation and quotes omitted).
11
12 The FTC's theory of the case is that Defendants offered a free internet auction kit
13 as a ruse to enroll consumers in OnlineSupplier. Defendants thereby grossed over $45
14 million in two years by tricking over 470,000 consumers into unwittingly submitting their
15 credit card information, which was used to charge them a monthly subscription fee
16 without their informed consent. (Opening Statements, Trial Tr., 1/31/12, 5:25-6:15,
17 10:8-10.) At trial, the FTC attempted to show that OnlineSupplier's landing and billing
18 pages, (Exhs. 1270, 1271), created the net impression that OnlineSupplier was a free
19 offer, except for small shipping and handling fee, and that although there was a
20 disclosure of the negative option plan, consumers were unlikely to see or understand it
21 because of the way it was placed on the sign-up pages. (Trial Tr., 1/31/12, 11:7-13.)
22
23 Mr. Gugliuzza denied liability and any wrongdoing on his part. He contended that
24 OnlineSupplier was not a devious internet scheme, but a legitimate product that people
25 wanted to use. (*Id.* at 20:24-21:7.) Mr. Gugliuzza argued that there was no empirical
26 evidence of deception or unfairness arising from the negative option disclosures on
27 OnlineSupplier's website. (Dkt. No. 187 [Def.'s Trial Brief], at 2.) Mr. Gugliuzza also
28 argued that there was no evidence that consumers were deceived by the webpages, and

1 any consumer confusion about OnlineSupplier resulted from third-party marketing fraud.
2 (*Id.*; *see also* Trial Tr., 1/31/12, 22:18-23:8.)
3
4 The Court finds that the landing and billing pages of OnlineSupplier were
5 materially misleading because those webpages created the net impression that consumers
6 could obtain a free auction kit, when in fact, consumers were subscribing to a continuity
7 program with monthly subscription fees. The clear weight of the evidence simply does
8 not support Mr. Gugliuzza's position that affiliate fraud was the primary cause of
9 consumer confusion. That confusion was clearly caused by OnlineSupplier's misleading
10 sign-up pages.
11
12 1. Version 1 is Factually Misleading
13
14 The most compelling evidence that the website marketing of OnlineSupplier was
15 misleading are the sign-up pages themselves. The landing and billing pages of the
16 webpages created the net impression that OnlineSupplier was a free kit containing
17 information on how to sell products online, rather than a continuity plan with a monthly
18 membership fee. The central message on the landing page of Version 1 is that consumers
19 will get a free kit that gives them information about how to sell products on eBay. (Exh.
20 1270.) When looking at the landing page, the most prominent graphic is the red boxed
21 message on the upper left corner that states, "AS SEEN ON TV," which then leads the
22 eye to the main message in caps "OVER $3.2 BILLION WAS MADE ON eBay LAST
23 YEAR!" The phrase "$3.2 Billion" and "On eBay" are also in red, except that the eBay
24 logo is in primary colors. Above this in smaller, dark blue font is the phrase "Work From
25 Anywhere Using Your Computer!" Underneath the main headline about eBay is the
26 message in a green banner that states "JOIN OVER 724,000 AMERICANS MAKING A
27 LIVING ON EBAY." (Exhs. 1270-1, 1271-1.) Below the banner, the webpage is
28 divided into two sections. The left section contains information about an "Online

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

Auction Starter Kit" that "provides detailed instructions to maximize profits, using little known but proven strategies." Just below this statement in Version 1 is the directive "GET YOUR KIT NOW FOR FREE." The word "FREE" is in red, as is the phrase "STARTER KIT." The kit is advertised to include the following benefits: (1) a step-by-step quick start guide, (2) no experience required, (3) advanced training for experienced auctioneers, (4) and up to 50% discounts on thousands of name brand products. The right section of the webpage contains a light blue box where the user may submit her shipping address. There is a countdown clock on top that ticks off the number of minutes left until the offer expires. Just below the question "Where do we ship your FREE KIT?" The phrase "FREE KIT" is in red. The button "Ship My Kit" appears below the spaces for filling in one's name and contact information. Below that is the message inserted in light gray that states "GET YOUR ONLINE AUCTION STARTER KIT TODAY FREE!" The price 19.95 is crossed out and next to it is the offer "NOW FREE! (limited time offer)!" Again, "FREE" is in red. Below the fold,[4] in smaller text, is the following disclaimer. "By submitting this form you are accepting and agreeing to the Privacy Policy and Terms of membership of this Web Site." The phrase "Privacy Policy" and "Terms of Membership" are hyperlinked in slightly darker blue. Further below is the message: "BONUS, your kit includes a FREE 14-DAY TRIAL TO YOUR VERY OWN WEBSTORE." On the bottom left are "Success Stories," which consist of testimonials from two satisfied customers who purchased the kit.

Overall, the predominant message is that consumers can order a free kit on how to make money by selling products on eBay. This is underscored by the repetition and placement of the phrase "Free Kit," which is bolded in red, and by the use of name eBay at the center top of the webpage. Notably, there is no mention of the product's name "OnlineSupplier," on the webpage in a manner that enables viewers to associate the kit

[4] The term "fold," originally a newspaper terminology, refers to the bottom edge of a webpage that is viewable on the computer screen without scrolling down. (See King, 2/2/12, 130:3-14.)

with OnlineSupplier.[5] Nor is there any information about Commerce Planet, its subsidiaries, or any information about cost or the continuity program. Rather, the net impression created by the landing page is that the kit is affiliated with eBay, and that consumers can learn how to sell products on eBay from the kit.

While the terms of the continuity program are disclosed in a separate, hyperlinked "Terms of Membership" page, this is an insufficient cue. Disclaimers do not automatically exonerate deceptive activities. See FTC v. Gill, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), aff'd, 265 F.3d 944 (9th Cir. 2001). "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation contains truthful disclosures." Cyberspace.com, 453 F.3d at 1200. There are multiple reasons why the hyperlinked "Terms of Membership" page is inadequate to overcome the net impression that OnlineSupplier was a free auction kit. First, the hyperlink is buried at the bottom and is not placed in close proximity to the "Ship My Kit" button, making it unlikely that consumers would notice or click on the link. There is also no indication that the "Terms of Membership" are specifically in regard to a negative option plan. Second, when the viewer clicks on the hyperlink, the actual terms of membership appear on the separate pop-up page rather than being directly inserted on the landing page. Such separation suggests that the disclosure is inadequate because it appears in a different context than the claims they purport to repudiate. See Gill, 71 F. Supp. 2d at 1044 (holding that a disclaimer in contract consumers eventually signed was inadequate to overcome deceptive representations in defendants' advertisements). Third, the information about the continuity plan, contained under numeral 4 ("Payment of Fees"), is buried with other densely packed information and legalese, which makes it unlikely that

[5] The name OnlineSupplier appears only later on the billing page, (Exh. 1270-2), with the message, "Charges will appear as Online Supplier," which is placed under the "Ship My Kit" button. The Court finds this insufficient to overcome the overwhelming impression that the kit is associated with eBay, as the eBay name figures prominently throughout the payment, billing, upsell, and confirmation pages.

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

317

1  the average consumer will wade through the material and understand that she is signing

2  up for a negative option plan.

3

4      Once the consumer clicks the "Ship My Kit" button, she is taken to the billing

5  page. (Exhs. 1270-2.) The eBay logo, along with the message "AS SEEN ON TV," is

6  repeated on top, reinforcing the message that the kit is affiliated with eBay. The space

7  for filling in one's payment information is inserted in a light blue vertical box to the right.

8  At the top are two shipping options, regular shipping for $1.95 and expedited shipping for

9  $7.95. Below the space for the credit card information is the "Ship My Kill" button. At

10  the very bottom, below the fold, in slightly darker blue font and in fine print is the

11  disclosure regarding the negative option plan and payment terms. Although information

12  about OnlineSupplier's negative option plan is disclosed on the webpage, fine-print

13  disclosures may not overcome the net impression of a deceptive representation.

14  *Cyberspace.com*, 453 F.3d at 1200-1201 (finding that disclosures in small-print on the

15  back of a check regarding the monthly fee for internet access was insufficient to defeat

16  the net impression that the check was a refund or rebate); *see also FTC v. Brown &*

17  *Williamson Tobacco Corp.*, 778 F.2d at 35, 42-43 (D.C. Cir. 1985) (holding that a cigarette

18  advertisement of tar content was deceptive despite a truthful, fine-print explanation in

19  corner of advertisement of how tar was measured). As placed, the disclosure regarding

20  OnlineSupplier's negative option plan is difficult to read because it is printed in the

21  smallest text size on the page and in blue font against a slightly lighter blue background

22  at the very end of the disclosure. The disclosure is also not placed in close proximity to

23  the "Ship My Kill" button and placed below the fold. It is highly probable that a

24  reasonable consumer using this billing page would not scroll to the bottom and would

25  simply consummate the transaction by clicking the "Ship My Kill" button, as the

26  consumer is urged to do by the message at the top left: "You are ONE CLICK AWAY

27  from receiving the most up-to-date information for making money on ebay!"

28  Furthermore, the term "negative option" is not clearly defined in the disclosure. The

1  disclosure also states that the consumer "may" be liable for payment of future goods and

2  services if she fails to cancel the service, which casts ambiguity as to whether the

3  consumer will in fact be charged a monthly fee. *See Removatron Int'l Corp. v. FTC*, 884

4  F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are

5  not adequate to avoid liability unless they are sufficiently prominent and unambiguous to

6  change the apparent meaning of the claims and to leave an accurate impression.

7  Anything less is only likely to cause confusion by creating contradictory double

8  meanings.")

9

10      After the consumer clicks on the "Ship My Kill" button on the payment page, she

11  is next taken to the upsell page where various products and services are advertised. (Exh.

12  1270-3.) The product offers are pre-clicked to "Yes," and the consumer must change it to

13  "No" to decline the offer. Each of the products and services involves a free trial offer and

14  a monthly or annual membership fee. Again, there is no clarification that the kit is a

15  negative option plan. Instead, the top banner states "Come Work Online Using Ebay!"

16  and "Join Over 724,000 Americans ... Making a Living on Ebay!," which reinforces the

17  central message of using the kit to make money on eBay. If the consumer clicks on the

18  submit button, she is taken to the final confirmation page. (Exh. 1270-4.) That page

19  contains the same message and graphics as the previous upsell page and states that the

20  order has been completed. Even assuming that the upsell and confirmation pages

21  included clarifying information about OnlineSupplier's negative option plan, it is not

22  enough because the transaction would have been completed upon submitting the "Ship

23  My Kill" button on the billing page. *See Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d

24  962, 964 (9th Cir.) ("The Federal Trade Act is violated if [an advertisement] induces the

25  first contact through deception, even if the buyer later becomes fully informed before

26  entering the contract."), *cert. denied*, 423 U.S. 827 (1975).

27

28

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

## 2. Version II Is Factually Misleading

The sign-up pages of Version II are similarly misleading because they create the net impression that consumers are getting a free kit to sell products on eBay. The landing and billing pages of Version II are largely similar to those of Version I. (Exh. 1271.) On the landing page, the phrase "AS SEEN ON TV" and the eBay logo have been removed, although the word eBay (in red) is still included in the header, and there is a reference to a CBS news story regarding people making a living on eBay. (Exh. 1271-1.) The figure $3.2 billion is now increased to $52 billion. The phrase "GET YOUR KIT NOW FOR FREE" in Version I has been changed to "GET YOUR KIT NOW." (Exh. 1271-1.) The phrase "Just Pay S/H" has also been added next to the phrase "Free," and the trial period has been shortened from 14 to 7 days. These modifications, however, do not substantively change the net impression that consumers can order a free kit on how to sell products on eBay with payment of shipping. Again, there is no information about OnlineSupplier, Commerce Planet, or the negative option plan.[6] As in Version I, the landing page on Version II includes a hyperlink to "Terms of Membership," which pop up on a separate page. The terms and conditions page now includes information regarding the negative option plan at the very top instead of further down in the text. However, the disclosure is still inadequate for the same the reasons discussed above: the hyperlink is not placed in close proximity to the "Ship My Kit" button; it is placed below the fold; there are no cues that the terms of membership are specifically in regard to the negative option plan; and the terms and conditions appear on a separate pop-up page.

