UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW J. LOEWEN, 0803065 B.C. Ltd., 0881046 B.C. Ltd., ReadyPay Services, Inc., and Xavier Processing Services, LLC,<br><br>Defendants. | CASE NO. C12-1207 MJP<br><br>ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 56), to which the pro se Defendants have not responded. Having reviewed the motion and its exhibits, including those volumes previously entered in support of Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 40-1–40-5), Defendants' Declarations in support of their Response to the Motion for a Temporary Restraining Order (Dkt. Nos. 28–30), and all related filings, the Court GRANTS Plaintiff's motion and hereby ORDERS that summary judgment is entered in favor of Plaintiff.

**Background**

Plaintiff Federal Trade Commission (FTC) brings this action against Defendants Matthew J. Loewen and his companies 0803065 B.C. Ltd., 0881046 B.C. Ltd., ReadyPay Services, Inc., and Xavier Processing Services, LLC, alleging violations of Section 5 of the FTC Act, 15 U.S.C § 45, and the Telemarketing Sales Rule, 16 C.F.R. Pt. 310. According to the FTC, Loewen used these companies to operate a telemarketing scheme that defrauded the sellers of vehicles on Craigslist.org and similar websites in three principal ways, each of which allegedly gives rise to liability under both the FTC Act and the Telemarketing Sales Rule. (Pl's Mot. Summ. Judg. at 14–17, Dkt. No. 57 at 21–24.) The FTC alleges first, that Loewen's telemarketers (doing business as such entities as Auto Marketing Group and Vehicle Stars) contacted the Craigslist sellers and fraudulently offered to match them with specific buyers; second, that the telemarketers falsely represented that a sale would be accomplished within a short period of time; and third, that they sold refund guarantees for an additional fee, but that due to undisclosed conditions, those refunds were nearly impossible to redeem. (Id.) With regard to each defendant, the FTC alleges that Defendants ReadyPay Services, Inc., and Xavier Processing Services, LLC, provided substantial assistance to Loewen's telemarketers in violation of the Telemarketing Sales Rule; the Loewn is personally liable; and that all Defendants operated as a common enterprise.

The FTC previously brought two motions for temporary restraining orders (Dkt. Nos. 3, 8), which this Court denied because at the time there was insufficient evidence in the record to demonstrate that Loewen's activities continued past the purported sale of his telemarketing business in November 2011. (Dkt. No. 7; Dkt. No. 39 at 4–5, 6.) The FTC also brought a motion for sanctions against Defendants based on their failure to participate fully in discovery (Dkt. No.

53), which this Court granted. (Dkt. No. 55.) The FTC now moves for summary judgment or, in the alternative, to strike Defendant's answer and enter defaults against each Defendant for failure to comply with this Court's sanctions order. (Dkt. No. 56; Dkt. No. 57.) Loewen is now proceeding pro se, and has not responded to Plaintiff's motion for summary judgment.

**Facts**

I.   The Telemarketing Scheme

In part because Defendants declined to fully participate in discovery (see Pl's Second Mot. for Sanctions, Dkt. No. 57 at 2, 3 n.1), the FTC relies on the declarations of individuals who were contacted by Loewen's telemarketing entities to establish the outline of the pitch. (See Pl's Vol. I, Ex. 1–11, Dkt. No. 40-2 at 3–140.) In the initial pitch, Loewen's telemarketers contacted people who were attempting to sell used vehicles on Craiglist.org or similar websites. (Dkt. No. 40-2 at 3; id. at 28; id. at 33; id. at at 55; id. at 64; id. at 72; id. at 82; id. at 93; id. at 103; id. at 123; id. at 135.) After informing the seller that the caller represented one of Loewen's various D/B/As (see Dkt. No. 40-2 at 3; id. at 28; id. at 33; id. at 33; id. at 55; id. at 64; id. at 72; id. at 82; id. at 93; id. at 103; id. at 123; id. at 135), the caller in most cases explained that one or two buyers had been located for the exact vehicle the seller had put up for sale, and that in exchange for a fee of around $399, the caller would put the buyer or buyers in touch with the seller. (Dkt. No. 40-2 at 3; id. at 28; id. at 55–57; id. at 64; id. at 72; id. at 93; id. at 103; id. at 123; id. at 135; see also id. at 33–34 [caller represented that there were several buyers in the area looking for that sort of vehicle and that he was confident Vehicle Stars could sell it]; id. at 82 [caller represented that there was great demand for that type of vehicle in the area and that she was sure it would sell quickly].) The caller frequently stated that the company provided financing for buyers with poor credit histories—a fact that, if true, would have explained the

ORDER ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT- 3

53), which this Court granted. (Dkt. No. 55.) The FTC now moves for summary judgment or, in the alternative, to strike Defendant's answer and enter defaults against each Defendant for failure to comply with this Court's sanctions order. (Dkt. No. 56; Dkt. No. 57.) Loewen is now proceeding pro se, and has not responded to Plaintiff's motion for summary judgment.