The most significant change appears on the billing page of Version II. (Exh. 1271-2.) The name eBay has been removed altogether from the top, and "onlinesupplier.com"

[6] The term "onlinesupplier.com" appears on the billing, upsell, and confirmation pages. However, it is not sufficiently prominent or associated with the kit to the extent that it is likely to overcome the impression that the kit is affiliated with eBay, which appears on the first landing page.

-23-

has been added on the right. Second, the disclosure text has been taken out of the right blue box, centered at the bottom, and written in black font. As the defense team pointed out during trial, the shipping and handling fee, along with the monthly fee, is now in red while the remaining text is in black. Although these modifications do somewhat improve readability, the Court finds that they are inadequate to change the net impression of the landing and billing pages. As in Version I, the disclosure is not placed in close proximity to the "Ship My Kit" button, but placed at the very bottom of the page, below the fold, so that a reasonable consumer is not likely to scroll to the bottom and see or read it. Furthermore, the main information about the negative option plan is in the smallest text size on the page and densely packed with the other text, rendering it difficult to read.

The remaining pages in Version II follow the same flow as the pages in Version I. When the consumer clicks the "Ship My Kit" button, she is taken to the upsell page. (Exh. 1271-3.) Here, the eBay logo has been removed, and "onlinesupplier.com" has been added to the header. Version II contains an increased number of upsell offers, which, again, have been pre-clicked to "Yes." Clicking the submit button takes the consumer to the final confirmation page. (Exh. 1271-4.) This page also has "onlinesupplier.com" in the header. The final confirmation page includes some additional information regarding a 7-day trial membership for $1.95, when the consumer will receive the product, customer service information, and OnlineSupplier's website address. It also contains a link to the terms and conditions. But the added information does not change the net impression of OnlineSupplier, as the transaction would already have been completed upon clicking the "Ship My Kit" button on the billing page. See Resort Car Rental Sys., Inc., 518 F.2d at 964.

In short, the sign-up pages of Version I and II are misleading because the overall, net impression from the content, layout, and design of the webpages is that consumers are ordering a free kit on how to sell goods on eBay with payment of a small shipping and

-24-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1 handling fee, not that they are subscribing to a negative option plan. It is also apparent

2 that the disclosure—by its placement, wording, colorization, spacing, and size of the

3 text—was designed not to be clear and conspicuous, but rather to mask information about

4 OnlineSupplier's continuity program without entirely omitting the information. Such a

5 method of disclosure is inadequate because it simultaneously conceals, obscures, and

6 suppresses the very information it purports to convey. This misrepresentation is

7 undoubtedly material because the information about a free kit goes to the cost of the

8 product, an important factor in a consumer's decision on whether or not to purchase a

9 product. See Cyberspace.com, 453 F.3d at 1200. The notion that consumers will get a

10 free kit makes it more likely that they will unwittingly provide their credit card

11 information, thinking they are only paying for shipping and handling, when in fact, they

12 are obligating themselves to pay a subscription fee for the continuity program.

14    3. Expert Testimony

16 Although a facial examination of the sign-up pages sufficiently demonstrates that

17 the website marketing of OnlineSupplier was misleading to a reasonable consumer, the

18 Court may consider extrinsic evidence as corroborating evidence. See Kraft, Inc. v. FTC,

19 970 F.2d 311, 318–19 (7th Cir. 1992). The FTC presented additional evidence that

20 corroborates the Court's conclusion that OnlineSupplier is facially misleading. In

21 particular, the Court finds the expert testimony of Jennifer King to be on-point and

22 persuasive. Ms. King is a researcher and a third-year Ph.D. candidate at the U.C.

23 Berkeley School of Information, with a master's degree in information management and

24 systems, a program that focuses on graduating professionals in Human Computer

25 Interaction ("HCI"). (King, 23/12, 101:7–8, 107:2–9, 109:22–110:3.) At Berkeley, Ms.

26 King studies privacy using HCI-based methods, which is the study of how humans

27 interact with computers. (Id. at 101:9–18.) HCI research is an interdisciplinary study

28 that encompasses both qualitative and quantitative methods and draws upon such fields as

1 computer science, cognitive psychology, and social psychology, among others. (Id. at

2 103:14–17, 104:22–105:9.)

4 Ms. King was retained by the FTC to review OnlineSupplier's webpages and

5 determine whether (1) customers would understand that a negative option was present

6 when they reviewed the sign-up pages, and (2) after they finished the check-out process,

7 whether they would understand that they were enrolled in a continuity program. (Id. at

8 113:2–10.) Here, Ms. King applied a usability inspection method, a type of HCI

9 qualitative-based approach that is "user-centered"—meaning that it focuses on what the

10 user can perceive and what the user should do. (Id. at 105:23–106:1, 115:22–116:10.)

11 Ms. King likened the method to a preflight checklist whereby she analyzes the webpages

12 to see if they are consistent with certain HCI heuristics or principles of usability. (Id. at

13 114:22–115:15; 116:16–117:4.) Thus, like an airline pilot who goes through a pre-flight

14 checklist trying to determine if the plane should fly, an expert conducting a usability

16 inspection looks for major flaws in a website to determine whether it should be launched.

17 (Id.)[7] After inspecting Version I and Version II, Ms. King concluded that she did not

18 believe that "most people" would know, after visiting the webpages, that a negative

19 option existed or that "most people" would know they were enrolled in a continuity

20 program upon completing the check-out process. (Id. at 114:9–18.)

22    (i) Version I

24 With respect to Version I, Ms. King focused on what consumers are drawn to

25 based on principles of usability. These principles include the fact that users typically do

26 not scroll, tend to scan very quickly and read only 20% of what is on the page, and seek

27 cues for what to do next on a webpage. (Id. at 123:19–1256, 125:20–23.) Ms. King

28 [7] In light of Ms. King's education and experience in the field of HCI, the Court finds her well-qualified to conduct and testify on a usability inspection of OnlineSupplier's webpages.

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1 testified that on the landing page of Version 1, the things that draw the most attention are
2 the "AS SEEN ON TV" logo, the eBay logo, and the word "kit" used multiple times. (Id.
3 at 124:7-11.) The primary call to action on the landing page is the "Ship My Kit"
4 button. (Id. at 124:13-18, 124:23.) On the billing page, the primary call to action is
5 filling out the payment information and the "Ship My Kit" button. (Id. at 127:6-18.)
6 Ms. King testified that there is nothing on the screen to cause a typical consumer to
7 believe that they would be signing up for a free trial and would incur monthly charges on
8 their credit card. (Id. at 127:21-23.) As to the hyperlinked "Terms of Membership," Ms.
9 King testified that she had grave concerns with the pop-up window, as a lot of factors
10 could potentially interfere with viewing that window, such as a pop-up blocking software
11 installed on the computer or other windows on the screen. (Id. at 135:12-136:4.) Ms.
12 King also pointed out that the terms and conditions contain at least 6,000 words in giant
13 blocks of text; the disclosure about the membership fee is buried in section 4; and the
14 terms and conditions are written in legal language, which most people do not understand
15 and immediately ignore. (Id. at 137:2-17, 138:4-9.) Ms. King testified that the "Terms
16 of Membership" hyperlink and the adjacent "Privacy Policy" hyperlink are also terms
17 that most people are trained to immediately tune out. (Id. at 136:5-19, 136:20-137:1.)
18
19 Ms. King further identified several key flaws with regard to the disclosure. First,
20 Ms. King provided screenshots of the landing and billing pages, which showed that the
21 disclosure appeared below the fold, as seen on a computer screen with the resolution size
22 of 1024 by 768 pixels (the most common resolution for computers during the time the
23 webpage were live from 2005 and 2006) and allowing for the maximum amount of
24 screen space. (Id. at 131:3-132:25, 133:1-4, 133:20-134:25; Exhs. 1324, 1325.) Ms.
25 King explained that the placement of the disclosure below the fold violates the cardinal
26 heuristic of usability because people do not read the entire webpage and do not tend to
27 scroll down to look for information below the fold. (King, 2/3/12, 128:1-7, 130:5-16,
28 130:5-9.) Generally, what one wants people to read the least is placed at the bottom

1 while the thing one cares about the most is placed at the top of the webpage and above
2 the fold. (Id. at 128:8-12.)
3
4 In rebuttal, Gugliuzza provided evidence of a screenshot from his computer
5 showing the disclosure on the billing page of Version 1 to be above the fold. (Exh. 19;
6 see also Exh. 2002.) But the net impression test under section 5(a) is from the
7 perspective of a reasonable consumer, not that of the seller or the seller's employee.
8 While Gugliuzza's computer may, indeed, have shown a part of the billing page
9 disclosure to be above the fold, it is not representative of the resolution size of the typical
10 consumer. Ms. King testified that the most common resolution size at the time Version 1
11 was live was 1024 by 768 pixels. (King, 2/3/12, 126:16-21.) Ethan Brooks, the
12 company's Chief Technology Officer from 2006 to 2007, also confirmed that during the
13 time that OnlineSupplier's sign-up pages were live, the screen resolution was 1024 by
14 768 for approximately 50% of users, which would place the disclosure below the fold.
15 (Brooks, 2/9/12, 100:16-101:2, 102:7-12, 113:23-114:9, 115:20-22, 116:14-21.) The
16 defense team also pointed to hints of something more below the fold—i.e., the light blue
17 box continues downward and the graphic on the left is cut off. However, Ms. King
18 testified that these were ineffective visual cues considering the totality of the page and the
19 prominence of the "Ship My Kit" button. (King, 2/7/12, 29:12-31:5; Exh. 1323.) Even
20 assuming the disclosure were entirely above the fold for most consumers, the Court finds
21 that its visibility is only slightly improved given its overall placement and presentation on
22 the page.
23
24 A second flaw Ms. King observed was that the disclosure is located far away from
25 the "Ship My Kit" button, at the very bottom of the page, and after the hyperlinked terms
26 of membership and "Privacy Policy." (King, 2/3/12, 128:18-22.) Ms. King testified that
27 her research in user cognition and privacy policies demonstrates that "as soon as you put
28 the word 'privacy policy' in front of a consumer, they completely tune out. They're one

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

of the most unused components of a web page." (Id. at 128:23–129:6.) Thus, "the location of the disclosure after that privacy policy link basically signals to somebody that here is something you don't need to read; this is not relevant to your shopping experience. If it were crucial, it would have been placed up near the 'ship my kit' button." (Id. at 129:7–13.) Third, Ms. King testified that the visibility of the disclosure was poor given the blue-on-blue lettering, the small and blocky text, the all-cap font (rendering it more difficult, not easier to read), and the legalese language (most people are not familiar with the term "negative option"). (Id. at 128:13–17, 129:21–130:2.)

Ms. King concluded that Version I did not appear to be offering for sale a membership program because (i) that messaging was absent from the entire user flow and the focus of the pages was instead on obtaining a free kit, and (ii) there was no mention of the continuity program in the area of the webpage where she believed most people would spend their viewing time. (Id. at 139:11–21.) Ms. King stated that she would not recommend launching Version I until the core flaws she identified were fixed. (Id. at 139:22–140:4.)

(ii) Version II

With regard to Version II, Ms. King similarly opined that the landing and billing pages did not contain anything that would cause a typical consumer to believe she would be signing up for a free trial in OnlineSupplier and would incur monthly charges until she affirmatively cancelled. (Id. at 141:5–9, 142:2–6.) The primary message of Version II's landing page is consistent with that of Version I—the focus is on the words eBay, starter kit, and free online auction. (Id. at 140:5–24.) The billing page does include the word OnlineSupplier for the first time, but the call to action remains "Ship My Kit!" (Id. at 141:15–142:1.) As to the disclosure on the billing page, Ms. King acknowledged that some changes were made to improve visibility, but that they were inadequate because

-9-

"key flaws" were not addressed—i.e., the disclosure is still ensconced in a very large block of small text, printed in caps, dressed in legal language, placed at the bottom of the page away from the primary call to action ("Ship My Kit!"), and appears below the fold. (Id. at 142:7–25, 152:23–154:2.) Ms. King testified that because most major webpages tend to always put their legal disclosures in the footer, "people have been trained to know if you see 'terms and conditions,' 'privacy policy,' . . . they are things that they do not need to read to complete the task at hand." (Id. at 143:7–18.) As with Version II, Ms. King provided a screenshot of the landing and billing pages of Version II, using the same resolution (1024 by 768 pixels) and maximizing the display windows. (Exhs. 1323, 1326.) Neither of the screenshots shows the terms and conditions hyperlink or the disclosure to be above the fold, and Ms. King testified that most consumers would not have seen the disclosures on the billing page. (King, 2/3/12, 144:3–25, 147:9–148:7.) As in Version I, Ms. King testified that the terms and conditions are unhelpful in disclosing the materials terms of OnlineSupplier because they are only available by clicking the hyperlinked "Privacy Policy" and "Terms and Condition"—two terms of membership for OnlineSupplier are also ineffective because—although the terms of the negative option plan appear at the very beginning of the 6,000-word text—the disclosure is contained in a separate pop-up window rather than directly on the billing page. (Id. at 148:13–149:1, 149:24–150:12.)