**Facts**

I.   The Telemarketing Scheme

In part because Defendants declined to fully participate in discovery (see Pl's Second Mot. for Sanctions, Dkt. No. 57 at 2, 3 n.1), the FTC relies on the declarations of individuals who were contacted by Loewen's telemarketing entities to establish the outline of the pitch. (See Pl's Vol. I, Ex. 1–11, Dkt. No. 40-2 at 3–140.) In the initial pitch, Loewen's telemarketers contacted people who were attempting to sell used vehicles on Craiglist.org or similar websites. (Dkt. No. 40-2 at 3; id. at 28; id. at 33; id. at at 55; id. at 64; id. at 72; id. at 82; id. at 93; id. at 103; id. at 123; id. at 135.) After informing the seller that the caller represented one of Loewen's various D/B/As (see Dkt. No. 40-2 at 3; id. at 28; id. at 33; id. at 33; id. at 55; id. at 64; id. at 72; id. at 82; id. at 93; id. at 103; id. at 123; id. at 135), the caller in most cases explained that one or two buyers had been located for the exact vehicle the seller had put up for sale, and that in exchange for a fee of around $399, the caller would put the buyer or buyers in touch with the seller. (Dkt. No. 40-2 at 3; id. at 28; id. at 55–57; id. at 64; id. at 72; id. at 93; id. at 103; id. at 123; id. at 135; see also id. at 33–34 [caller represented that there were several buyers in the area looking for that sort of vehicle and that he was confident Vehicle Stars could sell it]; id. at 82 [caller represented that there was great demand for that type of vehicle in the area and that she was sure it would sell quickly].) The caller frequently stated that the company provided financing for buyers with poor credit histories—a fact that, if true, would have explained the

1  company's access to purchasers who were not in a position to respond directly to the seller's
2  online ad. (See Dkt. No. 40-2 at 3; id. at 28; id. at 33–34; id. at 72; id. at 82; id. at 93.)
3  Representing the transaction as nearly risk-free, the telemarketer told the seller that the $399 fee
4  would become a refundable deposit with the purchase of additional insurance for $99. (Dkt. No.
5  40-2 at 29; id. at 33–34; id. at 56; id. at 64–65; id. at 72; id. at 83; id. at 93–94; id. at 103–04; id.
6  at 123; id. at 135; see also id. at 3-4 [base price characterized as refundable deposit and only at
7  the verification stage did the caller mention the $99 insurance].)

8       According to representations that Loewen's companies made to credit card companies
9  and regulators prior to this lawsuit and that Loewen submitted to this Court in the case's early
10 stages, a formal proposal email was sent to prospective clients at the time of the initial pitch and
11 before their credit card was charged. (See Dkt. No. 40-2 at 17–18; Declaration of Walter Kean,
12 Dkt. No. 30-1 at 8–9; id. at 21; id. at 23–25.) However, the record does not show that clients
13 regularly received such emails prior to credit card confirmation or that the emails listed any of
14 the otherwise undisclosed eligibility requirements that were attached to the guarantee. (Compare,
15 e.g., Dkt. No. 40-2 at 17–18 [purported proposal email provided by Auto Marketing Group to
16 credit card company after the charge was disputed, listing two requirements for post-
17 confirmation registration by the seller but no other refund eligibility requirements] with id. at 38
18 [different email received by declarant prior to credit card confirmation, giving no indication of
19 either registration requirements or refund eligibility requirements]; and id. at 5 [no email
20 received prior to credit card confirmation].)

21      Those who accepted Loewen's deal soon discovered that neither buyers for their vehicles
22 nor refunds from the telemarketer were forthcoming. (See Dkt. No. 56 at 11–13.) The record
23 lacks any evidence that Loewen's companies engaged in providing financing for credit-
24

challenged buyers of vehicles, as the telemarketers had suggested. Indeed, Loewen's manager previously represented to this Court that the verification script used by the telemarketers included a standard admission that there was <u>no</u> buyer for the vehicle and that the seller was instead entering into a contract to place advertisements for the vehicle online (Dkt. No. 30 at 9)—a revealing if not particularly persuasive assertion, since all the sellers had already demonstrated their ability to place online ads on their own.