Ms. King concluded that Version II does not appear to be offering for a sale a membership program and that she would not have recommended launching Version II because of "severe violations of usability rules that need to be addressed." (Id. at 152:14–22.)

///

///

-10-

### (iii) Rebuttal Testimony

Mr. Gugliuzza did not produce any expert rebutting Ms. King's usability inspection of OnlineSupplier's webpages. Rather, Mr. Gugliuzza attempted to minimize Ms. King's testimony by pointing out that she did not incorporate any analysis of empirical data in reaching her conclusions. (Def.'s Closing Brief, at 44.) For example, Mr. Gugliuzza relies on evidence that approximately 45% of the consumers who purchased OnlineSupplier cancelled within the free trial period, (Exh. 31), and that there were thousands of websites created between January 2005 and March 2007 using OnlineSupplier. (*see* Cruttenden, 2/28/12, 8:18–10:9, 12:6–8, 60:23–61:7; Exh. 2057). Mr. Gugliuzza's criticism misses the mark. There was no explanation of how an empirical analysis is relevant to a usability inspection, which focuses on what the user can perceive and do on a webpage given certain HCI principles of usability. Ms. King explained why she conducted a usability inspection, as opposed to other methods (such as a focus group), given the scope of the project and the size of OnlineSupplier's website. (*See* King, 2/3/12, 117:12–24.) The Court finds that a usability inspection, with its emphasis on user perception and comprehension of the information presented to them on a webpage, is consonant with a "real impression" test under section 5(a) of the FTC Act, which turns on a facial examination of the relevant marketing materials.

Mr. Gugliuzza further argued that a close analysis of user data reveals that the "vast majority" of consumers signed up for OnlineSupplier knowing the terms of the negative option plan. (Def.'s Closing Brief, at 39–40.) Mr. Gugliuzza's reliance on user data is misguided and uncorroborated by the evidence in the record. Mr. Gugliuzza introduced the testimony of its accounting expert, Dr. Stefano Vranca, who submitted a rebuttal report to the consumer injury calculation of Dr. Daniel Becker, the FTC's consumer injury expert. Dr. Vranca testified that for the period from 2005 to April 2008, using the company's Microsoft Access Realtime (RT) database, 46.32% of those who

-31-

ordered OnlineSupplier cancelled within the free trial period. (Vranca, 2/28/12, 74:3–76:5; Exh. 2061.) Dr. Vranca further testified that nearly 20% of OnlineSupplier subscribers maintained their membership for more than three months and 10% of subscribers maintained their membership in excess of six months. (Vranca, 2/28/12, 84:3–22; Exhs. 2062–63.) Dr. Vranca's calculation, however, does not entirely support Mr. Gugliuzza's conclusion. As Dr. Becker pointed out, Dr. Vranca neither discussed the specific steps used to arrive at his calculation nor explained how the RT3 data was used in his rebuttal report. (*See* Becker, 2/15/12, 15:23–18:3.) Using the data from the company's RT3 system, Dr. Becker testified that both he and his assistant independently calculated a cancellation rate of 25%. (*Id.*) Even assuming that upwards of 45% of consumers did cancel within the free trial period, there was no accounting of how consumers knew about the membership terms—*i.e.*, whether they knew from the sign-up pages, from post-transaction communications, or examination of the kit itself. (*See* Vranca, 2/28/12, 104:5–109:1, 109:18–25.) More importantly, Dr. Vranca did not account for the 55% (the majority) of the consumers who did not cancel within the trial period and the 80% to 90% of those who did not subscribe to OnlineSupplier for more than three or six months.

There is also no showing that consumers who remained OnlineSupplier members did so knowing the terms of the membership upon submitting their credit card information. As true of Joan Cirillo, (*see infra* Part III.A.4), consumers simply could not have checked or seen the membership fee on their credit card bill for several months. Mr. Gugliuzza also pointed to the fact that there were thousands of websites created between January 2005 and March 2007 using OnlineSupplier, (Cruttenden, 2/28/12, 8:18–10:9, 12:6–8, 60:23–61:7; Exh. 2057), and that fourteen consumers—including Eric and Lucia Carter—provided positive testimonials of OnlineSupplier, (Carter, 2/17/12, 28:8–19, 37:24–38:24; Exh. 2004.) But the evidence shows that the Carters and others who submitted positive testimonials did so in early March 2005, and thus likely purchased

-32-

OnlineSupplier through in-bound telemarketing, not via the sign-up pages, which were not live until July 2005. (See Saidel, 2/14/12, 150:20–151:20; Gravitz, 2/2/12, 108:17–109:1; Exh. 2004.)[8] More importantly, the FTC is not required to prove that all consumers were deceived. *Stefanchik*, 559 F.3d at 929; *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989) ("[T]he FTC need not prove that every consumer was injured."), *cert. denied*, 493 U.S. 954 (1989). Nor does the FTC need to prove that individual reliance of the misrepresentation by each purchasing consumer. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605–606 (9th Cir. 1993), *cert. denied*, 510 U.S. 1110 (1994). It is also not enough that there were a few satisfied customers of OnlineSupplier or that it had some utility. *See FTC v. Tashman*, 318 F.3d 1273, 1278 (11th Cir. 2003) (concluding that the district court incorrectly focused on a few satisfied customers and utility of the product being sold, rather than analyzing the misrepresentations made about the product); *Amy Travel Serv., Inc.*, 875 F.2d at 572 ("The existence of some satisfied customers does not constitute a defense under the FTCA."); *accord Stefanchik*, 559 F.3d at 929 n.12. Finally, as discussed below, there were numerous complaints of consumer confusion regarding OnlineSupplier's payment terms that undercut Mr. Gugliuzza's argument that, at best, only "an infinitesimally small percentage" of customers ever claimed to be confused by the disclosure of the terms. (Def.'s Closing Brief, at 39–40).

### 4. Consumer Complaints

To establish a section 5 violation, proof of actual deception is unnecessary; it only requires a showing that misrepresentations "possess a tendency to deceive." *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979); *see also Feil v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960) (stating that "[a]ctual deception is not necessary" for the FTC to

[8] For example, Mr. Custer, who appeared on an infomercial regarding OnlineSupplier in 2005, testified that he purchased the program in 2004 (before Version I and II were live), that he did not recall if he used the webpages to sign up for the program, and that he was neither charged a shipping fee nor received a kit in the mail. (Custer, 2/17, 6:15–7:4, 33:21–35, 51:22–52:5; Exh. 1134.)

exercise its extensive power to prevent the use of deceptive acts). Although proof of actual deception is not necessary, "such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under the circumstances." *Cyberspace.com*, 453 F.3d at 1201.

The FTC presented abundant evidence that consumers were actually misled by OnlineSupplier's webpages. Two fairly sophisticated consumers, David Suckling and Joan Cirillo, testified that they were misled by OnlineSupplier's webpages. Mr. Suckling, a former owner of an internet company that built websites for clients, testified that he signed up for OnlineSupplier from a webpage advertising that he could obtain a free information if he just paid for shipping. (Suckling, 1/31/12, 61:6–15, 61:11–16.) His overriding impression was that he was being offered a free information kit on how to make money on eBay. (*Id.* at 62:15–17.) When he ordered the kit by submitting his address and credit card information on the sign-up pages, he did not believe that he was going to be charged anything in addition to the shipping fee. (*Id.* at 61:25–62:8.) Mr. Suckling later discovered he was charged $49.95 when he examined his credit card bill and called customer service to request a full refund. (*Id.* at 65:4–9.) Mr. Suckling received only a partial refund for $24.95. (*Id.* at 65:1–17.) After his call with customer service, he filed a complaint with the BBB. (*Id.* at 65:18–20.) Like Mr. Suckling, Ms. Cirillo, a corporate attorney for ten years, is well-versed in computer usage. She testified that she believed that she was ordering a free kit to learn how to be a seller on eBay, only to discover that she had been charged $49.95 five times, totaling approximately $250, from November 2006 to April 2007. (Cirillo, 1/31/12, 74:3–19, 76:16–19, 82:21–24.) Ms. Cirillo also called customer service to request a refund and filed a complaint with the BBB. (*Id.* at 74:23–75:7, 88:14–22.) Ms. Cirillo did not receive any refund. (*Id.* at 90:2–6.) Mr. Suckling's and Ms. Cirillo's overall impression that they were ordering a free information kit to sell products on eBay are consistent with the Court's overall net

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

324

impression of OnlineSupplier's webpages and Ms. King's usability inspection of the sign-up pages.

There is also ample evidence that Commerce Planet, through its customer service department CLG, received thousands of telephone complaints regarding OnlineSupplier and requests for refunds. José Guardiola, the customer service manager for CLG, handled customer complaints regarding billing issues on a daily basis, either by personally taking a call or by interacting with customer service representatives on the floor. (Guardiola, 2/21/12, 7:22–8:4, 90:19–23.) The most common type of complaint Mr. Guardiola identified were "free-kit-only" complaints—*i.e.*, people thought they were just paying $1.95 in shipping for a starter kit, only to discover they were being charged a monthly fee. (*Id.* at 8:11–21.) Mr. Guardiola estimated that approximately 70% of the consumer complaints consisted of free-kit-only complaints. (*Id.* at 8:22–9:6.) For example, in Mr. Guardiola's weekly reports during July and November 2006 and March 2007, there were a total of 18,000 calls handled by customer service, out of which Mr. Guardiola estimated that between 70% to 80% of the calls related to free-kit-only complaints. (*Id.* at 31:20–32:13; Exhs. 1292a, 1293, 1295.) Mr. Guardiola conservatively estimated that CLG received about a thousand free-kit-only complaints per week and tens of thousands of such complaints during his tenure at Commerce Planet from August 2006 to August 2007. (*Id.*)

In addition to telephone complaints, thousands of written complaints regarding OnlineSupplier were submitted to the BBB, the Attorney General, and Commerce Planet via emails, mail, and website submissions. (Exhs. 163, 193, 1180, 1177–79.) The Court admitted a total of approximately 4,000 complaints consisting of over 500 BBB complaints (Exh. 163); 3,272 archived email complaints to Commerce Planet from July 2005 to March 2008 (Exh. 1180); and over 200 Consumer Sentinel FTC database complaints (Exhs. 1177–79). (Trial Tr., 2/9/12, 97:22–98:7; Exh. 1176 [excluding

---

declaration and categorizations).)[9] A significant number of these related to consumer confusion regarding the nature of the product and its cost. Consumers complained that they thought they had signed up for a free information kit about how to sell products on eBay with payment of shipping, rather than subscribing to a continuity program with a monthly fee. For example, on June 13, 2006, Kenneth Goolsby filed a complaint with the BBB regarding a May 2006 purchase of OnlineSupplier, stating that he "thought [he] was signing up for free ebay info w/ a shipping of $1.95" and never agreed to monthly charges. (Exh. 163–694.) On September 5, 2006, Selena Phillips similarly stated regarding her August 2006 order of OnlineSupplier: "I ordered a 'free' package that was supposed to explain everything online supplier is supposed to do. I was only told to pay the shipping and handling fee of $1.95. Never did they ask me to look over the terms or agreement or have anything checked off that I looked at the terms or agreement." (Exh. 163–719.) Mr. Guardiola identified Mr. Goolsby's and Ms. Phillips' complaints as typical of those he encountered at CLG. (Guardiola, 2/21/12, 9:9–10:14.) On April 26, 2007, Joanna Gaul submitted a complaint to the Attorney General regarding her purchase of OnlineSupplier on January 31, 2007, stating that she "did not authorize them [Commerce Planet] to charge my card for anything but the $1.95. . . I ordered a How To Use E-Bay book online for $1.95," but "[w]hen I received the information I discovered it wasn't about using E-bay it was about having an on line business. . . when I received my credit card bill I had been charged $49.95. I called and told them I did not authorize this charge . . . ." (Exh. 193.) On April 25, 2006, Ian Bennett sent the following email complaint to Commerce Planet regarding the lack of clear disclosure for the continuity