After charging the sellers' credit cards, Loewen's companies sent follow-up emails listing additional steps for "registering to be eligible for the money back guarantee," such as uploading digital photographs of the vehicle, that had not been previously disclosed. (<u>See</u> Dkt. No. 40-2 at 5; <u>id.</u> at 9; <u>id.</u> at 24–25; <u>id.</u> at 35; <u>id.</u> at 40; <u>id.</u> at 65; <u>id.</u> at 68; <u>id.</u> at 83–84; <u>id.</u> at 87; <u>id.</u> at 94; <u>id.</u> at 98; <u>id.</u> at 110.) The list of hurdles for securing a refund after the vehicle inevitably failed to sell through the company was even longer, and included such onerous and previously undisclosed requirements as having proof of continued ownership of the vehicle notarized and submitted via certified mail within the 7-day period following the end of the 90-day refund period. (Dkt. 30-1 at 14; <u>but see also</u> Dkt. No. 40-2 at 72 [declarant stating that the telemarketer had specified that refund request had to be notarized].) Unsurprisingly, few sellers were able to clear the hurdles, and even those who diligently fulfilled the requirements were frequently denied refunds by Loewen's companies. (Dkt. No. 40-2 at 6–7; <u>id.</u> at 31–32; <u>id.</u> at 35–36; <u>id.</u> at 73–75; <u>id.</u> at 79; <u>id.</u> at 105–06; <u>id.</u> at 137–38; <u>id.</u> at 125; <u>see also</u> <u>id.</u> at 58–59 [seller obtained chargeback from credit card company]; <u>id.</u> at 96 [same]; <u>id.</u> at 66–67 [seller obtained partial refund after intercession by the Better Business Bureau]; <u>id.</u> at 84–86 [seller obtained refund only after placing hundreds of calls to the company].) The only service Loewen's companies may have performed on occasion for their clients was to post advertisements for vehicles on the company

website (see, e.g, Dkt. No 40-2 at 30)—the same service that the clients had performed for themselves on other websites prior to engaging Loewen.

Loewen's companies generated a high number of "chargebacks" from credit card companies, indicating that many of his clients were so dissatisfied with the services provided that they successfully disputed the charges with their credit card company rather than or in addition to seeking a refund. (See Pl's Vol. II, Ex. 13, Attach. 12, Dkt. No. 40-4 at 35–46 [MasterCard records indicating chargeback rates for Auto Marketing Group that increased until the account was eventually terminated for violating the excessive chargeback program].) After one of Loewen's merchant accounts, Defendant ReadyPay Services, was terminated and he himself was placed on MATCH, an industry blacklist (Loewen Dep., Dkt. No. 56-2 at 181–82; Dkt. 40-4 at 47), Loewen engaged his friend Erica Siegred to open a merchant account in her own name and process payments for the telemarketing operation in exchange for two percent of the gross receipts. (Siegred Dep., Pl's Vol. IV, Ex. Dkt. No. 56-2 at 12 [email from Siegred to Loewen indicating the terms of the arrangement and expressing trepidation about being "black listed"].) Siegred received the chargeback notifications from the credit card payment processor, but immediately forwarded them to Loewen. (Siegred Dep., Pl's Vol. IV, Ex. 16, Dkt. No. 56-1 at 9, 15.) From Siegred's perspective, Loewen remained in charge of in the same telemarketing operation beyond November 2011, when Loewen claims the operation was sold to another entity, even as it transitioned to a new D/B/A. (Dkt. No. 56-1 at 34, 96.)

II. Roles of the Defendants

Loewen's telemarketing experience began in 2006 when his Nevada corporation, Defendant ReadyPay Services, Inc. (see Dkt. No. 56-2 at 28:14–25), started to provide credit card payment processing for a preexisting telemarketing business operated by Warren Kean.

(Dkt. No. 56-2 at 23:19–25:7.) In 2007 Loewen opened a merchant account for Kean at payment processor Orion Payment Systems in the name of ReadyPay, using a D/B/A ("Boy [sic] Great Auto") very similar to the D/B/A then used by Kean ("Buy Great Autos"). (Pl's Vol. II, Ex. 13, Attach. 11, Dkt. 40-4 at 24–25; Dkt. No. 56-2 at 96:4–13, 115–16; Pl's Vol. III, Ex. 14, Dkt. No. 40-5 at 4–5.) As Loewen conceded at his deposition, opening a merchant account in a name other than that of the actual merchant is not typical in the credit card processing industry; the practice is resorted to when the merchant is unable to open an account in its own name. (Dkt. No. 56-2 at 88:3–6; 90:16–21.)