[9] With regard to the archived emails, (Exh. 1180), the Court admitted them as proper summaries under Federal Rule of Evidence 1006. The Court noted that the complaints were not being offered for the truth of the matter asserted, but as evidence of the consumer's confused state of mind. (Trial Tr., 3/9/12, 13:17–15:2.) All the BBB, email, Attorney General, and Consumer Sentinel complaints—stating 4,057 complaints from 2004 to 2009—were classified in the FTC's March 2011 Project. (Gale, 2/9/12, 99:16–100:3, 112:25–14:23.) In this classification project, FTC investigator Breea Gale and his litigation team (consisting of six law students and one other FTC investigator) classified all the complaints into eight categories. The Court excluded the classifications as improper expert opinion. (Trial Tr., 2/9/12, 89:3–90:7, 94:17–22, 97:22–98:7.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

program: "This is notice for you to refund the $29.95 you billed me [I did not authorize
it] and to inform you that your method of securing payment for shipping of free kit did
not CLEARLY show the fact that a letter would have to be generated to cancel any
further obligations. . . . The following web page [for OnlineSupplier] does not show the
required verbiage except below the fold of the displayed page which would not be read
by most people. . . . Your manner of advertising is deceptive and misleading and you
should take immediate steps to CLEARLY indicate during the initial offer that after 14
days an automatic billing of $29.95 would occur." (Exh. 1180.) Another consumer sent a
similar email complaint on August 18, 2006: "Your business practice [is] extremely
misleading and border on fraud. . . . There is nothing what so ever on the sign up page or
the terms of membership that in fact state that requesting the 'free' startup kit is in fact
the same thing as account activation and/or account registration. NOTHING." (Id.) The
Court finds the testimony of Mr. Suckling, Ms. Cirillo, and Mr. Guardiola as well as the
evidence of consumer complaints credible and highly probative evidence that the website
marketing of OnlineSupplier was misleading and deceptive.

### 5. Excessive Chargeback Rates

The FTC presented additional evidence of excessive chargeback rates for
OnlineSupplier during the relevant time period, which corroborates the Court's finding
that the program's sign-up pages were misleading. A "chargeback" consists of a returned
sales transaction from the issuing bank to the acquiring bank sponsoring a particular
merchant into the credit card payment system. (Chen, 2/2/12, 133:22–134:11, 135:7–11.)
When a chargeback occurs, the funds associated with that transaction flow back to the
issuer bank. (Id. at 135:12–16.) The average chargeback rate in the United States is
0.2% of the transaction rate. (Id. at 136:22–137:13.) Visa Credit Cards, one of the credit
cards accepted for purchasing OnlineSupplier, identifies merchants who exceed a
chargeback rate of about 1% in any given month. (Id. at 138:8–22, 140:18–141:4.)

1  Visa's business records show that OnlineSupplier was enrolled in Visa's Merchant
2  Chargeback Monitoring Program ("MCMP") starting in 2004. (Exh. 1057.)
3  OnlineSupplier continued to be in Visa's MCMP when the webpages of Version I and
4  Version II were live during Mr. Gugliuzza's tenure at Commerce Planet. (Exhs. 1058–
5  62.) OnlineSupplier was also part of Visa's Global Merchant Chargeback Monitoring
6  Program ("GMCMP") in 2007. (Exhs. 1064–65.) From February 2006 to July 2007,
7  OnlineSupplier exceeded Visa's 1% chargeback threshold for most months, reaching
8  peaks of 5% in June 2006 and April through May 2007, 7% in June 2007, and 8% in July
9  2007 with certain acquiring banks. (Exh. 1312; see also Exhs. 1058–62; Exhs. 1317–19,
10  1321–22.) Commerce Planet incurred substantial fees in connection with OnlineSupplier
11  chargebacks, totaling more than one million dollars between February 2006 and July
12  2007. (Seidel, 2/14/12, 74:24–75:20; Chen, 2/3/12, 59–23; Exhs. 1126, 1162, 1317,
13  1320.) From February 2006 to July 2007, Andrew Chen, who works at Visa's
14  management division and is responsible for monitoring merchants with excessive
15  chargebacks, testified that Visa monitored OnlineSupplier in all four of its risk
16  management programs: (1) the MCMP, (2) the GMCMP, (3) the Risk Identification
17  Service Online ("RIS"), and (4) the Merchant Fraud Performance Program. (Chen,
18  2/3/12, 131:3–12.) Mr. Chen opined that OnlineSupplier's performance in those
19  programs was poor, given the extended time period during which OnlineSupplier was
20  part of the programs and the fact that its chargeback problems never abated, among other
21  factors. (Chen, 2/2/12, 131:13–132:7.) Mr. Chen testified that based on his research into
22  case logs of merchants in Visa's monitoring programs, OnlineSupplier was the only
23  merchant that had been in all four monitoring programs. (Id. at 132:2–7.) Officers and
24  employees at Commerce Planet, including Messrs. Gugliuzza, Hill, and Gravitz, all
25  averred that OnlineSupplier's chargeback rate was a problem throughout their tenure at
26  the company. (Gravitz, 2/1/12, 60:11–12, 60:24–61:2, 78:1–3; Gugliuzza, 2/22/12,
27  55:25–56:23, 60:4–6, 104:9–17; Daniel, 2/14/12, 19:9–19, 20:17–20, 24:5–9, 24:20–25:3,
28  26:8–11; Hill, 2/7/12, 156:13–157:3; Fouear, 2/16/12, 134:17–135:22, 160:5–9; Exh. 40.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

326

1  The chargeback problem for OnlineSupplier was never resolved. (Gravitz, 2/1/12,
2  134:10–15.)
3
4     Mr. Chen testified that the frequent source of OnlineSupplier's excessive
5  chargeback rates was e-commerce fraud, meaning that "consumers didn't recognize the
6  transactions." (Chen, 2/3/12, 26:7–24.) Commerce Planet's chargeback reductions plans
7  identify inadequate disclosure of OnlineSupplier's billing terms in their advertisement as
8  one source of the company's chargeback problem. (*Id.* at 28:17–30:18; Exhs. 1076–77,
9  40.) Although Visa did not specifically link OnlineSupplier's excessive chargeback rates
10 to deceptive website marketing during its monitoring of OnlineSupplier, Mr. Chen
11 testified that Visa was just beginning to witness e-commerce deceptive marketing from
12 2004 to 2007 so that Visa did not know how to exactly identify that kind of problem until
13 a few years later. (Chen, 2/3/12, 28:3–14.) In 2008 and 2009, Visa identified certain
14 features employed by continuity merchants, such as use of a free trial offer, a pay-for-
15 shipping model, and a negative option plan, as being potentially deceptive marketing
16 tactics. (*Id.* at 2/3/12, 156:21–157:21.) All these characteristics were marketing features
17 of OnlineSupplier. The Court finds OnlineSupplier's history of excessive chargeback
18 rates to be consistent with deceptive website marketing.
19
20     **6. Third-Party Marketers**
21
22     Mr. Gugliuzza does not dispute that at least some consumers were confused and
23 misled into signing up for OnlineSupplier or that Commerce Planet had high chargeback
24 rates resulting from consumers requesting that their credit card company rescind the
25 charges on their purchase. Rather, Mr. Gugliuzza heavily relies on the defense that
26 consumer confusion and high chargeback rates were the result of third-party affiliate

1  marketers[10] who engaged in affiliate fraud that induced consumers to sign-up for
2  OnlineSupplier under false pretenses. In opening statements, the defense team pinned
3  blame on third-party marketers, who they argued violated the terms of the marketing
4  agreement by employing such tactics as using unapproved email
5  notifications, false promises of free gifts upon signing up for OnlineSupplier
6  (incentivized marketing), and use of stolen credit card information and prepaid credit
7  cards. (Trial Tr. 1/31/12, 12:18–23:3, 46:14–18.) The defense argued that once Mr.
8  Gugliuzza discovered that affiliate fraud was occurring, he took aggressive steps to
9  combat the problem, and that at the end of his tenure at Commerce Planet, it was mostly
10 resolved. (*Id.* at 23:4–8.)
11
12     The Court does not find this defense to be convincing in light of the totality of
13 evidence presented. First, there is insufficient evidence in the record that establishes that
14 affiliate fraud was primarily responsible for consumer confusion about OnlineSupplier.
15 Commerce Planet began to use affiliate marketers around September 2005 under various
16 payment arrangements. (Hill, 2/17/12, 97:23–98:4.)[11] Mr. Hill testified that Commerce
17 Planet was subject to certain third-party marketing fraud, including unapproved pages
18 and email creatives to drive traffic, click fraud, and stolen credit cards. (*See id.* at 98:15–
19 99:9, 100:22–102:3.) Around November 2006, Commerce Planet was also subject to
20 incentivized marketing traffic—i.e., offers for free gifts for signing up for
21 OnlineSupplier. (Brooks, 2/9/12, 140:23–141:18; Gravitz, 2/1/12, 120:10–24; Exh. 40-
22 1175) Mr. Hill testified that Mr. Gugliuzza vigorously countered the problem through
23
24
25
26 _____
27 [10] Affiliate marketers are publishers who generate consumer interest in the product through use of opt-in
28 emails or advertising. (Gravitz, 2/1/12, 121:4–18.)

[11] These arrangements included cost-per-click advertising in which Commerce Planet would pay the
third-party marketer every time someone clicked on the marketer's ad; cost-per-thousand advertising
when the company pays based on the number of impressions that the ad shows or number of emails that
are sent; and cost-per-acquisition marketing that compensated the third-party marketer based on actual
placements of an order. (Gravitz, 2/1/12, 13:5–20.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

327

nonissuance of payment, cancellation of contracts, and filing lawsuits. (Hill, 2/1/12, 102:4–103:5.) However, aside from testimony that affiliate fraud occurred, there was no specific evidence linking affiliate fraud as the primary cause of consumer confusion and high chargeback rates. There was also no documentation that specific third-party marketers employed certain types of affiliate fraud. While third-party marketers may have increased traffic to the sign-up pages by, for example, use of unapproved email creatives, consumers still had to view and utilize the sign-up pages to order OnlineSupplier. (See Hill, 2/1/12, 137:17–138:9.) Any confusion caused by the email creative would have been countered by representations about the product on the landing and billing pages. There is no evidence in the record that consumers ordered OnlineSupplier directly from third-party marketing materials or that third-party marketers were responsible for the sign-up pages. While affiliate fraud undoubtedly hurt Commerce Planet, it is unclear if it hurt consumers. (See Hill, 2/1/12, 136:12–20.) For example, in the case of contractual fraud (such as use of a prepaid debit card or click fraud),[12] Commerce Planet bore the cost, but consumers were unaffected. (Id. at 137:11–16.) Furthermore, the evidence shows that OnlineSupplier was consistently subject to high chargeback rates and was enrolled in Visa's MCMP in 2004, before third-party marketers were used. Excessive chargeback rates also predated incentivized marketing traffic, which began in November 2006. (See Brooks, 2/9/12, 140:23–142:2; Graviz, 2/1/12, 120:22–24; Exh. 40.) Mr. Chen testified that affiliate fraud would not have been the sole driver of all the fraud and chargeback issues, particularly once merchants started to shut down those affiliate relationships. (Chen, 2/3/12, 94:10–17.) With respect to OnlineSupplier's ten-month history in the MCMP, Mr. Chen testified that affiliate fraud would not typically have been the driving factor for that time period. (Id. at 94:18–25.) Mr. Graviz testified that the chargeback problem for OnlineSupplier was never resolved.

[12] Click fraud occurs when third-party marketers simulate consumer traffic by a bot or a computer.

-4-

(Graviz, 2/1/12, 134:10–15.) The evidence taken as a whole does not support Mr. Gugliuzza's affiliate fraud story.