During the period Loewen was providing payment processing to Kean, he further assisted the operation by regularly changing the D/B/As for the ReadyPay merchant account. (Dkt. No. 40-5 at 30.) This rotation of names helped to ensure that clients would not encounter "bad publicity on the Internet" for the D/B/A currently in operation. (Dkt. No. 56-2 at 143:14–144:13.) In February 2010, Loewen obtained a personal stake in the telemarketing operation and became a co-owner along with Kean. (Dkt. No. 28 at 4–5; Dkt. No. 30 at 3; Dkt. No. 56-2 at 149; Dkt. No. 56-3 at 37.) By November 2010, Loewen was referring to himself as the CEO of Auto Marketing Group. (Dkt. No. 56-2 at 149; Dkt. No. 56-4 at 2.) He was in charge of processing chargebacks for the various D/B/As. (Dkt. No. 56-1 at 9, 15.) Loewen's participation in the telemarketing operation also extended to knowledge of certain refund procedures (Dkt. No. 56-2 at 12) and the fact that the telemarketers ceased calling California and British Columbia telephone numbers so that employees would not be bothered by local "disgruntled consumer[s]" (id. at 108:12–24; id. at 12).

Furthermore, since this Court's denial of the temporary restraining order, the FTC has submitted additional evidence showing that Loewen's participation in the telemarketing scheme

did not cease in November 2011, when he purportedly sold the operation to Marbls Marketing. (See Dkt. No. 28 at 2.) At Loewen's direction, Erica Siegred opened a merchant account for a new D/B/A at the time of the purported sale. (See Dkt. No. 56-1 at 34, 96.) Well after the purported sale, Loewen was invoicing Marbls Marketing for a monthly "management fee," an "administrative fee," and IT support. (Dkt. No. 56-1 at 52:18–54:4, 109–10.) At her deposition, Siegred stated that she continued working as a payment processor for Loewen personally through the time of the purported sale, that the transition to the new D/B/A was "seamless," and that her duties to Loewen did not change as a result of the transition. (Dkt. No. 56-1 at 47:16–48:19.)

In addition to ReadyPay Services, Inc., the FTC has also named as defendants Xavier Processing Services, LLC; 0803065 B.C. Ltd.; and 0881046 B.C. Ltd.—all entities controlled by Loewen. The companies' responsibilities were thoroughly "intermingle[d]" and even Loewen had difficulty in his deposition recalling which employees formally worked for which companies. (See Dkt. No. 56-2 at 34:12–13; 36:12–25.) Loewen ran the operation out of the same locations (Dkt. No. 56-2 at 69:12–71:8), and the companies shared the same administrative staff. (See Dkt. No. 56-2 at 33:21–25; 59:9–17; 80:13–20.) Generally, however, Xavier Processing Services, LLC, was used to open a Florida post office box that was used in conjunction with one of Loewen's D/B/As (see Dkt. No. 56-2 at 58–62); 0803065 was used to process payments from Canadian customers, receive funds from American customers, and pay salaries for the operation's employees, including its telemarketers (see Dkt. No. 56-2 at 66–67, 75–78; Dkt. No. 56-1 at 40–42, 62–63, 64–65, 107–08, 115–16, 117–25); and 0881046 was used to hold the licenses required for telemarketing in Canada (see Dkt. No. 56-2 at 82–84).

**Discussion**

The Court considers Plaintiff's Motion for Summary Judgment first, in light of the public policy favoring the disposition of cases on their merits. See Dreith v. Nu Image, Inc., 648 F.3d 779, 788 (9th Cir. 2012).