In short, the FTC has provided a plethora of evidence that OnlineSupplier's sign-up pages were misleading because they conveyed the net impression that consumers could order a free auction kit with payment of a small shipping and handling fee, when in fact, they were subscribing to a negative option plan. The expert testimony of Ms. King, along with numerous free-kit-only complaints and excessive chargeback rates, provide strong corroborating evidence that the website marketing of OnlineSupplier was misleading and deceptive.

**B. Unfair Acts (Count II)**

The FTC has provided sufficient evidence that Commerce Planet's website marketing of OnlineSupplier was also unfair under section 5(n). An act is unfair if it (1) causes substantial injury (2) not outweighed by countervailing benefits to consumers or competition, and (3) one that consumers themselves could not reasonably have avoided. 15 U.S.C. § 45(n); see also FTC v. Neovi, Inc., 604 F.3d 1150, 1155 (9th Cir. 2010); FTC v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000).

**1. Substantial Injury**

The substantial injury prong is satisfied if the FTC offers sufficient evidence that consumers "were injured by a practice for which they did not bargain." Neovi, 604 F.3d at 1157 (citation and quotes omitted); accord J.K. Publications, 99 F. Supp. 2d at 1201. "An act or practice can cause substantial injury by doing a small harm to a large number of people, or if it raises a significant risk of concrete harm." Neovi, 604 F.3d at 1157–58 (citation and quotes omitted). "Both the Commission and the courts have recognized that

-5-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

328

1 consumer injury is substantial when it is the aggregate of many small individual injuries."

2 Pantron I Corp, 33 F.3d at 1102; see also Orkin Exterminating Co. v. FTC, 849 F.2d

3 1354, 1365 (11th Cir. 1988) ("As the Commission noted, although the actual injury to

4 individual customers may be small on an annual basis, this does not mean that such injury

5 is not 'substantial.'"), cert. denied, 488 U.S. 1041 (1989). Here, the evidence shows

6 that thousands of consumers were misled into signing up for OnlineSupplier, thinking

7 that they were ordering a free auction kit, instead of a continuity program with an

8 automatic monthly charge to their credit card. Although the precise dollar amount of

9 injury cannot be calculated here, there were thousands of consumers who were misled

10 into signing up for OnlineSupplier and incurred monthly charges ranging from $29.95 to

11 $59.95. The FTC approximated the total amount of consumer injury to be at least $18.2

12 million, which the Court finds reasonable and substantial. (See infra Part IV.B.)

13

14 **2. Countervailing Benefits**

15

16 "The second prong of the test is easily satisfied when a practice produces clear

17 adverse consequences for consumers that are not accompanied by an increase in services

18 or benefits to consumers or by benefits to competition." J.K. Publications, 99 F. Supp.

19 2d at 1201 (citations and quotas omitted). This prong is satisfied here because consumers

20 who were misled into ordering OnlineSupplier would not have known that they had

21 subscribed to a web hosting program; hence, they would not have utilized its product and

22 services. Consumers also did not give their consent to enrollments in OnlineSupplier, and

23 thus, the harm resulted from a practice for which they did not bargain. Neovi, 604 F.3d at

24 1157. Although there is evidence that some consumers did in fact set up websites and

25 were satisfied with OnlineSupplier, it is not enough that there were a few satisfied

1 customers of OnlineSupplier or that it had some utility. See Tashman, 318 F.3d at 1278;

2 Amy Travel Serv., Inc., 875 F.2d at 572; Stefanchik, 559 F.3d at 929 n.12.[13]

3

4 **3. Not Reasonably Avoidable**

5

6 "In determining whether consumers' injuries were reasonably avoidable, courts

7 look to whether the consumers had a free and informed choice." Neovi, 604 F.3d at 1158.

8 As discussed above, OnlineSupplier's landing and billing pages created the net

9 impression that consumers could order a free kit to learn how to sell products online.

10 They were not adequately informed that they were signing up for a continuity program

11 with monthly charges. Ms. King testified that most consumers would have been

12 confused by the sign-up pages. Most consumers thus could not have reasonably avoided

13 the monthly charge. Accordingly, the website marketing of OnlineSupplier constituted

14 unfair practice in violation of section 5(a).

15

16 **C. Individual Liability**

17

18 An individual may be held liable for corporate violations of the FTC Act if the

19 individual (1) participated directly in the wrongful practice or act or had authority to

20 control it, (2) had knowledge of the wrongful practice or act, was recklessly indifferent to

21 the truth or falsity of the misrepresentation, or was aware of a high probability of fraud

22 along with an intentional avoidance of the truth. Stefanchik, 559 F.3d at 931; FTC v.

23 Garvey, 383 F.3d 891, 900 (9th Cir. 2004); Amy Travel Serv., 875 F.2d at 573. If the

24 FTC proves direct participation in or authority to control the wrongful act, then the

25 individual may be permanently enjoined from engaging in acts that violate the FTC Act.

[13] It is also doubtful whether any of the satisfied customers—including the Bureom customers who submitted positive testimonials—actually utilized the webpages to order OnlineSupplier. (See supra Part III.A.3.fft.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1  *Garvey*, 383 F.3d at 900. To hold an individual liable for monetary redress, the FTC

2  must additionally establish knowledge. *FTC v. Affordable Media*, 179 F.3d 1228, 1234

3  (9th Cir. 1999); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.

4  1997). Proof that the defendant intended to deceive consumers or acted in bad faith is

5  unnecessary to establish a section 5(a) violation. *FTC v. World Travel Vacation Brokers,*

6  *Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) ("An advertiser's good faith does not immunize

7  it from responsibility for its misrepresentations." (citation and quotes omitted)); *Feil*, 285

8  F.2d at 896 ("Whether good or bad faith exists is not material, if the Commission finds

9  that there is likelihood to deceive.")

10

11  **1. Participation and Authority to Control**

12

13  Authority to control may be evidenced by "active involvement in business affairs

14  and making of corporate policy, including assuming the duties of a corporate officer."

15  *Amy Travel Serv.*, 875 F.2d at 573. An individual's position as a corporate officer and/or

16  authority to sign documents on behalf of the corporate defendant is sufficient to show

17  requisite control. *See Publishing Clearing House*, 104 F.3d at 1170 (holding that

18  individual's "assumption of the role of president of [the corporation] and her authority to

19  sign documents on behalf of the corporation demonstrate that she had the requisite

20  control over the corporation" for purposes of finding individual liability under section

21  5(a)); *J.K. Publications*, 99 F. Supp. 2d at 1181–82 (holding a consultant liable because

22  he had "ownership in and/or control over" the company).

23

24  The FTC has satisfied the first prong for individual liability. The evidence

25  abundantly establishes that from June 2005 to November 2007, Mr. Gugliuzza

26  participated in and had authority to control the deceptive website marketing of

27  OnlineSupplier. Mr. Gugliuzza's total involvement with Commerce Planet spanned three

28  years from May 2005 to May 2008. Mr. Gugliuzza held the title of consultant, president,

---

1  and director at Commerce Planet from July 2005 to November 2007. During the relevant

2  time period, Mr. Gugliuzza wielded considerable authority and power at the company.

3  He served as a top executive, oversaw and directed the company's operations, and had

4  authority to control the activities of the various department heads, including Mr. Gravitz

5  and the company's in-house counsel. Mr. Gugliuzza was involved in making core

6  decisions that affected the operations of Commerce Planet and its subsidiaries, including

7  the marketing of OnlineSupplier.

8

9  **(i) Role as Consultant**

10

11  Although a titular consultant from July 2005 to September 2007, the evidence

12  shows that Mr. Gugliuzza at least shared, if not supplanted, Mr. Hill's role as CEO and

13  president. Mr. Hill testified that when Mr. Gugliuzza was hired as a consultant, his own

14  authority was curtailed and that his responsibilities changed from overseeing the

15  company's day-to-day operations to implementing Mr. Gugliuzza's recommendations.

16  (Hill, 2/7/12, 129:14–130:6.) The Board of Directors conferred upon Mr. Gugliuzza a

17  large portion of Mr. Hill's authority to help manage the company, which included the

18  day-to-day oversight over marketing and supervising Mr. Gravitz. (Hill, 2/7/12, 129:14–

19  130:6; Hill, 2/17/12, 121:9–25.) While still a consultant, Mr. Gugliuzza signed an

20  "Executive Compensation" agreement with Commerce Planet in March 2006, which

21  entitled him to the same terms of compensation as Mr. Hill. (Fouser, 2/16/12, 167:24–

22  168:13; Exhs. 16, 1331.) Mr. Gugliuzza, in fact, had identified the company's "dire need

23  of a leader" with management skills in his report, (Exh. 6), and it appears that Mr.

24  Gugliuzza filled that role from the very beginning. (See Hill, 2/7/12, 137:20–138:7

25  (testifying that Mr. Gugliuzza "was given the authority by the Board to ultimately take

26  over the entire operation of the company and was told to replace me").) Mr. Gugliuzza

27  also had the power to negotiate contracts on behalf of Commerce Planet and did so in

28  2005 with respect to NeWave's contract with Neichemistry, a vendor for the company

that hosted and managed the store-builder product software for OnlineSupplier. (Cruttenden, 1/28/12, 5:11–17; 40:11–42:1.) Mr. Gugliuzza had the power to hire and fire and exercised that authority with respect to various employees at Commerce Planet, including Paul Daniel, whom he terminated as the company's CFO, and David Foucar whom he hired to replace Mr. Daniel in June 2006. (Hill, 2/17/12, 129:19–130:9; Gugliuzza, 2/22/12, 46:4–7; Foucar, 2/16/12, 130:24–25.)

Mr. Gugliuzza also oversaw and regularly met with department heads, who were required to submit weekly reports to him. (Hill, 2/7/12, 132:9–133:24; Gugliuzza, 2/23/12 Vol. 1, 57:8–11; Exhs. 1124, 1130, 1354, 1356, 1368–71, 1292a, 1293, 1295.) Specifically, Mr. Gugliuzza had supervisory authority over Aaron Graviz, who was responsible for marketing OnlineSupplier. (Hill, 2/7/12, 134:20–135:3; Graviz, 2/2/12, 122:3–11.) Mr. Graviz reported directly to Mr. Gugliuzza and met with him daily. (Hill, 2/7/12, 136:21–23, 137:13–19.) Mr. Gugliuzza also set marketing goals, budgets, and action items. (Exh. 1120.) Although Mr. Gugliuzza did not come up with the design or concept of OnlineSupplier's webpages or the use of a negative option plan, he oversaw the company's transition from telemarketing to online marketing in 2005. (Hill, 2/17/12, 122:1–4; Daniel, 2/14/12, 28:15–23.) Mr. Hill testified that Mr. Gugliuzza made the decision to transition from telemarketing to internet marketing because the cost in generating orders was much higher for the former. (Graviz, 2/1/12, 44:19–45:12.) Mr. Gugliuzza also became involved in reviewing OnlineSupplier's sign-up pages and advertising materials. (Id. at 17:13–14.) Mr. Gugliuzza testified that he saw, reviewed, and approved various versions of the sign-up pages: "I know there are versions that I had reviewed and commented on and approved to some [degree]." (Gugliuzza, 2/21/12, 179:12–20.) Mr. Graviz testified that he submitted all marketing materials to Mr. Gugliuzza or Jeffrey Conrad and believed that he would be terminated if he ran an advertisement that was not approved by them. (Graviz, 2/2/12, 48:25–49:17, 119:12–120:5; Exh. 108.) Mr. Gugliuzza specifically made decisions to increase the traffic to

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

OnlineSupplier's landing pages, such as by allotting more money to media to drive consumers to landing pages. (Graviz, 2/1/12, 64:11–23.) Mr. Gugliuzza also made the decision to incrementally increase the price of OnlineSupplier from $29.95 to $39.95 per month. (Id. at 66:24–67:8.) The evidence shows that Mr. Gugliuzza participated in and had authority to control the website marketing of OnlineSupplier as a consultant.

(ii) Role as President

Although Mr. Gugliuzza formally served as president of Commerce Planet from September 2006 to November 2007, the evidence shows that he had already been serving as a de facto executive of Commerce Planet since July 2005. As a practical matter, his responsibilities and duties did not materially change. (Hill, 2/7/12, 153:18–25.) Mr. Gugliuzza continued to have operational control over the company and its subsidiaries and had oversight over the department heads. (Foucar, 2/16/12, 137:19–138:6.) Mr. Gugliuzza averred that as president of Commerce Planet, the "success of [the company's four subsidiaries] were important and ultimately rolled up to some degree and capacity to Commerce Planet, which [he] had responsibility for." (Gugliuzza, 2/22/12, 52:5–13.) Mr. Gugliuzza continued to oversee Mr. Graviz and to be involved in the marketing of OnlineSupplier, including reviewing and approving its sign-up pages. (Hill, 2/7/12, 155:8–10, 155:11–20.) The evidence shows that Mr. Gugliuzza participated in and had the authority to control the website marketing of OnlineSupplier as the president of Commerce Planet.