I.   Summary Judgment Standard

A party is entitled to summary judgment of its claims when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, the FTC bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Once the FTC meets its initial burden, "the burden shifts to [Defendants] to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." FTC v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009). Defendants wishing to assert that there is a genuine issue of material fact "must support the assertion by (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute, or that [Plaintiff] cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). If Defendants fail to address the FTC's assertion of facts as required by Rule 56, the Court may "consider the fact undisputed for the purpose of the motion." Fed. R. Civ. P. 56(e). The rule "prohibits the grant of summary judgment 'by default even if there is a complete failure to respond to the motion.'" Heinemann v. Satterberg, No. 12–35404, 2013 WL 5312568, at *3 (9th Cir. Sept. 24, 2013) (quoting Fed. R. Civ. P. Advisory Notes (2010)). And in considering the motion, the Court must view all the evidence in the light most favorable to Defendants. See SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1085 (9th Cir. 2010). Nonetheless, the Court may "grant summary judgment if

the motion and supporting materials—including the undisputed facts—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

II. Liability Under the FTC Act and the Telemarketing Sales Rule

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). In order to establish Defendants' liability under Section 5(a), the FTC must demonstrate "(1) that there was a representation; (2) that the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) that the representation was material." Stefanchik, 559 F.3d at 928 (quoting FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001)). Here, the FTC alleges that three representations in Defendants' telemarketing pitch were both misleading and material:

1) Defendants had found a buyer for the consumer's vehicle, and Defendants would put the consumer in contact with the buyer for a fee, typically $399.00. (Dkt. No. 56 at 21.)

2) Because of the high demand for the consumer's vehicle at the price the consumer was offering, a consumer who used Defendants' service was highly likely to sell her vehicle in a short period of time. (Id.)

3) If the consumer purchased a refund insurance policy for an additional $99, then Defendants would refund the $399 initial fee if Defendants failed to secure a buyer for the vehicle within 90 days. (Id. at 22.)

Since most consumer declarants heard both Statements 1 and 3, and all those that did not hear Statement 1 did hear Statement 3 (see Dkt. No. 40-2 at 33–34; id. at 82), the Court will focus its analysis on those two statements.

Both statements are specific and clearly "material" as the term is used in the FTC Act. FTC v. Cyberspace.com, LLC, 453 F.3d 1196, 1201 (9th Cir. 2006) (defining "material" as "involv[ing] information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product"). Both the promise of a buyer and a money-back guarantee should the buyer fall through are features that would be likely to lure consumers attempting to sell vehicles. Indeed, though the FTC need not prove actual reliance by consumers on the statements, FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605–06 (9th Cir. 1993), the consumer declarations here are full of examples of such reliance.

Both statements are also misleading. With regard to Statement 1, the telemarketers had not, in fact, located buyers for the vehicles, and if any service was provided in exchange for the $399 fee, it was the far less valuable service of advertising the vehicle on the website of the D/B/A in operation at the time. The promise to match buyer with seller was simply false. As for Statement 3, statements can also be misleading under the FTC Act if the overall "net impression" they create is deceptive. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009). Although some exceedingly persistent consumers may have obtained refunds from Loewen's companies (see Dkt. No. 40-2 at 84–86 [refund obtained after hundreds of calls]; Dkt. No. 56-1 at 111 [email to Siegred with subject line "BBB refunds" listing "immediate refunds with the Customer Names"]), the net impression of an easily obtainable refund was decidedly deceptive.

The conclusion that these statements are deceptive is further supported by the high chargeback rates Loewen's companies experienced and the need to resort to multiple D/B/As as a means of evading poor publicity and thwarting credit-card excessive-chargeback policies. See FTC v. Grant Connect, LLC, 827 F. Supp. 2d 1199, 1221 (D. Nev. 2011) (citing "high cancellation, refund, and chargeback rates" as evidence of deceptive practices); FTC v. J.K.

Publications, Inc., 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (citing fictitious business names as a key fact helping to demonstrate defendants' unfair business practices in violation of the FTC Act). The FTC has thus demonstrated that no genuine issue of material fact exists with respect to Defendant's liability under the FTC Act.

Similarly, no genuine issue exists with respect to Defedants' liability under the Telemarketing Sales Rule (TSR). The TSR prohibits telemarketers from, among other acts, "[m]aking a false or misleading statement to induce any person to pay for goods or services." 16 C.F.R. § 310.3(a)(4). Statements 1 and 3 were at minimum misleading, as described above, and were made in order to persuade customers to pay hundreds of dollars to Loewen's companies. Similarly, Defendants' promise to match buyers with sellers violated the provision of the TSR prohibiting material misrepresentations regarding the "nature[ ] or central characteristics" of the service, 16 C.F.R. § 310.3(a)(2)(iii), and Defendants' representations about the refund insurance program violated the provision of the TSR prohibiting material representations regarding the terms of the seller's refund policies. 16 C.F.R. § 310.3(a)(2)(iv).