2. Knowledge

The knowledge requirement is satisfied by establishing that "the individual had actual knowledge of the material misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along

with an intentional avoidance of truth." *Garvey*, 383 F.3d at 900 (citing *Publishing Clearing House, Inc.*, 104 F.3d at 1171). "The degree of participation in business affairs is probative of knowledge." *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994); *see also Amy Travel Serv.*, 875 F.2d at 574; *Affordable Media*, 179 F.3d at 1235 ("The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.").

The evidence demonstrates that, at the very least, Mr. Gugliuzza was recklessly indifferent to the misleading representations of OnlineSupplier on its landing and billing pages. From his 30-day assessment of the company in May 2005, Mr. Gugliuzza was able to acquire a fairly comprehensive understanding of the company's management, operations, technology, finances, marketing, customer service, and personnel. (Exh. 6.) His report also shows that he was familiar with OnlineSupplier and the various ways it was marketing. (*Id.*) Mr. Gugliuzza supervised Mr. Gravitz and the marketing of OnlineSupplier and oversaw the company's migration from telemarketing to online sign-ups. Mr. Gugliuzza also should have been particularly well-tuned to the activities of the marketing department, as he identified marketing expenditures to be one of the largest contributors to the company's negative net profits in his assessment report. (*Id.*) Although Mr. Gugliuzza testified that each subsidiary was a separate entity and had its own president, (Gugliuzza, 2/22/12, 50:16-51:8), the record shows that he communicated fairly extensively and regularly with the department heads, met with them, and required them to submit weekly reports to him. This is consistent with Mr. Gugliuzza's goal of improving the communication and coordination among the departments in his assessment report.

Specifically, with respect to the landing and billing pages, the evidence shows that Mr. Gugliuzza knew or at least was recklessly indifferent to the fact that they were misleading. Mr. Gugliuzza testified that he had seen, reviewed, commented on, and

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

332

approved various versions of the OnlineSupplier sign-up pages. (Gugliuzza, 2/21/12, 179:12-20, 179:21-180:22; Exh. 1026.) Mr. Seidel and Mr. Guardiola, the president and manager of CLG, respectively, reported to Mr. Gugliuzza and sent him weekly reports of the call logs in customer service that contained the cancellation rates and refund amounts. Mr. Gugliuzza had ample notice of consumer complaints, including the free-kit-only type of complaints to which Mr. Guardiola testified. (Guardiola, 2/21/12, 15:11-18, 17:7-23, 23:2-15, 27:8-21, 30:25-31:4; Exhs. 292a, 1295-95.) Mr. Guardiola also testified that one of the primary suggested changes brought up during his weekly meetings was to enlarge the font of the disclosure. (Guardiola, 2/21/12, 16:14-19.) Mr. Guardiola testified that based on his weekly staff reports and meetings that Mr. Gugliuzza periodically attended, he believed Mr. Gugliuzza knew about the number and substance of the billing complaints received by the company. (*Id.* at 32:14-23.) Mr. Gravitz and Mr. Hill testified that when Commerce Planet received complaints, they discussed them with Mr. Gugliuzza. (Gravitz, 2/1/12, 75:25-77:6; Exh. 1027; Hill, 2/7/12, 155:21-156:12, 160:10-161:25; 163:18-164:10.) Mr. Hill and others discussed the problem of OnlineSupplier's chargeback rates with Mr. Gugliuzza. (Hill, 2/7/12, 156:13-157:9; Exhs. 186-87, 1289.) Mr. Hill testified that OnlineSupplier's chargeback problems were never resolved and remained throughout the 1% threshold for almost the entire time that Mr. Gugliuzza worked at the company. (Hill, 2/7/12, 168:9-23.) Mr. Gugliuzza also rejected the company's experiment in placing clearer disclosures and sending post-transaction emails because they hurt conversion rates. (Exh. 1097.) Mr. Gugliuzza's pervasive role and authority at Commerce Planet, which extended to almost every facet of the company's business and operations, also creates a strong inference that Mr. Gugliuzza had the requisite knowledge that OnlineSupplier's webpages were misleading. *American Standard Credit System*, 874 F. Supp. at 1089; *Amy Travel Serv.*, 875 F.2d at 574; *Affordable Media*, 179 F.3d at 1235. Accordingly, Mr. Gugliuzza had the requisite knowledge to be held individually liable for the deceptive website marketing of OnlineSupplier.

In his defense, Mr. Gugliuzza testified that it never once occurred to him during his entire tenure at Commerce Planet that people were being misled by the webpages. (Gugliuzza, 2/21/12, 182:16-21.) This is simply not credible in light of all the evidence of consumer confusion and Mr. Gugliuzza's extensive role at the company from 2005 to 2007. Mr. Gugliuzza also adamantly insisted that he did not attempt in any way to mislead consumers. (*Id.* at 100:23-24.) Commerce Planet's other officers and employees also consistently maintained that they did not believe that the company was intending to deceive consumers or to perpetuate a fraudulent internet scheme. (*See, e.g.,* Seidel, 2/14/12, 114:6-14.) However, proof that the defendant intended to deceive consumers or acted in bad faith is unnecessary to establish a section 5(a) violation. *World Travel Vacation Brokers,* 861 F.2d at 1029; *Feil,* 285 F.2d at 896. Mr. Gugliuzza further testified that he believed OnlineSupplier's webpages gave clear and conspicuous notice of the continuity program. (Gugliuzza, 2/21/12 Vol. I, 32:23-33:1, 33:7-13, 35:13-23.) Commerce Planet's other officers and employees concurred that they believed that the landing and billing pages gave clear notice of the terms of membership. (*See, e.g.,* Gravitz, 2/2/12, 36:23-37:3; Hill, 2/17/12, 88:2-6, 114:25-115:2; Seidel, 2/14/12, 125:9-126:23.) The relevant test, however, as to whether OnlineSupplier's webpages were misleading is from the perspective of a reasonable consumer confronted with the webpages, not that of the company's officers or employees who already had inside knowledge of how OnlineSupplier was being marketed and sold.

Finally, Mr. Gugliuzza argues that he did not know OnlineSupplier's webpages were misleading because there is no specific statute, law, or industry standard banning the use of a negative option plan or specifying how a negative option plan should be disclosed. (*See* Def.'s Closing Brief, at 47-48; Def.'s Closing Rebuttal, at 6.) This argument is unpersuasive. Although there is no specific law or industry standard prohibiting the use of a negative option plan or a bright-line rule on how such a plan should be disclosed, the FTC's Dot.Com Disclosures on Internet advertising was

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

---

published in May 2000 and readily available to Commerce Planet before its sign-up pages were live. (Gravitz, 2/2/12, 118:19-119:5; Exh. 377.) The Dot.com Disclosures provided guidelines on how to make clear and conspicuous disclosures that are consistent with the "net impression" test and principles of usability identified by Ms. King. (Exh. 377.) More importantly, the test under section 5(a) draws on well-established principles of advertising law and common sense. A bright-line rule on how precisely to disclose a negative option plan on a webpage is practically impossible, given the myriad variations of products, services, and webpages that are both extant and imaginable. Such a rule also calls for a rigid formula that undermines the very usefulness and flexibility of the law permitting it to be applied to a multitude of factual circumstances under sustained principles.

### D. Advice of Counsel and Good Faith

In his Answer to the FAC, Mr. Gugliuzza asserted several affirmative defenses, including advice of counsel, reliance on professionals, and good faith. Mr. Gugliuzza alleged that the FTC's claims are barred because he relied on the advice of counsel and professionals and acted in good faith. (Answer to FAC, at 8-9; *see also* Def.'s Trial Brief, at 3.) Specifically, Mr. Gugliuzza's defense is that he relied in good-faith on the advice of Commerce Planet's two in-house counsel, Jeffrey Conrad and Paul Hault, as to whether OnlineSupplier's sign-up pages were compliant under the FTC Act. (*See* Def.'s Trial Brief, at 12.)

Neither of these affirmative defenses has merit. As a matter of law, advice of counsel and good faith are not defenses to whether the defendant had the requisite knowledge under section 5(a). "'[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability." *Cyberspace.com,* 453 F.3d at 1202 (quoting *Amy Travel Serv.,* 875 F.2d at 575). This is because counsel

333

1 cannot sanction something that the defendant should have known, was wrong. *Any*
2 *Travel Serv., Inc.*, 875 F.2d at 575 ("Obtaining the advice of counsel did not change the
3 fact that the business was engaged in deceptive practices."). Good faith is also irrelevant
4 to the question of knowledge. *See Fall*, 285 F.2d at 896 ("Whether good or bad faith
5 exists is not material, if the Commission finds that there is likelihood to deceive."); *World*
6 *Travel Vacation Brokers*, 861 F.2d at 1029 ("An advertiser's good faith does not
7 immunize it from responsibility for its misrepresentations." (citation and quotes
8 omitted)).
9
10 Furthermore, the record does not support a finding that Mr. Gugliuzza relied in
11 good-faith on the advice of Commerce Planet's in-house counsel as to whether
12 OnlineSupplier's webpages complied with the FTC Act. Neither Mr. Conrad nor Mr.
13 Huff had experience or specialized knowledge in regulatory or advertising law. They
14 also were not hired specifically to review the landing and billing pages of OnlineSupplier
15 for compliance under the FTC Act. The evidence does not demonstrate that Mr.
16 Gugliuzza deferred to the legal advice of Mr. Conrad or Mr. Huff. Rather, the record
17 shows that Mr. Gugliuzza had superseding authority over both in-house counsel. For
18 example, Mr. Conrad initially performed general business consulting for the company in
19 January 2004 and then began reviewing advertisements and promotional materials in
20 mid-2004. (Conrad, 2/8/12, 39:15-40:17; Exh. 100.) Mr. Conrad, however, did not have
21 a background in advertising law. (Conrad, 2/8/12, 41:3-9.) Mr. Conrad and Mr.
22 Gugliuzza shared the role of reviewing legal materials, and Mr. Gugliuzza eventually
23 replaced Mr. Conrad as legal counsel and assumed responsibility for reviewing the
24 marketing materials. (Gravitz, 2/1/12, 135:21-16:9; Hill, 2/7/12, 139:11-140:8.) Mr.
25 Gugliuzza also held himself out to be legal counsel of OnlineSupplier, Inc. (Hill, 2/7/12,
26 140:9-141:13; Exh. 171.) Mr. Gugliuzza reviewed Mr. Gravitz's work to ensure that the
27 email creatives and OnlineSupplier's sign-up pages produced by Mr. Gravitz and his
28 team complied with applicable laws from 2005 to 2006. (Hill, 2/17/12, 122:8-13.) Mr.