III. Liability of Each Defendant

The 9th Circuit test for individual liability for injunctive and monetary relief depends in part on a determination of corporate liability. See Stefanchik, 559 F.3d at 931. Here, the lines between the four corporate defendants, which were all controlled solely by Loewen and shared employees and funds, were blurred to the point where they can only be considered a common enterprise. See FTC v. Network Servs. Depot, Inc., 617 F.3d 1127, 1142–43 (9th Cir. 2010) (finding a common enterprise where corporate defendants pooled resources, staff, and funds, were controlled by the same individuals, and participated in the same deceptive acts). Each can therefore be held liable for the deceptive practices of the others.

Individual liability then turns on whether the Loewen "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted," Network Servs. Depot, Inc., 617 F.3d at 1138, and whether he "participated directly in the deceptive acts or had the authority to control them." Stefanchik, 559 F.3d at 931 (emphasis in original). An awareness of a high probability of fraud along with an intentional avoidance of the truth suffices to establish "knowledge." Network Servs. Depot, Inc., 617 F.3d at 1138.

In previous stages of the case, Loewen's primary defense as to "knowledge" was his alleged lack of involvement in the day-to-day operations of the telemarketing business. (See Dkt. No. 28 at 3.) According to Loewen, he was a "passive owner" who "seldom" visited the office where the telemarketers worked. (Id.) Assuming this claim is true, the Court is nevertheless satisfied that Loewen's awareness of a high probability of fraud has been established by uncontroverted evidence that Loewen changed D/B/As to avoid bad publicity (Dkt. No. 40-5 at 30), that Siegred forwarded to Loewen all the chargeback notices for processing (Dkt. No. 56-1 at 9, 15), that Loewen was aware of certain exceptional refund procedures (Dkt. No. 56-2 at 12), and that he was aware that the telemarketers ceased calling California and British Columbia telephone numbers so that employees would not be bothered by local "disgruntled consumer[s]" (id. at 108:12–24; id. at 12), among other facts.

Loewen also had authority to control the deceptive acts. Due to his position as officer in each of the companies, including the company that was responsible for paying telemarketer salaries (Dkt. No. 56-2 at 75–78), Loewen had authority to control his companies' telemarketing

practices even if he did not exercise it. He can thus be held personally liable for both injunctive and monetary relief.

IV. Relief

The FTC seeks both permanent injunctive relief and equitable monetary relief in the amount of consumer losses, as measured by all adjusted net credit card sales (net sales less net chargebacks) by Lowen's and Siegred's merchant accounts for the telemarketing operation from March 2010 through the present. The Court is authorized to grant such relief by 15 U.S.C. § 53(b) ("in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction") and 15 U.S.C. § 57b(b) (monetary relief). There is no genuine issue of material fact as to the amount of consumer losses caused by Defendants' deceptive acts. (See Dkt. No. 56-2 at 150; Dkt. No. 56-3 at 32–34.) A permanent injunction restraining conduct must be tailored to the specific harm alleged, Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991), though the Supreme Court has advised those who violate the FTC Act to expect some degree of fencing in. FTC v. National Lead Co., 352 U.S. 419, 430 (1957). The FTC's requested injunctive relief—a ban on all telemarketing and payment processing—is directed at the activities which gave rise to Defendants' liability, and does not prohibit Defendants from engaging in business ventures other than telemarketing and payment processing. Cf. J.K. Publications, 99 F. Supp. 2d at 1209–10. The relief requested by the FTC is warranted to prevent Defendants from continuing to engage in the heretofore lucrative deception they have been practicing.

**Conclusion**

Plaintiff's motion for summary judgment is GRANTED. The Court grants Plaintiff's requested relief in the form presented by the FTC in its proposed order (Dkt. No. 56-7),

1  including a permanent injunction enjoining Defendants from violating the provisions of the FTC
2  Act and the TSR and from engaging in telemarketing and payment processing, and monetary
3  relief totaling $5,109,366.62. The Court adopts and incorporates the FTC's proposed order as
4  part of this ruling. Because the Court grants summary judgment in favor of Plaintiff, the Court
5  declines to consider Plaintiff's motion in the alternative to strike Defendants' answer and enter
6  default.
7  　　　The clerk is ordered to provide copies of this order to Defendants and all counsel.
8  　　　Dated this 29th day of October, 2013.

　　　　　　　　　　　　　　　　　　　　　　　　　　／s／ Marsha J. Pechman
　　　　　　　　　　　　　　　　　　　　　　　　　　Marsha J. Pechman
　　　　　　　　　　　　　　　　　　　　　　　　　　Chief United States District Judge