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

1 Gugliuzza testified that before Mr. Huff was hired, he was doing most of the legal review
2 for the company. (Gugliuzza, 2/22/12, 119:5-14.) In effect, Mr. Gugliuzza acted as
3 Commerce Planet's *de facto* legal counsel.
4
5 Similarly, Mr. Huff, who had a background in business and employment litigation,
6 did not have any experience in FTC Act compliance or advertising law before working at
7 Commerce Planet. (Huff, 2/15/12, 47:15-48:5, 56:15-19.) Mr. Huff was hired as in-
8 house by Commerce Planet to review contracts and for litigation, rather than for the
9 purpose of reviewing OnlineSupplier's sign-up pages. (*Id.* at 49:1-25, 50:20-25, 53:9-
10 16.) Mr. Gugliuzza delegated some responsibilities to Mr. Huff, but Mr. Huff reported to
11 Mr. Gugliuzza, who had authority to overrule him on legal matters. (Gravitz, 2/1/12,
12 35:1-8; Gravitz, 2/2/12, 120:14-19; Huff, 2/15/12, 54:1-8.) Mr. Gravitz continued to
13 seek legal advice from Mr. Gugliuzza, and both Mr. Huff and Mr. Gugliuzza gave their
14 input to Mr. Gravitz on the marketing materials for OnlineSupplier. (Gravitz, 2/1/12,
15 52:4-6; Gravitz, 2/2/12, 122:12-25; Exh. 2017.) Mr. Huff reviewed the sign-up pages
16 for OnlineSupplier, (Exhs. 213, 214), but there was no procedure in place whereby Mr.
17 Gravitz had to submit entire pages to Mr. Huff for approval before they could be placed
18 live on the internet. (Huff, 2/15/12, 82:7-13.) Thus, although Mr. Gugliuzza at least
19 shared the duties with Mr. Huff in reviewing OnlineSupplier's marketing materials for
20 legal compliance, Mr. Gugliuzza had superseding authority over Mr. Huff.
21
22 Mr. Gugliuzza did not offer evidence showing that he relied on any specific
23 recommendations or approvals from Mr. Huff regarding OnlineSupplier's webpages.
24 The defense makes much of the fact that in early 2007, Mr. Gugliuzza directed Mr. Huff
25 to attend a conference in Washington D.C. on the possibility of new guidelines on
26 acceptable marketing practices for negative options. (*Id.* at 54:2-55:17; Exh. 1193.)
27 While Mr. Huff attended the conference and changes were subsequently implemented to
28 OnlineSupplier's landing and billing pages in February 2007, (Exh. 1198), the evidence

1  does not show that Mr. Huff conducted a meaningful, independent review of the entire

2  OnlineSupplier sign-up process, that he recommended changes that Mr. Gugliuzzo and

3  Mr. Gravitz adopted as reflected in Version 11, or that he approved any specific changes

4  to the sign-up pages. (Huff, 2/15/12, 73:22–86:21; Exh. 1203.)[14]  Instead, Mr. Gugliuzza

5  and Mr. Gravitz requested that Mr. Huff give his oral opinion about certain print-outs of

6  OnlineSupplier's sign-up pages that had already incorporated some changes and included

7  handwritten comments by Mr. Gugliuzza.  (Huff, 2/15/12, 70:8–73:15; Huff, 2/16/12,

8  56:6–13; Exhs. 1197.)  Mr. Huff testified that he informed Mr. Gugliuzza and Mr.

9  Gravitz that the changes were improvements, but expressed ambivalence regarding his

10  qualifications and ability to say whether the pages complied with the FTC Act without

11  reviewing the entire sign-up process, conducting additional research, and getting

12  assistance from outside counsel. (Huff, 2/15/12, 70:8–73:15; Huff, 2/16/12, 56:6–13;

13  Exhs. 1197.)

14

15  Commerce Planet did not conduct a comprehensive review of the landing and

16  billing pages until after the CID was served on the company in March 2008 and in

17  conjunction with outside counsel, Linda Goldstein, who was experienced in the area of

18  FTC Act compliance. (Huff, 2/15/12, 72:8–19, 93:13–95:22.)  Although Commerce

19  Planet utilized outside counsel for certain matters, including the company's use of the

20  eBay logo, contracts with third-party marketers, and securities filings, the company did

21  not specifically hire outside counsel to review OnlineSupplier's sign-up pages for

22  compliance with the FTC Act until after Mr. Gugliuzza stepped down as president and

23  the CID was served on the company. (Hill, 2/7/12, 178:18–21; Hill, 2/7/12, 92:11–

24  93:22, Gravitz, 2/1/12, 198:10–21.)  In sum, the evidence does not show that Mr.

25

26  [14]  At the conference, Mr. Huff learned that there were already guidelines in place and established law
27  regarding companies to disclose clearly and conspicuously material terms of an offer to consumers
   before they complete a transaction. (Huff, 2/15/12, 65:18–24.)  Mr. Huff testified that he started to draft
28  an email with recommended changes to the landing and billing pages, but he never sent the email to Mr.
   Gugliuzza or Mr. Gravitz. (Id.)

---

1  Gugliuzza relied in good faith on the advice of Mr. Conrad or Mr. Huff as to whether the

2  sign-up pages complied with the FTC Act.

3

## IV.  REMEDIES

5

6  The FTC requests both a permanent injunction against Mr. Gugliuzza and

7  monetary equitable relief, including restitution and disgorgement. (FAC ¶¶ 55 & Prayer.)

8  Under section 13(b) of the FTC Act, the FTC "may seek, and after proper proof, the court

9  may issue, a permanent injunction." 15 U.S.C. § 53(b); see also FTC v. Evans Prods.

10  Co., 775 F.2d 1084, 1086 (9th Cir. 1985).  "This provision gives the federal courts broad

11  authority to fashion appropriate remedies for violations of the Act," Pantron I Corp., 33

12  F.3d at 1102, including "any ancillary relief necessary to accomplish complete justice, H.

13  N. Singer, 668 F.2d at 1113.

14

15  ### A.  Permanent Injunction

16

17  A permanent injunction is justified if there exists "some cognizable danger of

18  recurrent violation," United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953), or

19  "some reasonable likelihood of future violations," CFTC v. CoPetro Marketing Group,

20  Inc., 502 F. Supp. 806, 818 (C.D. Cal. 1980), aff'd, 680 F.2d 573 (9th Cir. 1982). The

21  Court examines the totality of the circumstances involved and a variety of factors in

22  determining the likelihood of future misconduct. CoPetro Marketing Group, 502 F.

23  Supp. at 818; SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980). Nonexhaustive factors

24  include the degree of scienter involved, whether the violative act was isolated or

25  recurrent, whether the defendant's current occupation positions him to commit future

26  violations, the degree of harm consumers suffered from the unlawful conduct, and the

27  defendant's recognition of his own culpability and sincerity of his assurances, if any,

28

against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89-3818, 1991 U.S. Dist. LEXIS 20452, at *44-*45 (C.D. Cal. Mar. 28, 1991).

The Court finds that a permanent injunction against Mr. Gugliuzza is appropriate under the circumstances to enjoin him from engaging in similar misleading and deceptive marketing of products and services. Here, Mr. Gugliuzza did not participate in an isolated, discrete incident of deceptive marketing, but engaged in sustained and continuous conduct that perpetuated the deceptive marketing of OnlineSupplier for over two years. Mr. Gugliuzza oversaw the migration from telemarketing to internet marketing of OnlineSupplier and served as a key leader and executive of the company. Mr. Gugliuzza supervised and had authority over Mr. Oraviz and the marketing of OnlineSupplier as well as over the company's in-house counsel. Mr. Gugliuzza reviewed and approved the various iterations of OnlineSupplier's sign-up pages and, at the very least, was recklessly indifferent to the fact that OnlineSupplier's webpages were misleading, given the ample notice of consumer confusion regarding OnlineSupplier's membership terms. Mr. Gugliuzza assessed the financial state of the company and helped turn Commerce Planet into a profitable business, mainly through the internet marketing and sale of OnlineSupplier from 2005 to 2007. Mr. Gugliuzza did not express any recognition of his culpability, but has firmly stood behind the sign-up pages and has obdurately insisted that at no time did he ever believe consumers were misled by OnlineSupplier's billing and landing pages. (Gugliuzza, 2/21/12, 182:16-21; 2/22/12, 152:3-8.) Instead, Mr. Gugliuzza placed blame on third-party marketers and the advice of in-house counsel—defenses that the Court has found thin in evidentiary support. All these factors weigh in favor of imposing a permanent injunction against Mr. Gugliuzza.

In his Answer to the FAC, Mr. Gugliuzza asserted mootness as an affirmative defense. He alleged that "because the challenged conditions no longer exist, or have never existed . . . there is no likelihood of recurrence." (Answer to FAC, at 9.) It is

-57-

uncontested that Mr. Gugliuzza is no longer involved in marketing OnlineSupplier at Commerce Planet since his departure from the company in 2007. However, as a general rule, mere voluntary cessation of the violative conduct does not render the case moot. *W. T. Grant Co.*, 345 U.S. at 632. If it did, the courts would be compelled to leave the defendant free to return to his old ways. *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968); *Affordable Media*, 179 F.3d at 1238 ("The reason that the defendant's conduct, in choosing to voluntarily cease some wrongdoing, is unlikely to moot the need for injunctive relief is that the defendant could simply begin the wrongful activity again.") Nevertheless, a case may be moot if "the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." *W. T. Grant Co.*, 345 U.S. at 633 (citation and quotes omitted); *accord TRW, Inc. v. FTC*, 647 F.2d 942, 953 (9th Cir. 1981). The burden of demonstrating mootness is "a heavy one." *W. T. Grant Co.*, 345 U.S. at 633. "[I]t must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *TRW, Inc.*, 647 F.2d at 953 (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203).

Mr. Gugliuzza has not shown that it is "absolutely clear" that he will not repeat his wrongful activities. Since leaving Commerce Planet, Mr. Gugliuzza has founded Grow Commerce, a website servicer for businesses, and has worked for Oaddsy, a sunglass company, as an e-Commerce strategy manager. Mr. Gugliuzza also testified that after the completion of trial he planned to work for "Trust Commerce," a merchant processor. (Gugliuzza, 2/21/12, 130:11-131:14.) Mr. Gugliuzza pointed out that none of his post-Commerce Planet activities have involved direct consumer marketing of a continuity program. Before joining Commerce Planet, Mr. Gugliuzza also never marketed a continuity program or was held liable for violations of the FTC Act. Mr. Gugliuzza further testified that after five years of his last contact with Commerce Planet, he "wouldn't touch a negative option with a ten-foot pole." (Gugliuzza, 2/23/12 Vol. II, 39:2-11.) While Mr. Gugliuzza has not specifically engaged in the internet marketing of

-58-

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

336

392 F.3d 12, 31 (1st Cir. 2004). The purpose of disgorgement is not to redress consumer injuries but to deprive wrongdoers of ill-gotten gains. *Febre*, 128 F.3d at 537.[15]

Irrespective of the measure used to calculate monetary equitable relief, courts apply a burden-shifting framework to determine the specific amount to award. *Direct Marketing Concepts*, 624 F.3d at 15. First, the FTC bears the initial burden of providing the district court with a reasonable approximation of the monetary relief to award. *Id.*; *Febre*, 128 F.3d at 535. A reasonable estimate, rather than an exact amount, is proper because that may be the only information available, as when defendants do not maintain data necessary to calculate the precise amount. *FTC v. QT, Inc.*, 512 F.3d 858, 864 (7th Cir. 2008) ("A court is entitled to proceed with the best available information . . . ."); *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) ("Of course, the reasonableness of an approximation varies with the degree of precision possible."), *cert. denied*, 549 U.S. 1278 (2007). Second, once the FTC satisfies this burden, "the defendant has an opportunity to demonstrate that the figures are inaccurate." *Direct Marketing Concepts*, 624 F.3d at 15; *see also QT*, 512 F.3d at 864. "Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy." *Direct Marketing Concepts*, 624 F.3d at 15; *Febre*, 128 F.3d at 535 ("[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." (citation and quotes omitted)).[16]

[13] The Court notes that there appears to be some inconsistency in the use of the term restitution and disgorgement, which, at times, have been used interchangeably and/or with improper terms. *See, e.g., Figgie Int'l*, 994 F.2d at 106 ("While ordinarily the proper measure of 'restitution' is the amount of enrichment received, if the loss suffered by the victim is greater than the unjust benefit received by the defendant, the proper measure of restitution may be to restore the status quo." (citation and quotes omitted)); *Direct Marketing Concepts*, 648 F. Supp. 2d at 218 (applying the term disgorgement to mean monetary relief as measured by consumer loss). To avoid confusion, the Court uses the term "consumer redress" to mean restitution.

[14] In his opening brief, Mr. Gugliuzza argued that monetary equitable relief contains a tracing element and that the evidence does not show OnlineSupplier's revenue is traceable to Mr. Gugliuzza. (Def.'s Trial Brief, at 18.) Mr. Gugliuzza proffered the same argument in his motions for partial summary judgment, which the Court rejected. (See Ct. Order, Dkt. No. 164, Sept. 8, 2011.)

### 2. Calculation of Consumer Loss

In the FAC, the FTC alleged that between July 2005 and March 2008, Commerce Planet obtained over $45 million from over 500,000 consumers. (FAC ¶ 27.) In its Closing Brief, the FTC requests a maximum amount of $36.4 million in consumer loss after adjustments or, at a minimum, $18.2 million. (Pl.'s Closing Brief, at 52.) The FTC relies on calculations performed by Dr. Daniel Becker, an expert in the field of Econometrics, who has worked for the FTC in the areas of enforcement, policy issues, and consumer protection. (Becker, 2/15/12, 7:24–12, 8:13–8, 8:19–9:11.) The FTC requested that Dr. Becker calculate the net consumer injury for consumers who enrolled in OnlineSupplier's membership program between July 2005 and March 2008. (*Id.* at 10:2–6.) The FTC also requested that Dr. Becker apply two assumptions: (i) no consumer would have joined OnlineSupplier if the nature of the membership had been fully disclosed to them, and (ii) consumers derived no benefit from their OnlineSupplier memberships. (*Id.* at 10:17–24.) Dr. Becker used Commerce Planet's RT3 database containing customer records and transactions involving OnlineSupplier. (*Id.* at 10:13–16.) Using the information from the RT3 database, Dr. Becker employed two steps to calculate the amount of consumer injury. (*Id.* at 18:3–20:10.) First, he calculated the population of injured consumers who purchased OnlineSupplier and created a subset of data that only contained consumers who signed up for the program with an order date between July 1, 2005 to March 31, 2008. Second, he calculated the net payments from the population of consumers who purchased OnlineSupplier during the relevant time period by adding up all the payments. Dr. Becker then subtracted off the refunds and chargeback amounts from the payments. (*Id.* at 18:21–24.)[17] Dr. Becker finally

[17] The total payments per month were based on the enrollment month rather than the payment month, *i.e.*, the monthly payment calculation incorporated all the payments in the month during which the consumers signed up for OnlineSupplier, irrespective of whether the payment was made in a subsequent month.

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

338

calculated the consumer injury for the period corresponding to Mr. Gugliuzza's tenure as consultant (July 2005 to August 2006) and his tenure as president (September 2006 to October 2007) as follows:

| Time Period | Consumer Injury |
|---|---|
| Consultant (July 1, 2005 to August 31, 2006) | $19.1 million |
| President (September 1, 2006 to October 31, 2007) | $19.6 million |
| Total Consumer Injury | $38.7 million |

(*Id.* at 20:11–21:4; *see also* Pl.'s Closing Brief, at 50–51.)

In its Closing Brief, the FTC provided an adjusted estimate. Mr. Gugliuzza's accounting expert, Dr. Stefano Vranca, pointed out that Dr. Becker used data from the company's RT3 database rather than from his Quickbooks database,[18] which resulted in the omission of additional chargebacks and refunds. (Vranca, 2/28/12, 95:2–20.) The FTC agreed that Dr. Becker failed to account for a number of refunds and chargebacks that were processed after March 2008 because the RT3 database was cut off at that date. According to Dr. Vranca, the refunds and chargebacks to OnlineSupplier during the relevant time period totaled approximately $7.85 million compared to Dr. Becker's figure of approximately $6 million, a difference of $1.85 million. (Pl.'s Closing Brief, at 51 (citing Vranca, 2/28/12, 95:2–20, 116:6–19).) The FTC further acknowledged that Dr. Becker erroneously included in his refund amount the total payments for shipping and handling. (Pl.'s Closing Brief, at 51–52 (citing Vranca, 2/28/12, 94:16–20).) The FTC

---

[18] The Quickbooks database was Commerce Planet's account system and system of records. All relevant financial information of the company was contained in Quickbook files. (Vranca, 2/16/12, 1437–13, 1664–10; Revelis, 2/10/12, 22:22–23:11.) The company's financial data was transferred to the FTC on hard drives in a Microsoft Access RT3 format. (Exh. 31.)

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

339

---

deducted a total of $2.35 million from the original estimate, applied proportionally across the time periods, and provided the following revised figures:

| Time Period | Original Calculation of Consumer Injury | Adjusted Calculation of Consumer Injury |
|---|---|---|
| Consultant (July 1, 2005 to August 31, 2006) | $19.1 million | $18 million |
| President (September 1, 2006 to October 31, 2007) | $19.6 million | $18.4 million |
| Total Consumer Injury | $38.7 million | $36.4 million |

(Pl.'s Closing Brief, at 52.)

Mr. Gugliuzza challenged the accuracy of Dr. Becker's estimate through the rebuttal testimony of Dr. Vranca. Dr. Vranca testified that the two assumptions applied by Dr. Becker—that no consumer would have joined OnlineSupplier if she had known about the terms of membership and consumers derived no benefit from the program—were unsupported. Dr. Vranca testified that a certain percentage of consumers cancelled within the free trial period or maintained their membership in excess of three or six months, suggesting that some consumers knew about the terms of membership and yet purchased the program. (Vranca, 2/28/12, 74:3–76:5, 80:5–13, 84:3–22; Exhs. 2062–63.) Dr. Vranca also testified that consumers derived some value from the product, as evidenced by the company's expenditure in staffing the customer service center. (*Id.* at 120:10–121:15.)

Dr. Vranca's critique is flawed in several respects. The Court agrees with the FTC that, as a matter of law, the FTC need not show that all consumers were deceived, relied upon the misrepresentations, or that consumers did not derive any utility from the product. Under section 13(b) of the FTC Act, proof of injury by every individual consumer is not required to justify a restitutionary award. *Stefanchik*, 559 F.3d at 929

n.12 (citation omitted); *Figgie Int'l*, 994 F.2d at 605 ("It is well established with regard to Section 13 of the FTC Act . . . that proof of individual reliance by each purchasing customer is not needed."). This is because, unlike a private suit for fraud, "[s]ection 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers," and "[r]equiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *Figgie Int'l, Inc.*, 994 F.2d at 605 (citation omitted). Rather, "[a] presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Id.*; *see also FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010) ("[I]t is sufficient for the FTC to prove that misrepresentations were widely disseminated (or impacted an overwhelming number of consumers) and caused actual consumer injury."), *aff'd*, No. 11-15330, slip op. (9th Cir. Mar. 30, 2012). Nor does the FTC need to prove that OnlineSupplier's webpages were essentially worthless to obtain restitution. *Figgie Int'l*, 994 F.2d at 606. This is because the injury occurs from the seller's misrepresentations that "tainted the customers' purchasing decisions"—it is "[t]he fraud in the selling, not the value of the thing sold" that entitles consumers to the refund. *Id.*

Here, the FTC has proven that the representations of OnlineSupplier on its webpages as a free auction kit were materially misleading; the representations were widely disseminated on the internet; and numerous consumers ordered OnlineSupplier. Once the FTC has met this burden, it must then "show that its calculations reasonably approximated the amount of customers' net loss," and then the burden shifts to the defendant to show those figures are inaccurate. *Febre*, 128 F.3d at 535. Mr. Gugliuzza attempted to challenge Dr. Becker's figures by referencing Dr. Vranca's user data. However, Mr. Gugliuzza does not challenge the validity of the actual data used by Dr. Becker in the RT3 database. Dr. Vranca himself relied on the data in the RT3 database

1. for many of his own calculations. (Vranca, 2/28/12, 74:3–10, 106:21–107:3.) Nor did
2. Dr. Vranca take issue with the accurateness of Dr. Becker's mathematical calculations.
3. (Vranca, 2/28/12, 110:18–113:13.) Moreover, Dr. Vranca's citation of user data does not
4. necessarily track consumers who know of OnlineSupplier's continuity program at the
5. time they placed their order, as they may have simply not noticed the charges to their
6. credit card for several months or discovered the terms of membership through a post-
7. transaction communication. (Vranca, 2/28/12, 108:12–23; *see also supra* Part III.A.3.)
8. The FTC has shown through overwhelming evidence that thousands of consumers were
9. misled by OnlineSupplier's webpages and suffered actual injury.
10. 
11. Nevertheless, although the FTC need not show that all consumers were misled, not
12. all consumers were in fact deceived by OnlineSupplier's webpages. As discussed above
13. in detail, the Court found that a reasonable consumer would likely be deceived by
14. OnlineSupplier's webpages. Jennifer King testified that "most" consumers would not
15. have known they were purchasing a negative option or signing up for a continuity
16. program. (King, 2/3/12, 114:9–21.) José Quarciola testified that at least 70% of calls to
17. the customer call center—about 1,000 calls per week—comprised free-kit-only
18. complaints. (Quarciola, 2/21/12, 8:11–9:6, 31:20–32:13.) The FTC acknowledged that
19. the Court may adjust their estimate of consumer injury using these approximations.
20. Assuming that the lower bound of "most" is 50%, the FTC argued that the Court could
21. reasonably find that the actual consumer injury was not less than 50% or $36.4 million or
22. $18.2 million. (Pl.'s Closing Brief, at 54–55.) The FTC's second adjusted amount is
23. summarized as follows:
24. 
25. ///
26. ///
27. 
28. 

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

| Time Period | Adjusted Calculation of Consumer Injury | 50% of Adjusted Calculation of Consumer Injury |
|---|---|---|
| Consultant (July 1, 2005 to August 31, 2006) | $18 million | $9 million |
| President (September 1, 2006 to October 31, 2007) | $18.4 million | $9.2 million |
| Total Consumer Injury | $36.4 million | $18.2 million |

The Court finds that the FTC's second adjusted amount of $18.2 million to be appropriate and reasonable. The Court takes into account the inherent difficulty of tracking and retaining consumer data regarding consumers' experience that thwarts a precise calculation of consumer injury. The Court also considers the limitation of the financial data and records maintained by Commerce Planet as to the user experience with OnlineSupplier's website and services. (*See* Brooks, 2/9/12, 117:14-18; Seidel, 2/14/12, 101:18-102:20.) The evidence strongly supports the conclusion that most reasonable consumers would have been misled by OnlineSupplier's landing and billing pages. A conservative floor then is that at least 50% of consumers who ordered OnlineSupplier were misled by the sign-up pages, which results in a reduction of the FTC's original adjusted estimate by half. Accordingly, the Court finds $18.2 million to be a reasonably conservative estimate of consumer injury.

In response, Mr. Gugliuzza countered that the Court should not award any restitution because the consumer injury essentially amounts to zero. (Def.'s Closing Brief, at 58.) Mr. Gugliuzza relies on Dr. Vranca's expert opinion that he believed the consumer injury to be *de minimis* or zero, as estimated by applying three assumptions that defense counsel requested he adopt during his testimony: (i) if people were confused by the terms, they were primarily in the group that cancelled after getting billed once or twice within 60 days of signing up, (ii) there were some people in the zero to 60 day

BRANNON-QUALE ATTACHMENT 19
TRO Exhibit 13

341

group who were not confused, but understood the terms and cancelled within the 60 days after being charged once or twice, and (iii) people who felt they were confused were the most likely to obtain refunds and chargebacks. (Vranca, 2/28/12, 100:16-102:23.) Based on these assumptions, and figuring in the total amount of chargebacks and refunds, Dr. Vranca opined that the amount of consumer loss would be almost nonexistent. (*Id.*) The Court finds this estimate implausible. As a preliminary matter, Dr. Vranca's assumptions are entirely unfounded and speculative. The evidence clearly establishes that there were confused consumers, such as Ms. Cirillo, who unwittingly purchased OnlineSupplier and were charged for the program for at least several months, but did not receive a full refund. Moreover, Dr. Vranca's testimony is not competent evidence of consumer injury, as he was not retained to give such an estimate and there was no expert disclosure for such testimony. The only estimate of consumer injury the Court may properly consider, as Dr. Vranca acknowledged, is that of Dr. Becker. (*Id.* at 105:1-23, 106:13-15.) Mr. Gugliuzza's estimate of zero injury is not reasonable or credible. Accordingly, Mr. Gugliuzza is liable for restitution in the amount of $18.2 million.

///
///

## V. CONCLUSION

For the foregoing reasons, the Court finds in favor of the FTC and against Mr. Gugliuzza on both counts for deceptive and unfair practices under section 5(a) of the FTC Act. The Court finds Mr. Gugliuzza individually liable for the deceptive and unfair marketing of OnlineSupplier in violation of section 5(a). The Court finds that a permanent injunction against Mr. Gugliuzza is warranted. The Court further awards the FTC restitution for consumer redress in the amount of $18.2 million. The FTC is directed to file a proposed permanent injunction and a proposed judgment consistent with the Court's decision within ten (10) days of this memorandum.

DATED:   June 22, 2012

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

-69-